## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JPMORGAN CHASE & CO.,<br>JPMORGAN CHASE BANK, N.A. and<br>JPMORGAN CHASE ELECTRONIC<br>FINANCIAL SERVICES, INC., | )<br>)<br>)<br>)<br>) | Civil Action No: 08-189-SLR |
| *Plaintiffs,* | )<br>) | |
| v. | )<br>) | JURY TRIAL DEMANDED |
| AFFILIATED COMPUTER SERVICES, INC. and<br>ACS STATE & LOCAL SOLUTIONS, INC., | )<br>)<br>) | **PUBLIC VERSION** |
| *Defendants.* | )<br>) | |

### THIRD AMENDED AND SUPPLEMENTAL COMPLAINT FOR
### DECLARATORY JUDGMENT AND PATENT INFRINGEMENT

Plaintiffs JPMorgan Chase & Co. ("JPMC"), JPMorgan Chase Bank, N.A. ("JPMCB"),

and JPMorgan Chase Electronic Financial Services, Inc. ("JPMorgan EFS") (collectively,

"JPMorgan" or "Plaintiffs"), for their Third Amended and Supplemental Complaint against

Defendants Affiliated Computer Services, Inc. ("ACSI") and ACS State & Local Solutions, Inc.

("ACS Solutions") (collectively, "ACS" or "Defendants"), state and allege as follows:

### INTRODUCTION

1.      ACS is the dominant provider in the market for outsourced state government

processing of child support payments.  ACS's website boasts that it controls 50% of the $20B

market in child support payments processed in the United States on a  yearly basis.  Intent on

preserving its dominance, ACS Solutions initiated this dispute by issuing a thinly-veiled threat in

the guise of a patent notice letter to JPMC stating that JPMC and its subsidiaries may need a

license to five of ACS Solutions' patents if JPMC is to continue operating in the child support

payment processing market. The timing of the notice letter was not a coincidence. ACS sent the letter after JPMorgan EFS had just won its first comprehensive child support payment processing contract in the U.S.—in direct competition against ACS Solutions for the award of a contract by the State of Kansas. Indeed, during the past seven years ACS Solutions has aggressively brandished its patents against emerging market competitors, such as JPMorgan. For example, ACS Solutions has used its patents to secure injunctions that have driven other competitors out of the market in 2002 and 2004 in *ACS State & Local Solutions, Inc. v. eftchildsupport.com, LLC,* (M.D. Penn.) (CA-01-2060) and *Pay Child Support Online, Inc. v. ACS State & Local Solutions, Inc.,* (D. Minn.) (CA-02-1321). Given this factual background, JPMorgan, a relative newcomer to the child support payment processing market, can only conclude that ACS will escalate this dispute this dispute as JPMorgan continues to compete with ACS in the marketplace.

2.      Following receipt of ACS's patent notice letter, JPMorgan undertook an investigation and determined that it does not use the patented technology at issue and, thus, does not require a license. Moreover, at least some of ACS Solutions' asserted patents are invalid because the applicants failed to comply with the rules governing patentability. Nevertheless, in view of ACS Solutions' well-established pattern of asserting its patents against other market competitors, as well as the continuing competition between JPMorgan and ACS in the child support payment services market, among others, it is apparent that ACS Solutions will vigorously pursue this patent challenge against JPMorgan. As a result, the dispute will not be resolved without the Court's intervention.

3.      JPMorgan desires to expeditiously resolve the dispute. Accordingly, JPMorgan brings this action to seek a declaration of non-infringement and invalidity of ACS Solutions'

U.S. Patent Nos. 5,946,669 ("the '669 Patent," attached as Exhibit A), 6,119,107 ("the '107 Patent," attached as Exhibit B), 7,225,155 ("the '155 Patent," attached as Exhibit C), 6,567,821 ("the '821 Patent," attached as Exhibit D) and 7,072,909 ("the '909 Patent," attached as Exhibit E) (collectively, "the ACS Patents").

4.      Additionally, as set forth more fully herein, JPMorgan seeks a declaration that the '669, '107 and '155 Patents are unenforceable as a result of ACS's inequitable conduct during the reexamination of these patents by, *inter alia*, intentionally, and misleadingly, failing to disclose material prior art to the United States Patent & Trademark Office (PTO) and submitting false affidavits with the purpose and effect of preserving their patent applications.

5.      JPMorgan's investigation did more than conclude that JPMorgan did not need a license; it developed facts showing that ACS was actually infringing JPMorgan's patents. Specifically, JPMorgan determined that ACS's prepaid debit card services (e.g., child support, unemployment benefits, social security, adoption and foster care, and workers compensation services offered in connection with, for example, ACS's state-administered programs), and ACS's lockbox processing services, directly infringe JPMorgan's own patented technology. Indeed, ACS not only flagrantly infringes JPMorgan's patents but also actively induces and contributes to the infringement of these patents by urging third parties to adopt and distribute infringing products and services. Accordingly, JPMorgan seeks to halt ACS's infringement of its rights under the patent laws of the United States.

6.      Accordingly, JPMorgan also brings this suit to enjoin infringement and obtain damages resulting from ACS's unauthorized manufacture, use, offer to sell, and/or sale of products, methods, processes, services and/or systems that infringe one or more claims of JPMorgan's U.S. Patent Nos. 7,174,315 ("the '315 Patent," attached as Exhibit F), 6,615,190

("the '190 Patent," attached as Exhibit G), 7,165,049 ("the '049 Patent," attached as Exhibit H), 7,317,823 ("the '823 Patent," attached as Exhibit I), and 5,917,965 ("the '965 Patent," attached as Exhibit J) (the '315, '190, and '049 Patents are referred to herein as "the JPMorgan Stored Value Patents" and the '823 and '965 Patents are referred to herein as "the JPMorgan Lockbox and Check Imaging Patents") (collectively, "the JPMorgan Patents") directly pursuant to 35 U.S.C. § 271(a) or indirectly pursuant to 35 U.S.C. §§ 271(b)-(c). JPMorgan seeks injunctive relief to prevent ACS from continuing to infringe the JPMorgan Patents. In addition, JPMorgan seeks a recovery of monetary damages resulting from ACS's past infringement of these patents.

## PARTIES

7.     Plaintiff JPMC is organized under the laws of the State of Delaware having a principal place of business at 270 Park Avenue, New York, New York.

8.     Plaintiff JPMCB is a National Association having a principal place of business at 1111 Polaris Parkway, Columbus Ohio and an office at 270 Park Avenue, New York, New York. JPMCB is the lawful assignee of all right, title and interest in and to the '315, '190, '049, '823, and '965 Patents. JPMCB is a wholly-owned subsidiary of JPMC.

9.     Plaintiff JPMorgan EFS is a corporation organized under the laws of the State of New York having a principal place of business at 420 West Van Buren Chicago, Illinois 60606. JPMorgan EFS is a wholly-owned subsidiary of JPMCB. JPMorgan EFS is the entity through which the child support payment processing services of JPMorgan are provided. JPMorgan EFS practices the inventions patented under the JPMorgan Stored Value Patents pursuant to exclusive license from JPMCB. JPMorgan EFS also has rights to enforce the JPMC Stored Value Patents against infringers under the exclusive license granted to it.

10.     Defendant ACSI is a corporation organized under the laws of the State of

4

Delaware having a principal place of business at 2828 North Haskell Dallas, Texas 75204, and offices nationwide.

11.     Defendant ACS Solutions is a corporation organized under the laws of the State of New York, having a principal place of business 1800 M Street, NW, Washington, D.C. 20036, and offices nationwide. ACS Solutions is a wholly-owned subsidiary of ACSI. ACS Solutions is the assignee of record of all right, title and interest in and to the ACS Patents.

12.     Upon information and belief, ACSI and ACS Solutions make, use, sell, offer for sale, and/or import into the United States certain prepaid debit card services (e.g., child support, unemployment benefits, social security, adoption and foster care, workers compensation, and other debit card services, offered in connection with, for example, ACS's state-administered programs). By way of example, but not limitation, these services include those that ACS markets as the "EPPICard™." ACSI and ACS Solutions also make, use, sell, offer for sale, and/or import into the United States certain lockbox processing products, systems, and services nationwide, including without limitation those that ACS markets as part of its "SDU360 Image Payment Processing (IPP) System" solution, as well as other lockbox processing and check image processing services for government and commercial clients.

## JURISDICTION AND VENUE

13.     These claims arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*

14.     This court has subject matter jurisdiction based upon 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202.

15.     This Court has personal jurisdiction over all Defendants at least for the reasons that: (1) ACSI is organized and existing under the laws of the State of Delaware and thus has consented to jurisdiction; and (2) ACS Solutions is qualified to do business in the State of

Delaware. Personal jurisdiction over Defendants also comports with the United States Constitution and Section 3104 of the Delaware Code because: (1) Defendants regularly transact business in this judicial district by, among other things, offering their products and services to customers, business affiliates and government entities located in this judicial district, thereby engaging in "systematic and continuous" contacts with the forum state; and (2) Defendants have committed acts of direct infringement and/or indirect infringement of the JPMorgan Patents and engaged in other specific conduct in this judicial district related to child support and/or unemployment payment processing giving rise to the specific claims in this suit.

16.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400(b) because the Defendants are subject to personal jurisdiction in this district and have committed acts of infringement in this district.

17.     By way of example, and without limitation, on its website, ACS states: "ACS is the national standard-bearer in state disbursement unit (SDU) services - providing remittance processing and disbursement services for half of all child support dollars processed nationally." ("ACS      Government      and      Community      Solutions,"      available      at: http://138.69.165.3/sls/prodserv/cfs.html (last visited Apr. 3, 2008)).

18.     In addition, by way of example, and without limitation, ACS also states on its website that it provides information management solutions to the State of Delaware Administrative Office of the Courts. The award is valued at approximately $12.5 million dollars and includes the "ACS Justice Information System" and related implementation services provided by ACS Solutions. ("ACS Investor Relations," available at: http://phx.corporate-ir.net/phoenix.zhtml?c=99443&p=irol-newsArticle&ID=622522&highlight= (last visited Apr. 3, 2008)).

19.     Upon information and belief, ACS Solutions has sold its products and services to other government entities in the State of Delaware. By way of example, and not limitation, ACS Solutions contracted with the City of Wilmington to provide traffic enforcement services pursuant to Ordinance No. 05-071. ("Substitute No. 1 to Ordinance No. 06-052," available at: www.ci.wilmington.de.us/legislation/ ordinances/2006/2658Rev1.pdf (last visited Apr. 3, 2008)).

20.     Upon information and belief, ACSI and ACS Solutions have also marketed, licensed and/or sold other products and services to customers in the State of Delaware.

## BACKGROUND FACTS COMMON TO DECLARATORY JUDGMENT COUNTS

### The ACS Patents

21.     Broadly speaking, the ACS Patents can be divided into two families. The first family, including the '669, '107, and '155 Patents, is directed to methods and software for collecting and disbursing child support payments. The second family, including the '821 and '909 Patents, is directed to collecting, grouping, and disbursing wage assignment information.

22.     The '669, '107, and '155 Patents are each entitled "Method and apparatus for payment processing using debit-based electronic funds transfer and disbursement processing using addendum-based electronic data interchange," and name John Polk as the sole inventor.

23.     The application that matured into the '669 Patent was filed on September 30, 1997. The '669 Patent issued on August 31, 1999. On October 21, 2003, the U.S. Patent & Trademark Office ("PTO") ordered an *Ex Parte* Reexamination of the '669 Patent to investigate a "substantial new question of patentability." A Reexamination Certificate was issued by the PTO on August 28, 2007. The '669 Patent is generally directed to systems and methods for accumulating child support payments collected by an employer at an "accumulator agency"

through a bank, and processing a disbursement to a state government agency and/or a recipient, wherein the accumulator agency, the bank, and the state agency are separate entities.

24.     The application that matured into the '107 Patent was filed on January 7, 1998 as a division of the '669 Patent. The '107 Patent issued on September 12, 2000. On October 21, 2003, the PTO ordered an *Ex Parte* Reexamination of the '107 Patent to investigate a substantial new question of patentability.   A Reexamination Certificate was issued by the PTO on September 25, 2007.  Like the '669 Patent, the '107 Patent is directed to the accumulation and disbursement of child support payments by an accumulator agency through a bank to a state entity and/or recipient.

25.     The application that matured into the '155 Patent was filed on October 7, 1999 as a continuation of the '107 Patent. The '155 Patent issued on May 29, 2007.

26.     The '821 and '909 Patents are each entitled "Method and apparatus for electronic collection, translation, grouping and delivery of wage assignment information," and name John Polk as the sole inventor.

27.     The application that matured into the '821 Patent was filed on November 30, 1998. The '821 Patent issued on May 20, 2003.

28.     The application that matured into the '909 Patent was filed on May 29, 2002 as a continuation of the '821 Patent. The '909 Patent issued on May 20, 2003.

29.     The '821 and '901 Patents are generally directed to an accumulator and/or software at an accumulator for: (1) receiving and collecting wage assignment information from initiators (*i.e.*, an entity that initiates a wage assignment); (2) translating the information into electronic files with a standard format; (3) grouping standardized wage assignment files into batch files (based on data stored in a data field of each file); and (4) delivering a batch file to

recipients (*i.e.*, employers).

30.     Upon information and belief, at the time the patents were filed John Polk was an employee of ACS's predecessor Lockheed Martin IMS, Corp.. In 2001, Lockheed Martin IMS, Corp. was purchased by ACS. *See* "ACS Completes Lockheed Martin IMS Buy," Dallas Business Journal, Aug. 24, 2001 (available at: http://dallas.bizjournals.com/dallas /stories/2001/08/20/daily50.html) (last viewed on Aug. 19, 2008). ACS is now the assignee of record to all title to and interest in each of the ACS Patents.

### ACS Aggressively Wields the ACS Patents Against Market Competitors

31.     ACS has aggressively wielded the ACS Patents against child support payment processing market competitors for at least the past seven years.

32.     By way of background, in 1988 the Family Support Act amended the Social Security Act to require that all states establish a single statewide child support system. In 1996, additional federal legislation, the Personal Responsibility and Work Opportunity Reconciliation Act (known as "PRWORA"), increased the federal automation requirements by requiring all states to establish a single location for processing all child support collections and disbursements by October 1, 1998. Just a little over a year after Congress passed PRWORA, ACS filed the patent applications that matured into the '669 and '821 Patents with the PTO.

33.     The cumulative effect of the Family Support Act and PRWORA is that Federal law now requires each state to: (1) implement a single statewide child support system, including a single system for processing child support collections, and payments for cases handled by local child support agencies; (2) provide statewide case management capabilities; and (3) streamline the receipt and disbursement of child support collections and reduce the costs associated with it.

34.     As a result of the Federal law mandate to centralize child support in State Disbursement Units (SDUs), state child support enforcement and collection agencies now award contracts to outside vendors for electronic child support collection and processing services. These contracts are frequently valued in the millions of dollars.  For example, in 2002 alone, ACS contracted to operate the State of Ohio's child support collection and disbursement unit for $234 million dollars through fiscal year 2003.  (*See* Welsh, William, "ACS Wins $34 Million Ohio Child Support Contract," http://www.washingtontechnology.com/online/1_1/18898-1.html (last visited Apr. 3, 2008)).

35.     According to the ACS website, in 2005, ACS processed nearly $12.3 billion dollars in child support transactions -- about 50% of the total collected nationwide -- and received more than 85 million payments in 14 states. (*See* "ACS Awarded Child Support Payment Services Contract With State of New Hampshire," http://phx.corporate-ir.net/phoenix.zhtml?c=99443&p=irol-newsArticle&ID=831941&highlight= (last visited Apr. 3, 2008)).

36.     To maintain its market position, ACS Solutions has repeatedly asserted its child support payment processing patents against its competitors.  For example, on October 29, 2001, ACS Solutions filed a complaint in the U.S. District Court for the Middle District of Pennsylvania against eftchildsupport.com, LLC ("eftchildsupport.com") alleging infringement of the '107 Patent.  The case was styled *ACS State & Local Solutions, Inc. v. eftchildsupport.com, LLC,* Civ. Action No. 01-2060 (M.D. Penn.).   ACS Solutions sought a preliminary and permanent injunction against eftchildsupport.com, damages to compensate for alleged the infringement, and pre- and post-judgment interest on damages.  Judgment in that action was entered on March 15, 2002

37.     The stipulated judgment in the *eftchildsupport.com* case included an injunction, and to the best of JPMorgan's knowledge, eftchildsupport.com no longer operates in the child support payment market.

38.     Less than a year later, on July 31, 2002, ACS Solutions countersued Pay Child Support Online, Inc. ("PCS") for infringement of the '669 and '107 Patents in a case styled *Pay Child Support Online, Inc. v. ACS State & Local Solutions, Inc.*, Civil No. 02-1321, in the U.S. District Court for the District of Minnesota.   Additionally, ACS Solutions asserted patent infringement claims against Programming Solutions, Inc. ("PSI") and William C. Hill, III, PSI's president.  Upon information and belief, at the time the case was filed Pay Child Support Online, Inc. was a Minnesota corporation that provided electronic child support payment services. Judgment in that action was entered on July 28, 2004.

39.     The stipulated judgment provided for payment of damages to ACS Solutions and the imposition of an injunction on PCS.   To the best of JPMC's knowledge, PCS no longer operates in the child support payment market.

40.     Upon information and belief, ACS also leverages the ACS Patents by citing them in proposals to states, such as in ACS responses to requests for proposal ("RFP"), as evidence that ACS has exclusive patented rights covering its child support payment processing products and services.  Upon information and belief, including references to the ACS Patents in proposals has in some instances had the effect of discouraging states from awarding contracts to ACS competitors in the child support payment processing market, such as JPMorgan EFS.

11

**ACS Solutions Asserts the ACS Patents Against JPMorgan**

41.     On October 21, 2003, the PTO ordered the reexamination of the '669 and '107

Patents.  These reexaminations concluded on August 28, 2007 and September 25, 2007, when the

PTO issued Reexamination Certificates for the '669 and '107 Patents, respectively.

42.     During that time period, JPMorgan EFS competed against ACS for the award of

JPMorgan's first comprehensive child support services contract.  In November 2006, the Kansas

Department of Social and Rehabilitation Services (SRS) awarded its contract to JPMorgan EFS

over ACS.  JPMorgan EFS signed the agreement with Kansas SRS in December 2006.  Over the

course of the next seven months, JPMorgan EFS implemented its child support payment system

in Kansas, completing the initial set-up in July 2007.

43.     Within five months of JPMorgan's implementation of the Kansas system, and less

than three months after the PTO completed its Reexamination of the '669 and '107 Patents, ACS

Solutions initiated this dispute by issuing a written patent notice letter (attached hereto as Exhibit

K) to the General Counsel of JPMC, Stephen Cutler.

44.     In the letter, dated November 27, 2007, ACS Solutions stated that it had "recently

become aware of payment processing services and products being offered by JPMorgan Chase &

Co. and its subsidiaries including but not limited to JPMorgan Chase Electronic Financial

Services, Inc. ('JPMorgan').  These services include but are not limited to child support payment

processing."  The letter then suggested that JPMorgan should consider "licensing the right to use

one or more of the inventions covered [by the ACS Patents]."  The letter then insisted on a

response from JPMorgan "no later than" November 23, 2007—three weeks later.  JPMorgan

understood that this letter was a threat of potential litigation.

45.     Following receipt of ACS Solutions' letter, JPMorgan immediately undertook an

investigation of ACS Solutions' asserted patents.  On November 19, 2007, JPMorgan responded to ACS Solutions' patent notice letter (attached hereto as Exhibit L), by notifying ACS Solutions that it had undertaken an investigation regarding the ACS Patents.

46.     In response, on November 21, 2007, ACS Solutions' Vice President and Senior Corporate Counsel sent a communication to JPMorgan (attached hereto as Exhibit M).  In its correspondence, ACS Solutions counsel sought the results of JPMC's investigation and suggested that license negotiation regarding the ACS Patents was now appropriate

### JPMorgan Performs Child Support Payment Processing

47.     JPMorgan EFS currently performs child support payment processing services in West Virginia and Kansas.

48.     The Kansas Department of Social and Rehabilitation Services (SRS) contracted with JPMorgan EFS to serve as the statewide child support payment processing services provider.  The expected revenues for the four-year contract was valued in the millions of dollars.  JPMorgan EFS made a significant investment to establish this service, and began processing child support payments for the Kansas Payment Center on July 1, 2007.  The payment center processed millions of dollars and over 180,000 payments during the first month of operation.

49.     The West Virginia Support Payment Center was established as the result of more than six months of intensive effort by the state and JPMorgan EFS.

50.     By way of example, but not limitation, JPMorgan EFS' substantial investment in the development of West Virginia's system permitted non-custodial parents to access a secure web portal to make child support payments processed by JPMorgan EFS.

**A Case or Controversy is Present**

51.     JPMorgan EFS has performed and will perform child support payment processing

services in Kansas, West Virginia, and other states.   JPMorgan EFS will continue to submit

proposals and otherwise market its child support payment processing services on a nationwide

basis.

52.     ACS Solutions has aggressively enforced its patents relating to child support

payment processing against a variety of market competitors over the past seven years. On

information and belief, ACS Solutions' enforcement policy includes listing the ACS Patents in

its proposals to state agencies.

53.     ACS is currently the largest provider of child support payment processing

services to state governments, processing about 50% of all child support payments in the United

States on an annual basis.

54.     ACS and JPMC compete head-to-head in the child support payment processing

market.  In fact, ACS has publicly acknowledged that JPMorgan is a primary market competitor.

According to ACS's Form 10-K filed with the Securities & Exchange Commission on August

28, 2007: "We primarily compete in the government market with Accenture, Convergys, EDS,

IBM, JPMorgan Chase, Maximus, Roper Industries, Northrop Grumman Corporation, Coventry

Health Care, Inc. and Unisys Corp." (emphasis added) (excerpted from ACS 10-K, page 7,

available at http://www.sec.gov/Archives/edgar/data/2135/000095013407019225/d49445e10vk.

htm (last visited Apr. 3, 2008)).

55.     ACS Solutions asserted the ACS Patents in its notice letter to JPMC and by doing

so, ACS Solutions has demonstrated its intent to enforce its patents against JPMC.

56.     ACS Solutions has never disavowed, in its notice letter or elsewhere, an intent to assert JPMorgan infringes one or more of the ACS Patents.  On the contrary, ACS Solutions has demonstrated its propensity for litigating its patents by the two lawsuits prosecuted against competitors that were ultimately subjected to injunctions and forced out of the market.

57.     JPMorgan EFS' child support payment processing services in Kansas and West Virginia do not use the technology claimed in the ACS Patents.  Moreover, one or more of the ACS Patents are invalid.

58.     To avoid legal uncertainty, and to protect its substantial investment (and anticipated future investment) in JPMorgan EFS' child support payment processing systems, JPMorgan seeks a declaratory judgment of non-infringement and invalidity of the '669, '107, '155, '821, and '909 Patents.  In addition, JPMorgan seeks a declaratory judgment that the '669, '107 and '155 Patents are unenforceable due to inequitable conduct by the patent owner.

## BACKGROUND FACTS COMMON TO PATENT INFRINGEMENT COUNTS
### The JPMorgan Stored Value Patents

59.     JPMorgan is a pioneer in creating and developing stored value and sponsor-funded prepaid debit card technology.  JPMorgan's predecessor First USA, N.A. began developing and marketing stored value card (also referred to as "prepaid debit card") technology in the 1998 timeframe.  Applications for patents on stored value cards including sponsor-funded stored value cards issued by governmental sponsors and the like were filed beginning in 1998.  JPMorgan currently holds several patents in this technology space.

60.     The JPMorgan Patents are generally directed to methods and systems for issuing stored value and sponsor-funded cards.  In the past, when a government agency or private organization wanted to distribute funds to citizens or members, the only real options were to

distribute cash, to issue checks, or to make direct deposit electronic transfers. All of these options had significant drawbacks. Distributing cash is unwieldy and has obvious security issues. Issuing and processing checks is costly for the sponsor, has its own security issues, and can be problematic for recipients without bank accounts. Direct deposit avoids some of the transaction costs of check processing, but takes some time to set-up and is not available to those without bank accounts.

61.    The JPMorgan sponsor-funded card technology provided a solution for government and other sponsor-funded distribution of funds that avoided many of the aforementioned drawbacks. Instead of distributing cash, printing checks, or processing direct deposits, the sponsor would provide for special prepaid bank accounts that would hold funds deposited by the sponsor. The funds would be accessible by the recipient using a card similar to a credit card or ATM card that could be activated and used in the usual manner. JPMorgan's sponsor-funded card technology provides a secure, dependable, and economic mechanism for the distribution of funds to recipients that works for those with bank accounts as well as those without bank accounts.

62.    Turning to the JPMorgan Stored Value Patents, the application that matured into the '315 Patent, entitled "Debit purchasing of stored value card for use by and/or deliveries to others," was filed on November 15, 2004 in the name of inventors Gregory Joseph Phillips, Rebecca Deporte, Jeffrey Norwine, and Penny Joines. The PTO duly and legally issued the '315 Patent on February 6, 2007. The '315 Patent is based on an original application filed on June 22, 1998.

63.    The application that matured into the '190 Patent, entitled "Sponsor funded stored value card," was filed on February 9, 2000 in the name of inventor Kim Michele Slater. The PTO duly and legally issued the '190 Patent on September 2, 2003.

64.    The application that matured into the '049 Patent, entitled "Sponsor funded stored value card," was filed as a continuation of the '190 Patent on October 31, 2002. The PTO duly and legally issued the '049 Patent on January 16, 2007.

65.    The '190 Patent and the '049 Patent are generally directed to methods and systems for issuing a stored value card affiliated with a transaction network, an organization sponsor, and an issuer. Taking Claim 1 of the '049 Patent as an example, the claimed method includes creating an independent and unassociated card account funded by the organization sponsor and issuing the card to the cardholder. The card is marked with the cardholder's name and indicia of the transaction network, the issuer, or the organization sponsor. Additionally, the card is accepted where cards associated with the transaction network are accepted.

66.    JPMCB is the assignee of all right, title and interest in and to the JPMorgan Patents, subject to an exclusive license to JPMorgan EFS with rights to enforce by the licensee. As such, JPMCB and JPMorgan EFS have the legal right to enforce the JPMorgan Patents against the Defendants in this case.

## ACS Infringes the JPMorgan Stored Value Patents

67.    ACS markets, makes, uses, sells and/or offers for sale products and services that directly infringe, contributorily infringe and/or induce others to infringe, or are used to practice processes that infringe, one or more claims of the JPMorgan Stored Value Patents. The infringing ACS products and services include, by way of example and without limitation, its child support, social security, unemployment benefit, and workers compensation prepaid debit

card services offered in connection with ACS's government-administered programs.   For example, ACS sells or offers for sale infringing prepaid debit card services nationwide branded as the EPPICard™.

68.     By way of example, and without limitation, ACS establishes a prepaid debit account and provides a prepaid debit card (*e.g.*, the EPPICard™) to a cardholder through a bank. The prepaid debit card is issued to the cardholder pursuant to a license from an association or other transaction network.

69.     By way of example, and without limitation, according to the EPPICard™ website ("EPPICard™, The Safe and Secure Way to Access Your Payments," available at: http://www.eppicard.com (last visited Apr. 3, 2008)), ACS's prepaid debit cards include an account number, the cardholder's name, indicia of a sponsor (for example, "Indiana"), and a transaction network logo (e.g., VISA® or MasterCard™) (see Exhibit N, attached hereto).

70.     By way of example, and without limitation, activation of an EPPICard™ prepaid debit card may be accomplished upon initiation of a user's enrollment into the EPPICard™ or program by a state entity.  Alternatively, ACS directs cardholders to a phone number or web site to activate the EPPICard™  card.  Issuing banks are notified of a cardholder's receipt of a card via activation and other similar security methods.

71.     By way of example, and without limitation, an account corresponding to ACS's EPPICard™ program is a prepaid debit card funded exclusively by a sponsor.  According to the EPPICard™ website, the prepaid debit card account is completely separate from a cardholder's other accounts. (*See* "EPPICard™ New York, Frequently Asked Questions," available at: http://www.eppicard.com/pdf/NY_DCSP_FAQ060205.pdf (last visited Apr. 3, 2008)).  Further, a cardholder is not permitted to add funds to the card account.  The EPPICard™ website states:

"[o]nly the funds from [a cardholder's] State will be applied to the debit card. Additional funds can not be added to the account." *Id.* Nevertheless, a user "can count on using [their] EPPICard™ for all [their] purchases as long as [they] have support payments on [the] card." *Id.*

72. By way of example, and without limitation, ACS's EPPICard™ program is targeted directly to sponsoring entities or organization sponsors such as state child support or unemployment benefit program agencies. Further, ACS's advertising indicates that funds are added to prepaid debit card accounts per the state agency and/or government sponsor's guidelines.

73. By way of example, and without limitation, ACS relies on Electronic Fund Transfers ("EFTs") to transfer funds between a state's banks and a card-issuing bank, and thus, ACS's system involves an electronic request to coordinate timely, accurate, and secure reloading of the funds into the card account.

74. The infringing EPPICard™ prepaid debit card has been provided or is being provided by ACS in at least the following states: Indiana (child support and unemployment), Pennsylvania (child support and unemployment), Florida (child support), Georgia (child support), Oklahoma (child support), Illinois (child support), Mississippi (child support and unemployment), New York (child support), Ohio (child support), New Jersey (child support), Virginia (child support and unemployment), Utah (child support and unemployment), North Carolina (unemployment), Nevada (unemployment), and Texas (child support). Upon information and belief, ACS will continue marketing its infringing EPPICard™ to other states within the United States implementing child support and/or unemployment benefits payment processing.

75.     Accordingly, ACS markets, makes, uses, sells and/or offers for sale products and services that directly infringe, contributorily infringe and/or induce others to infringe, or are used to practice processes that infringe, one or more claims of the JPMorgan Patents.

76.     ACS's ongoing infringement of the JPMorgan Patents has been and is willful, deliberate, and in disregard of JPMorgan's patent rights.  ACS has knowledge of JPMorgan's patent rights, yet continues its infringement, despite an objectively high likelihood that its actions constitute infringement of a valid patent.

### The JPMorgan Lockbox and Check Imaging Patents

77.     JPMorgan is a pioneer in creating and developing lockbox processing and check imaging technology.  Companies that receive a large number of payments from customers, such as envelopes with checks and remittances, often outsource the processing of these papers to a financial institution or other service provider.  This is commonly known in the industry as "lockbox" processing.  JPMorgan currently holds several patents in the lockbox processing and check imaging technology spaces.

78.     The JPMorgan Lockbox and Check Imaging Patents are generally directed to methods and systems for imaging, storage and retrieval of checks and associated remittance documents.  In the past, service providers such as utilities expended significant sums of their own time and money to process payments from their customers.  To streamline operations and focus their efforts on their own core competencies, these companies looked to financial institutions, which already specialized in the daily handling and processing of enormous numbers of financial instruments.  Conventionally, however, lockbox processing involved a great deal of manual intervention and visual inspection.  In addition to being expensive and time-consuming, this process was prone to errors, which led to misdirection or delays in transferring funds.

79.     Digital image scanning technology streamlines lockbox processing by capturing electronic images of the received checks.  Given the enormous volume of associated papers involved in lockbox processing and the requisite accuracy demanded to execute the financial transactions, however, conventional check imaging and storage solutions still had significant drawbacks.  For example, conventional check imaging and storage solutions typically did not allow for the speedy management and association of the scanned checks and related remittance documents.  Further, conventional solutions typically did not provide lockbox customers or government agencies with the ability to quickly and accurately retrieve specified images of checks and associated remittance documents.  The JPMorgan lockbox processing and check imaging technologies provided a solution for processing and managing the enormous amounts of paper involved in lockbox processing that avoided many of the aforementioned drawbacks.

80.     JPMorgan's lockbox processing and check imaging technologies provide an efficient and accurate mechanism for the intake, processing, imaging, storage and retrieval of large numbers of financial instruments and related documents.

81.     Turning to the JPMorgan Lockbox and Check Imaging Patents, the application that matured into the '965 Patent, entitled "Method and Apparatus for Storing Images of Documents Having Magnetic Ink Code Line," was filed on May 5, 1995.  The PTO duly and legally issued the '965 Patent on June 29, 1999, to inventors Thomas Cahill, John J. McMonagle, Richard Sferra, Glenn Levine, Saul Goldfisher and Philip Wilson.  The '965 Patent claims priority to U.S. Patent Application Serial No. 08/342,265, filed on November 18, 1994.

82.     The application that matured into the '823 Patent, entitled "Lockbox Imaging System," was filed on June 6, 2006 by inventors Joanne Price, Sumit Mathur, and Paul Mao.  The PTO duly and legally issued the '823 Patent on January 8, 2008.  The '823 Patent claims

priority to U.S. Patent Application Serial No. 09/569,179 filed on May 11, 2000, which in turn claims priority to provisional application Serial No. 60/133,577, filed on May 11, 1999.

83.     The '965 Patent is generally directed to methods and systems for storing electronic images of documents having a magnetic ink code ("MICR") line.   For example, the patent includes coverage for forming an electronic image of the documents, reading and decoding the MICR line to form decode MICR data, and merging the electronic image and decoded MICR data into a tagged image file format (TIFF) file.

84.     The '823 Patent is generally directed to methods and systems for processing lockbox remittances including a check and an associated document.   For example, the patent provides coverage for a lockbox processing system that captures a document image and a document data record, as well as a check image and check data record.   The images and data records are associated for easy access and retrieval.

85.     JPMCB is the assignee of all right, title and interest in and to the JPMorgan Lockbox and Check Imaging Patents.   As such, JPMCB has the legal right to enforce the JPMorgan Lockbox and Check Imaging Patents against the Defendants in this case.

**ACS Infringes the JPMorgan Lockbox and Check Imaging Patents**

86.     ACS markets, makes, uses, sells and/or offers for sale products and services that directly infringe, contributorily infringe and/or induce others to infringe, or are used to practice processes that infringe, one or more claims of the JPMorgan Lockbox and Check Imaging Patents.   The infringing ACS products and services include, by way of example and without limitation, its lockbox processing services, including check imaging services.   For example, ACS sells or offers for sale lockbox processing services, including but not limited to a system branded as the "SDU360 Image Payment Processing (IPP) System."   The lockbox processing and check

processing provided by ACS in connection with state-administered programs is but one example of ACS's infringing conduct, which is believed to extend to lockbox and check image processing in other contexts, such as outsourced processing by commercial clients.

87.     By way of example, and without limitation, ACS's SDU360-Image Payment Processing (IPP) System ("the SDU360 System") creates digital images of all incoming mail and financial instruments, such as checks. *See* ACS Response to RFP for File No: O 51500 CP, Solicitation # 2223009 (Centralized Collection Unit for the Department of Social Services, Office of Family Support, Support Enforcement Services of Louisiana), attached as Exhibit O at G.A-9. The system scans high-quality images of the front and back of all documents, and provides in-line character recognition through magnetic ink character recognition (MICR) and OCR technologies to read the MICR line of all financial instruments. *See* Exhibit O at G.A-17 – G.A.-18. During scanning, the system assigns each item a unique identifier, which is also endorsed on the item. *See* Exhibit O at G.A-67. The online capture feature stores data and images in the appropriate database immediately upon capture. *See* Exhibit O at G.A-18. The SDU360 System also includes a searchable image archive. *See* Exhibit O at G.A-72.

88.     By way of example, and without limitation, in the SDU360 System, a financial instrument is identified by, *e.g.,* MICR scan line presence. *See* Exhibit O at G.A.-18. The SDU360 System software interprets and recognizes the MICR line and other information on the check to identify and balance a payment. *See* Exhibit O at G.A-20. Images of scanned checks can be accessed by authorized personnel using multiple indices, including bank number and account number, which are fields of a standard MICR line. *See* Exhibit O at G.A.-18. The SDU360 Image Viewer also allows a remote user to display the entire contents of an envelope.

*See* Exhibit O at G.A-76. Users can navigate through the entire contents of an envelope simply by clicking on an image list. *See* Exhibit O at G.A-77.

89.     The infringing SDU360 System has been provided or is being provided by ACS in at least the following states: Louisiana, Texas, New York, Massachusetts, Maryland, new Hampshire and Arizona. *See* Exhibit O at C-6. Upon information and belief, ACS will continue marketing its infringing SDU360 System in relation to child support and/or unemployment benefits payment processing.

90.     Accordingly, ACS markets, makes, uses, sells and/or offers for sale products and services that directly infringe, contributorily infringe and/or induce others to infringe, or are used to practice processes that infringe, one or more claims of the JPMorgan Lockbox and Check Imaging Patents.

91.     ACS's ongoing infringement of the JPMorgan Lockbox and Check Imaging Patents has been and is willful, deliberate, and in disregard of JPMorgan's patent rights. ACS has knowledge of JPMorgan's patent rights, yet continues its infringement, despite an objectively high likelihood that its actions constitute infringement of a valid patent.

### JPMorgan Has Been Irreparably Harmed by Defendants' Continued Infringement

92.     JPMorgan has been irreparably harmed by the Defendants' infringement of its valuable patent rights. JPMorgan practices the patented JPMorgan technology that direct competitor ACS is infringing.

93.     Moreover, ACS's unauthorized, infringing uses of JPMorgan's patented systems and methods have threatened the value of this intellectual property because ACS's conduct results in diminution of JPMorgan's lawful patent rights to exclude others from making, using, selling, offering to sell and/or importing the patented inventions.

94.     ACS's disregard for JPMorgan's property rights similarly threatens JPMorgan's relationships with potential licensees of this intellectual property.  Each of the Defendants will derive a competitive advantage over any of JPMorgan's future licensees from using JPMorgan's patented technology without paying compensation for such use.  Accordingly, unless and until each of the Defendants' continued acts of infringement are enjoined, patent owner JPMCB and exclusive licensee JPMorgan EFS will suffer further irreparable harm for which there is no adequate remedy at law.

## DECLARATORY JUDGMENT CLAIM

### COUNT I

**Declaratory Judgment of Non-Infringement, United States Patent No. 5,946,669**

95.     JPMorgan repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

96.     A case or controversy exists between JPMorgan and ACS concerning the infringement of the '669 Patent, which requires a declaration of rights by this Court.

97.     JPMorgan's child support payment services do not infringe any valid or enforceable claim of the '669 Patent.

98.     JPMorgan is entitled to a declaratory judgment that the manufacture, use, offer for sale, sale or importation of JPMorgan's child support payment services do not infringe any valid or enforceable claim of the '669 Patent.

## COUNT II

### Declaratory Judgment of Invalidity, United States Patent No. 5,946,669

99.    JPMorgan repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

100.    A case or controversy exists between JPMorgan and ACS concerning the invalidity of the '669 Patent, which requires a declaration of rights by this Court.

101.    The '669 Patent is invalid for failure to meet the requirements of patentability under 35 U.S.C. §§ 101, 102, 103, and/or 112.

102.    JPMorgan is entitled to a declaratory judgment that the '669 Patent is invalid.

## COUNT III

### Declaratory Judgment of Non-Infringement, United States Patent No. 6,119,107

103.    JPMorgan repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

104.    A case or controversy exists between JPMorgan and ACS concerning the infringement of the '107 Patent, which requires a declaration of rights by this Court.

105.    JPMorgan's child support payment services do not infringe any valid or enforceable claim of the '107 Patent.

## COUNT IV

### Declaratory Judgment of Invalidity, United States Patent No. 6,119,107

106.    JPMorgan repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

107.    A case or controversy exists between JPMorgan and ACS concerning the invalidity of the '107 Patent, which requires a declaration of rights by this Court.

108.   The '107 Patent is invalid for failure to meet the requirements of patentability under 35 U.S.C. §§ 101, 102, 103, and/or 112.

109.   JPMorgan is entitled to a declaratory judgment that the '107 Patent is invalid.

## COUNT V

### Declaratory Judgment of Non-Infringement, United States Patent No. 7,225,155

110.   JPMorgan repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

111.   A case or controversy exists between JPMorgan and ACS concerning the infringement of the '155 Patent, which requires a declaration of rights by this Court.

112.   JPMorgan's child support payment services do not infringe any valid or enforceable claim of the '155 Patent.

113.   JPMorgan is entitled to a declaratory judgment that the manufacture, use, offer for sale, sale or importation of JPMorgan's child support payment services do not infringe any valid or enforceable claim of the '155 Patent.

## COUNT VI

### Declaratory Judgment of Invalidity, United States Patent No. 7,225,155

114.   JPMorgan repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

115.   A case or controversy exists between JPMorgan and ACS concerning the invalidity of the '155 Patent, which requires a declaration of rights by this Court.

116.   The '155 Patent is invalid for failure to meet the requirements of patentability under 35 U.S.C. §§ 101, 102, 103, and/or 112.

117.   JPMorgan is entitled to a declaratory judgment that the '155 Patent is invalid.

## COUNT VII

### Declaratory Judgment of Non-Infringement, United States Patent No. 6,567,821

118. JPMorgan repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

119. A case or controversy exists between JPMorgan and ACS concerning the infringement of the '821 Patent, which requires a declaration of rights by this Court.

120. JPMorgan's child support payment services do not infringe any valid or enforceable claim of the '821 Patent.

121. JPMorgan is entitled to a declaratory judgment that the manufacture, use, offer for sale, sale or importation of JPMorgan's child support payment services do not infringe any valid or enforceable claim of the '821 Patent.

## COUNT VIII

### Declaratory Judgment of Invalidity, United States Patent No. 6,567,821

122. JPMorgan repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

123. A case or controversy exists between JPMorgan and ACS concerning the invalidity of the '821 Patent, which requires a declaration of rights by this Court.

124. The '821 Patent is invalid for failure to meet the requirements of patentability under 35 U.S.C. §§ 101, 102, 103, and/or 112.

125. JPMorgan is entitled to a declaratory judgment that the '821 Patent is invalid.

## COUNT IX

### Declaratory Judgment of Non-Infringement, United States Patent No. 7,072,909

126. JPMorgan repeats and incorporates by reference each of the foregoing paragraphs

of its Complaint.

127.   A case or controversy exists between JPMorgan and ACS concerning the infringement of the '909 Patent, which requires a declaration of rights by this Court.

128.   JPMorgan's child support payment services do not infringe any valid or enforceable claim of the '909 Patent.

129.   JPMorgan is entitled to a declaratory judgment that the manufacture, use, offer for sale, sale or importation of JPMorgan's child support payment services do not infringe any valid or enforceable claim of the '909 Patent.

## COUNT X

### Declaratory Judgment of Invalidity, United States Patent No. 7,072,909

130.   JPMorgan repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

131.   A case or controversy exists between JPMorgan and ACS concerning the invalidity of the '909 Patent, which requires a declaration of rights by this Court.

132.   The '909 Patent is invalid for failure to meet the requirements of patentability under 35 U.S.C. §§ 101, 102, 103, and/or 112.

133.   JPMorgan is entitled to a declaratory judgment that the '909 Patent is invalid.

## COUNT XI

### Declaratory Judgment of Unenforceability of
### United States Patent Nos. 5,946,669; 6,119,107; and 7,225,155

134.   JPMorgan repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.  JPMorgan further pleads the following factual allegations:

135.   The movement to computerized child custody payment processing systems by the

various states was driven in large part by Congressional action in the late 1990s seeking to improve protections for the children of divorced or estranged couples.

136.    Most notably, U.S. Congress enacted the "Personal Responsibility and Work Opportunity Act of 1996" (Pub.L. 104-193, 110 Stat. 2105) ("PRWORA") on August 22, 1996.

137.    PRWORA required states to implement State Disbursement Units by October 1, 1998 that would collect and distribute child support payments.

138.    According to the Act, the state disbursement unit "shall be operated directly by the State agency (or 2 or more State agencies under a regional cooperative agreement), or (to the extent appropriate) **by a contractor responsible directly to the State agency**." § 454B(a)(2); 42 U.S.C. § 654(b) (1996) (emphasis added).

139.    Thus, PRWORA not only contemplated, but by its express terms disclosed an entity for collecting and distributing child support payments that was a state entity, or **one that was separate from the state (i.e., a contractor, or in the terms of the patents, an accumulator agency)**.

140.    This was even recognized by ACS's predecessor, Lockheed Martin IMS: the PRWORA "requires each state child support enforcement agency to operate a centralized, automated unit for the collection and disbursement of payments on child support orders enforced by the state and all orders issued after December 31, 1993 which are subject to wage withholding." Prepared Statement of Harry W. Wiggins, Vice President, Child Support Services, Lockheed Martin IMS Children & Family Services, Before the House Gov't. Reform & Oversight Comm, Human Resources Subcomm, "Social Service Privatization: The Benefits and Challenges to Child Support Enforcement Programs," Nov. 4, 1997 (attached hereto as Exhibit P). "Under the provisions of the Act, the State has the option of operating this unit itself **or may**

**choose to have a contractor operate it on its behalf.**" *Id.* [emphasis added].

141.    In the reexamination of ACS patents U.S. Pat. Nos. 5,946,669 and 6,119,107, the patents were rejected by the PTO based on an October 1994 document entitled "Electronic Funds Transfer Project Final Report" (EFTPFR) documenting a Washington State Department of Social and Health Services initiative for computerized processing of child support payments.

142.    In response to the PTO's rejection of the claims of the above-mentioned patents based on the EFTPFR reference, ACS distinguished the Washington State Department (WSD) child support payment processing system on the basis that it did not show processing of child support payments **by an entity separate from the state and a bank.**

143.    Moreover, ACS's distinction over the EFTPFR prior art was implemented in the claim amendment that ACS made that recited that the processing entity ("accumulator agency") was separate from the state and a bank.

144.    As a printed document that is widely available to the public, PRWORA is prior art within the meaning of the Patent Act that is applicable to the above-mentioned ACS patents. 35 U.S.C. § 102(b).  More specifically, PRWORA is a printed publication dated more than 1 year before the earliest filing date of the above-mentioned ACS patents of September 30, 1997.

145.    Upon information and belief, ACS's knowledge of PRWORA is evidenced by, among other things, the establishment of its predecessor Lockheed Martin IMS's "Welfare Reform Division" in 1996.  The so-called "Welfare Reform Division" of Lockheed Martin IMS provided child support processing and other government services. *See* Sanger, M., The Welfare Marketplace, Brookings Institution Press (2003).   Additional evidence is found in Harry Wiggins's testimony to the House Government Reform and Oversight Subcommittee referenced above.

146.    Additionally, Lockheed Martin's Security Exchange Commission filings in 1996 and 1997 repeatedly make reference to PRWORA.  For example, in 1997, Lockheed Martin's 10K stated: "With President Clinton's signing of federal welfare reform legislation, Lockheed Martin expects to play an even larger role in 1997 and beyond to assist states in streamlining the administration of human services programs, and in developing and implementing new and creative methods for helping low-income Americans make it on their own." (Lockheed Martin IMS,    Securities    &    Exchange    Commission    Form    10-K,    at http://investor.shareholder.com/lmt/secfiling.cfm?filingID=950109-97-2222) (March 14, 1997) (last viewed on August 19, 2008).

147.    The cover page of the reexamination certificates for the above-mentioned patents includes a section entitled "Cited References" that lists the various prior art references submitted to or cited by the Patent Examiner during the examination of the above-mentioned patents. Despite ACS's or its predecessor's knowledge of PRWORA, the Cited References sections for the above-mentioned patents do not list the PRWORA prior art reference.

148.    The Information Disclosure Statements listing various prior art references that were filed by ACS or its predecessors during reexamination do not list the PRWORA prior art reference.

149.    Patent holders like ACS have a duty of candor to the PTO during original examination and reexamination to bring to the attention of the Patent Examiner any prior art reference or other information that is material to patentability. 37 C.F.R. § 1.56.

150.    The significance of the duty of candor to effective patent examination and the public interest is clear in the Code of Federal Regulations:

> A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section.

37 C.F.R. § 1.56(a).

151.    A prior art reference is material to patentability if it "establishes, by itself or in combination with other information, a *prima facie* case of unpatentability", which is "when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard". 37 C.F.R. § 1.56(b).

152.    The PRWORA prior art is material on its face to the patentability of the above-mentioned patents because it describes, in fact, mandates, a computerized child support payment processing system that can be operated by a contractor, i.e., a third party entity separate from the state and a bank.

153.    The PRWORA prior art is also material to patentability because it discloses the distinguishing feature that ACS alleged to the Patent Examiner to be missing from the EFTPFR prior art—child support payment processing being operated by an entity separate from the state and a bank.

154.    The PRWORA prior art is material to patentability because the combination of the primary EFTPFR reference and PRWORA discloses the invention claimed in one more of the above-mentioned patents, and, as such, forms a *prima facie* case of unpatentability.

155.    ACS never disclosed the PRWORA prior art reference to the Patent Examiner in connection with the reexamination of the above-mentioned patents.  By virtue of their substantive involvement in the Polk patent applications, both John Polk (the inventor) and Lionel

Lavenue (who prepared the original patent application, Polk's declaration in reexamination, and who also submitted a declaration in support of Polk's declaration) had a duty of candor to the Patent Office. Each had knowledge of the PRWORA reference by virtue of their work for ACS. Neither disclosed the PRWORA prior art reference to the Patent Examiner in connection with the above-mentioned patents.

156.    As an entity providing child support payment processing to a number of states involving over $5B in yearly transactions, ACS or its predecessors had actual knowledge of the PRWORA prior art – the law that created the industry they are in and that governs how states and their contractors like ACS carry out computerized child support payment processing.

157.    Upon information and belief, ACS's failure to disclose the highly material PRWORA prior art reference to the PTO was intentional.

158.    Further, long before PROWRA was enacted, ACS's predecessor Lockheed Martin IMS performed child support payment processing and distribution services for many state and local governments.

159.    For example, Lockheed Martin IMS marketed and implemented child support payment processing software designed by Bottomline Technologies, Inc. of Portsmouth, NH. *See* "Bottomline Taps Lockheed to Market Software That Deducts Child Support," *Am. Banker*, Jul. 12, 1996, p. 15 (attached hereto as Exhibit Q). "The software – a modified version of an automated clearing house program...electronically transfers payments from a child support payer's employer to that company's bank. The bank then forwards the funds to the appropriate collection agency, which pays out the child support. Funds transfer is accomplished using electronic data interchange technology and the automated clearing house network." *Id.*

160.    In fact, by September 1997, Lockheed Martin IMS had gone on to add the

software to child payment processing services it provided in Arkansas, Colorado, Maryland, and New York. *See* "PMR News Briefs," Payroll Manager's Report September 1997, Sept. 1997, p. 13 (attached hereto as Exhibit R).

161.   In the case of Colorado, Lockheed Martin began managing the State of Colorado's Family Support Registry's (FSR) child support processing operation in the early 1990s, and the Lockheed Martin IMS/Bottomline Technologies software was first used there. *See* Exhibit Q.

162.   Upon information and belief, Lockheed Martin IMS's Colorado child support processing system, *inter alia*, digitally transferred a child support payment "from an employer's payroll to its bank, then to the bank of the agency responsible for distributing the money, and finally to the agency.  Child support payments [were thus] made by the employer and directly deposited to the custodial parent's personal bank account in less than 72 hours." *See* "States, Counties Automate Child Support Processing," ITPR, Vol. 7, Issue 15 (1996) (attached hereto as Exhibit S).

163.   In addition to the Colorado system, Lockheed Martin IMS implemented a child support processing operation in California as early as the mid-1990s.  Lockheed Martin IMS formally "unveil[ed] a new automated computer system designed to improve the collection and distribution of child support payments" in Los Angeles County on Mar. 9, 1995, although the system had been operating since February 6, 1995.  "New Computer Keeps Track of Child Support Payments," LOS ANGELES TIMES, B2, Mar. 9, 1995 (attached hereto as Exhibit T).  This new system in Los Angeles County was designed by Lockheed Martin IMS to serve as a "model for the nation" for "greatly improv[ing] the collection and distribution of child support payments, automating many functions that in the past had to be performed by hand." "Electronic Child

Support System Unveiled," LOS ANGELES TIMES, B1, Mar. 10, 1995 (attached hereto as Exhibit U).

164.   The automated child support processing system implemented in Los Angeles was "successful" and was "'the largest system in the country'" at the time. "State to Stay with Child-Support Computer Setup," LOS ANGELES TIMES, A3, May 2, 1997 (attached hereto as Exhibit V).

165.   As explained by John Brophy, Lockheed Martin IMS's President and CEO: "'Many of the services and efficiencies that IMS developed in concert with our Los Angeles customer-partner in the early 1990s – such as centralized payment processing and rapid payment of support funds – became nationwide requirements under the federal government's 1996 Welfare Reform Act [[also known as PRWORA)].'" "Lockheed Martin IMS Retains Landmark Child Support Processing Payment Contract in Los Angeles County," Lockheed Martin IMS Press Release, Dec. 4, 2000 (attached hereto as Exhibit W).

166.   As detailed above, Lockheed Martin IMS's child support processing systems (including at least the Bottomline software and the states where it was implemented by Lockheed Martin IMS, the Colorado system and the California system) were  commercial sales and/or uses of the inventions disclosed and claimed in the ACS Patents more than 1 year before the earliest filing date of the ACS Patents.  Lockheed Martin IMS's child support processing systems are therefore prior art within the meaning of the Patent Act that is applicable to the above-mentioned ACS patents. 35 U.S.C. § 102(b).

167.   Upon information and belief, ACS and its predecessor Lockheed Martin IMS failed to disclose such information concerning the prior sales and uses of the invention claimed in the ACS Patents during the prosecution of the ACS Patents.  Upon further information and belief, John Polk, an inventor of the ACS Patents, knew about the Lockheed Martin IMS child

support processing systems in at least Colorado and Los Angeles County, and also failed to disclose such information concerning the prior sales and uses during the prosecution of the ACS Patents.

168.   The above-described Lockheed Martin child support processing systems are material on their faces to the patentability of the above-mentioned patents because they describe computerized child support payment processing systems that can be operated by a contractor, i.e., a third party entity separate from the state, and a bank.  These systems are also material to patentability because they disclose the distinguishing feature that ACS alleged to the Patent Examiner to be missing from the EFTPFR prior art—child support payment processing being operated by an entity separate from the state and a bank.

169.   The Lockheed Martin child support processing systems prior art are material to patentability because they practice the invention claimed in one more of the above-mentioned patents, and, as such, form a *prima facie* case of unpatentability.

170.   Upon information and belief, ACS's, its predecessors', and John Polk's failure to disclose the highly material Lockheed Martin IMS child support processing system prior art to the PTO was intentional.  John Polk's, and ACS's predecessor, Lockheed Martin IMS's failure to disclose highly material prior art to the Patent Examiner during the examination of the '107 and '669 Patents, as well as John Polk's and ACS's failure to disclose highly material prior art to the Patent examiner during the examination of the '155 Patent, constitutes inequitable conduct, rendering the respective patents unenforceable.  ACS's and John Polk's failure to disclose highly material prior art to the Patent Examiner during reexamination of the above-mentioned patents constitutes inequitable conduct, rendering the '669 and '107 Patents, and their spawn including the '155 Patent, unenforceable.

171.    In addition, John Polk submitted false affidavits to the PTO during reexamination in order to preserve the patents in the face of rejections issued by the examiner.  Specifically, John Polk made false statements in declarations submitted to the PTO to antedate prior art and conceal material prior art systems.

172.    On May 11, 2005, during the reexamination of '669 Patent, the examiner issued an Office Action rejecting each claim of the '669 Patent under 35 U.S.C. § 103 as obvious in light of the EFTPFR reference in view of U.S. Pat. No. 6,070,150 ("the Remington Patent"). The Remington Patent was filed on October 18, 1996.  Likewise, during the reexamination of the '107 Patent, the examiner rejected all of the claims pursuant to 35 U.S.C. § 103 as obvious in light of the EFTPFR reference in view of the Remington Patent.

173.    In order to overcome those rejections, John Polk prepared declarations pursuant to 37 C.F.R. § 1.131 ("Rule 131"), whereby he submitted to the PTO a sworn statement claiming that he had conceived of his invention prior to the effective date of the Remington prior art reference.  Specifically, on June 22, 2005, an interview with the examiner was conducted and the submission of a declaration swearing behind the Remington Patent was discussed.  In order to swear behind the Remington Patent, ACS had to establish that Polk conceived of the claimed inventions of the '669 Patent prior to October 18, 1996 and was diligent in reducing the invention to practice.  Patent prosecution counsel Lionel Lavenue was present at the interview with the patent examiner.

174.    In sum, Polk would have to swear back his invention date *more than 11 months* from the date he filed his original application for the '669 Patent.

175.    On July 11, 2005, ACS responded to the examiner's office action and included a declaration from Lionel Lavenue ("Lavenue Declaration"), attached hereto as Exhibit X, a

declaration from John Polk ("First Polk Declaration"), attached hereto as Exhibit Y and a declaration from Richard Vesper ("Vesper Declaration"), attached hereto as Exhibit Z.  Other than swearing behind the Remington reference to remove it, the July 11, 2005 response to the May 11, 2005 office action made no substantive argument asserting that the invention was patently distinguishable over the Remington/EFTPFR prior art

176.    The July 11, 2005 Office Action Response, attached hereto as Exhibit AA, represented to the examiner that John Polk had created two undated PowerPoint slides allegedly depicting the invention described and claimed in the '669 Patent prior to the filing date of the Remington Patent. In particular, the July 11, 2005 Office Action Response indicated:

> "According to the Polk declaration, the inventor prepared drawings depicting specific aspects of the invention prior to October 18, 1996," (Exhibit AA at 19);

> and

> "[B]ased on the disclosures in the drawings in Exhibits 1 and 2 [to the First Polk Declaration] made by the inventor prior to October 18, 1996, one of ordinary skill could have reduced the invention to practice without extensive experimentation." (*Id.*)

177.    In the First Polk Declaration, Polk represented to the examiner that "Exhibits 1 and 2 are true and correct copies of two of those original drawings that I prepared prior to October 18, 1996." (Exhibit Y at ¶ 8).  Although Polk swore that Exhibits 1 and 2 were created before October 18, 1996, the drawings, attached hereto as Exhibit BB, bore no dates whatsoever.

178.    Polk also represented to the examiner that "[p]rior to October 18, 1996, I detailed specific aspects of my invention in drawings showing a third-party entity acting as an accumulator agency between state child support agencies and employers.  See Exhibits 1 & 2. The drawings originally included at least 4-5 pages.  I no longer have a copy of the complete set of drawings that I had at that time." (Exhibit Y at ¶ 8).

179.    Polk further represented to the examiner that "Exhibits 1 and 2 are true and

correct copies of two of the original drawings that I prepared prior to October 18, 1996. My full set of drawings included more detail and subject matter than are shown in Exhibits 1 and 2," (Exhibit Y at ¶ 9), and that "[b]ased upon my personal knowledge and recollection, I prepared these drawings of Exhibits 1 and 2 at a hotel in Virginia where I was attending a conference." (Exhibit Y at ¶ 10).

180.    Paragraphs 11-20 of the First Polk Declaration explain in detail how Exhibits 1 and 2 allegedly disclose each feature of the patented invention. Specifically, Paragraph 16 of the First Polk Declaration indicates that the use of "Formatted 521 Records", identified in Exhibit 2 to the First Polk Declaration, "clearly demonstrates two things: (1) use of a debit transaction (not a credit transaction) and (2) processing of a debit transaction to a bank." Paragraph 16 further indicates that "[o]ne of ordinary skill in this field would have known at the time of this invention that 521 records allow for payments using either debit or credit transactions." (Exhibit Y at ¶ 16).

181.    Polk also represented to the examiner that a narrative invention disclosure he prepared in November 1996 after Exhibits 1 and 2 supported conception of his invention prior to September 18, 1996. In this regard, Polk states that his former supervisor, Richard Vesper, requested that he "prepare a brief written description of my invention to submit to Lockheed Martin's intellectual property counsel to begin the process of obtaining a patent." (Exhibit Y at ¶ 25).

182.    Polk then prepared the narrative invention disclosure requested by Vesper: "On or before November 13, 1996, I complied with Mr. Vesper's request and prepared a description of my invention. Exhibit 10 is a true and correct copy of the description I prepared." (Exhibit Y at ¶ 26). Exhibit 10 is a one page invention disclosure dated November 13, 1996, entitled "Electronic Funds Transfer (EFT) on at Disk Tool for Employer Submission of Child

Support Withholdings," attached hereto as Exhibit CC.

183.    Paragraphs 22-55 of the First Polk Declaration purport to establish Polk's diligence between October 18, 1996 and the filing of the application on September 30, 1997 that resulted in the '669 Patent.

184.    On August 1, 2005, the examiner issued a Final Office Action maintaining the rejection of the '669 Patent claims ("the Final Office Action"), attached as Exhibit DD. In the Final Office Action, the examiner found that the evidence submitted and the arguments contained in the July 11, 2005 Office Action Response were insufficient to establish a date of invention prior to October 18, 1996, the effective date of the Remington Patent. In other words, the examiner did not accept John Polk's claim that he had created his invention prior to October 18, 1996 and worked on it diligently through the filing of the patent application on September 30, 1997.

185.    In the Final Office Action, the examiner also found that there was no evidence "to support the claim that one of skill in the art would know that Formatted 521 records allow for debit and credit transactions." (Exhibit DD at ¶ 4). The examiner further found that "there is no support in Exhibit 2 that the accumulator agency transmits the disbursement to the state." (*Id.*) Moreover, the examiner found that the evidence of diligence presented by Polk and Lavenue was insufficient.

186.    On September 29, 2005, ACS responded to the Final Office Action by submitting a supplemental Rule 131 declaration from John Polk ("Supplemental Polk Declaration," attached hereto as Exhibit EE). ACS's response argued that Polk's statement in the First Polk Declaration regarding Formatted 521 Records was sufficient evidence of conception. The response further argued that Exhibits 1 and 2 to the First Polk Declaration disclosed an accumulator agency

transmitting disbursements to the state. Other than swearing behind the Remington reference to remove it, the September 29, 2005 response to the Final Office Action made no substantive argument that the invention was patently distinguishable over the Remington/EFTPFR prior art.

187.     In support of ACS's statement that one skilled in the art would have understood Formatted 521 Records to allow for debit and credit transactions, the Supplemental Polk Declaration indicated that "[t]he Government Subcommittee of the ASC, also known as ASC X12G, released a Draft Technical Report, version 3, dated March 1, 1990, which is attached as Exhibit 69." (Exhibit EE at ¶ 8).

188.     The Supplemental Polk Declaration further stated that "at least for the reasons stated above, the Draft Technical Report of the ASC X12G, published March 1, 1990, clearly demonstrates that Formatted 521 records allow for debit and credit transactions." (Exhibit EE at ¶ 12).

189.     The Supplemental Polk Declaration reiterated the assertion from the First Polk Declaration that Polk "prepared Exhibits 1 and 2 at a hotel in Virginia where I was attending a conference on a date prior to October 18, 1996." (Exhibit EE at ¶ 16).

190.     Finding that Polk's Rule 131 declarations in combination with the supporting Lavenue and Vesper declarations were sufficient to overcome the Remington reference by showing a date of invention prior to October 18, 1996, the examiner withdrew the rejection. The examiner would not have withdrawn the rejections and a reexamination certificates would not have issued for the '669 Patent, but for the submission of the Polk declarations, the Lavenue Declaration, and the Vesper Declaration.

191.     Substantively identical declarations and arguments were submitted by Polk, Lavenue, and ACS in connection with the '107 Patent, which was faced with the same rejection

based on the Remington reference during reexamination. Substantially identical declarations and arguments were also submitted during the prosecution of the '155 Patent. But for the submission of these declarations, those patents would not be in force. Upon information and belief, the First Polk Declaration and/or the Lavenue Declaration have been submitted to the PTO in connection with one or more of the three pending continuation applications ACS has filed that are members of the Polk patent family originating with the '669 Patent application.

192.    As detailed below, ACS and Polk made affirmative misstatements as part of the Rule 131 declarations submitted to the examiner with the purpose and effect of preserving their patent applications. As detailed below, ACS and Polk made material omissions as part of these Rule 131 declarations. As detailed below, Lavenue, the patent attorney who drafted the Polk declarations and who submitted his own supporting declaration, was also responsible for these material misrepresentations and material omissions. Because the examiner relied on Polk's sworn statements on the date of conception in order to overcome the rejection and allow the '669 and '107 Patents based on an earlier date of invention, such misstatements and omissions are inherently material. More generally, a reasonable examiner would have considered the true nature of Polk's conception and reduction to practice to be important, such that false statements and omissions unquestionably meet the threshold requirement for materiality.

193.    The material misrepresentations and material omissions that render the Polk patents unenforceable for inequitable conduct include the following:

A)    Declaration Exhibits 1 & 2 are false conception documents: Polk intentionally misrepresented the date that he prepared the two PowerPoint slides in order to swear behind the Remington reference.

B)    To perpetuate the false dates of the PowerPoint slides, Polk intentionally misrepresented that an invention disclosure from November 1996 corresponded to declaration Exhibits 1 & 2, while he intentionally concealed later invention disclosures that did correspond to those slides.

C)      The November 1996 document is also a false conception document because it is for technology that Polk did not originate and further because the alleged conception is actually based on statutory bar prior art from mid-1996.

D)      Polk intentionally misrepresented the date of a document concerning the Formatted Record 521 Standard in his supplemental declaration

194.    At least Polk and Lavenue knew of the identified material misrepresentations and material omissions and intended to deceive the Patent Office by preparing and submitting the First Polk Declaration, the Lavenue Declaration, and the Supplemental Polk Declaration, all regarding conception, and the July 11, 2005 and the September 29, 2005 office action responses, to the examiner.

195.    First, contrary to Polk's explicit affirmations to the examiner, Exhibits 1 and 2 to the First Polk Declaration were not, in fact, prepared prior to October 18, 1996.

196.    Upon information and belief, Exhibits 1 and 2 to the First Polk Declaration were prepared using a version of Microsoft PowerPoint that was not available until months *after* Polk swore he created Exhibits 1 and 2.

197.    Upon information and belief, Exhibits 1 and 2 to the First Polk Declaration were prepared using either Microsoft PowerPoint 97 or a later version of Microsoft PowerPoint.

198.    Microsoft PowerPoint 97 was not available to the public prior to October 18, 1996.  Specifically, on information and belief, Microsoft PowerPoint 97 (8.0) was released to the public as part of the Microsoft Office 97 Suite on December 30, 1996.

199.    Further, Exhibit 1 to the First Polk Declaration contains clipart art from Microsoft PowerPoint 97/98 that was not available prior to October 18, 1996.  Specifically, on information and belief, the "money1" clipart depicted in Exhibit 1 to the First Polk Declaration was first released to the public as part of the Microsoft Office 97 Suite on December 30, 1996 – months after Polk swore he created Exhibits 1 and 2.



200.

201.

202.

203.

████████████████████████████

204.   ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

205.   In addition to misrepresenting the date of creation of Exhibit 1 and Exhibit 2 to the Polk Declaration, Polk misrepresented invention disclosures submitted to the PTO ████████

████████████████████████████████████████████

████████████████████

206.   For example, Exhibits 10 to the First Polk Declaration is an "invention disclosure document" dated November 13, 1996 which was provided to Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P. on December 3, 1996 (the "First Invention Disclosure", attached hereto as Exhibit CC).  (Exhibit Y at ¶ 27).

207.   To perpetuate the false dates of the PowerPoint slides, Polk intentionally misrepresented that this First Invention Disclosure from November 1996 corresponded to declaration Exhibits 1 & 2.

208.   The First Invention Disclosure does not correspond to declaration Exhibit 1 & 2.

209.   This First Invention Disclosure describes, *inter alia*, Bottomline Technologies software.  However, the First Invention Disclosure fails to refer to or describe Polk's alleged original conception documents Exhibits 1 and 2 by name or by content.  For example, the First Invention Disclosure does not describe or refer to Formatted 521 Records, the accumulator system, or other aspects of Exhibits 1 or 2 of the First Polk Declaration.  The First Invention Disclosure further fails to mention "debit based" transactions.  The First Invention Disclosure does not refer to Exhibits 1 explicitly or implicitly. (*See* Exhibit CC).

210.   The First Invention Disclosure is also a false conception document because (a) it is for technology that Polk did not originate and (b) because it is based on statutory bar prior art from mid-1996.

211.   The First Invention Disclosure document discloses EFT-on-a-disk using payment software created by Bottomline Technologies known as "EPIc". Polk was not the inventor of what is disclosed in the November 1996 document; instead, any contribution he made was at best a mere derivation of Bottomline's EPIc software. Moreover, Polk improperly used the November 1996 document to claim *conception* of subject matter that is actually based on *statutory bar prior art* under 35 U.S.C. § 102(b)—Bottomline's EPIc software that was in use and on sale in June-July 1996.

212.   On December 3, 1996, Lockheed Martin sent the First Invention Disclosure document to Thomas Martin at Finnegan, Henderson, Farabow, Garrett & Dunner L.L.P. (Exhibit Y at ¶ 27). The information sent to Mr. Martin including two articles concerning Bottomline Technology. Specifically, a July 9, 1996 Press Release by Bottomline Technologies and Lockheed Martin and a July 18, 1996 Wall Street Journal Article. (Collectively, "Bottomline Articles" attached hereto as Exhibits KK, LL).

213.   The Bottomline Articles show that the purported invention described in the First Invention Disclosure was actually created by Bottomline Technologies ("BT"). Even if John Polk had helped modify the software for a Lockheed Martin IMS specific implementation, at best he would be a co-inventor along with BT inventors. As such, Polk misrepresented to the examiner that the First Invention Disclosure evidenced conception of his invention disclosed in the patent application listing him as sole inventor.

214.   Upon information and belief, John Polk did not help modify the BT software so

he could not be considered an inventor or co-inventor of any subject matter described in his purported First Invention Disclosure from November 1996.

215.    Furthermore, the First Invention Disclosure that Polk relied on as evidence of conception is founded on the antithesis of what constitutes an invention, § 102(b) statutory bar prior art.  As the above articles reflect, the Bottomline EPIc software was on sale and in use in mid-1996 well before the September 30, 1996 critical date for the Polk patents.

216.    John Polk knew the statutory bar prior art Bottomline EPIc software was on sale and in use in mid-1996 because he was involved in the fielding of that software in the Colorado Family Support Registry (FSR) child support payment processing system run by his employer, Lockheed Martin IMS.

217.    On information and belief, in April 1997, Polk, individuals from ACS, and Lavenue discussed for the first time an alleged invention with respect to debit based transactions that would later be described in the '669 Patent.  Lavenue prepared a summary of this alleged invention that was sent to Polk for review and that was the basis for a separate patentability assessment.  (Exhibit Y at ¶ 35-39)  On information and belief, Polk did not disclose to Lavenue the idea transactions using Formatted 521 Records at this time.  On information and belief, Polk did not disclose to Lavenue the idea of an "accumulator" at this time.  On information and belief, Polk further did not disclose Exhibit 1 and Exhibit 2 to the First Polk Declaration to Lavenue at this time.  (Hereinafter, this disclosure in April is referred to as the "April 1997 Invention Disclosure").

218.    On information and belief, ACS rejected the idea of filing a patent application with respect to the First Invention Disclosure.  Despite this decision, Polk and Lavenue both relied upon the First Invention Disclosure to establish conception and diligence and failed to

inform the examiner of the fact that a disclosure with respect to debit based transactions did not occur until April 1997.

219.    Polk and Lavenue improperly redacted the description of the April 1997 Invention Disclosure in Polk's First Declaration.  Disclosing the April 1997 Invention Disclosure would expose Exhibits 1 and 2 as falsely-dated conception documents.  Disclosing the April 1997 Invention Disclosure would also expose the First Invention Disclosure as a false conception document offered to support Exhibits 1 and 2.  (Exhibit Y at ¶ 37) (redacting description of invention).

220.    A reasonable examiner would have considered the fact that Polk did not inform Lavenue of his alleged invention with respect to debit based transactions between October 1996 and April 1997 important in deciding whether to allow the '669 Patent and the '107 Patent to issue.  Specifically, this fact contradicts representations made in the First Polk Declaration, the Lavenue Declaration, the Supplemental Polk Declaration, the July 11, 2005 Office Action Response, and the September 29, 2005 Office Action Response indicating that Polk had created a debit-based invention prior to October 1996 and was diligent in reducing the invention to practice.

221.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

222. 

223.

224.

225.



226.

227.

228.   The Supplemental Polk Declaration further misrepresented to the examiner the date of an additional document relied upon to support conception. The First Polk Declaration relied on the fact that Formatted 521 records "allow for payments using either credit transactions or debit transactions" to support his assertion that Exhibits 1 and 2 to the First Polk Declaration disclose debit transactions. (*See* Exhibit Y at ¶¶ 16-18).

229.   In the Final Office Action, the examiner rejected this argument and found that "there is no evidence to support the claim that one of skill in the art would know that Formatted 521 records allow for debit and credit transactions." (Exhibit DD at ¶ 4).

230.    In the Supplemental Polk Declaration, Polk argued that the examiner was wrong. (*See* Exhibit EE at ¶¶ 7-12). Specifically, the Supplemental Polk Declaration relied upon a "Draft Technical Report" regarding Formatted 521 Records that was allegedly dated March 1, 1990.

231.    The Supplemental Polk Declaration represented to the examiner that "the Draft Technical Report of the ASC X12G, published March 1, 1990" described the Formatted 521 Records and demonstrates that "Formatted 521 Records allow for debit and credit transactions, providing additional support for the statement in my previous declaration that one of ordinary skill in the art would know that Formatted 521 records allow for debit and credit transactions." (Exhibit EE at ¶ 12).

232.    The document identified in the Supplemental Polk Declaration as allegedly "dated March 1, 1990" was not created on March 1, 1990. Specifically, the document specifically states that it is based upon "the December 1996 ASC X12 Standards," (ASC X12G Draft Technical Report, attached hereto as Exhibit OO at ACS00100031).

233.    At the time they submitted the Supplemental Polk Declaration, on information and belief, Polk and Lavenue were both aware that Formatted 521 Records were not available in 1990. The specification of the '909 Patent, which Lavenue was involved in the prosecution of and Polk is the sole inventor of, states:

> Therefore, under the X12 standard, there is an EDI transaction set for offset from wages or other income (i.e., the 521 record set) that allows for offsets to wages or other income by means of an electronic implementation of a wage assignment. As described in the Draft Standard for Trial Use, 521 Income or Asset Offset, dated May 15, 1997, hereby incorporated by reference, the record set 521 allows for the input of both the wage transfer instruction as well as other pertinent information related to a wage assignment transaction.

(US Patent No. 7,072,909, attached hereto as Exhibit PP at ACSe01374889).

234.    The misrepresentation of the date of the "Draft Technical Report" was material to the prosecution of the '669 Patent. Specifically, by arguing that he initially conceived of the invention prior to October 16, 1996, and relying on a statement concerning Formatted 521 Records from Exhibit 2 to the First Polk Declaration, Polk had to establish that one of skilled in the art would have known that Formatted 521 Records permitted debit transactions prior to October 16, 1996. A reasonable examiner would have considered Polk's misrepresentation regarding the Draft Technical Report important in deciding whether to allow the '669 Patent and the '107 Patent to issue. Specifically, the fact that Polk failed to identify any publicly available document supporting his assertion that Formatted 521 Records were known by one skilled in the art to provide for debit based transactions in October 1996 contradicts representations made in the First Polk Declaration, the Lavenue Declaration, the Supplemental Polk Declaration, the July 11, 2005 Office Action Response, and the September 25, 2005 Office Action Response.

235.    On its face, the '155 Patent indicates that it is a continuation of the '107 Patent and a divisional of the '669 Patent. ACS has contended in the present litigation that the '155 Patent was conceived on the same day as the '107 Patent and the '669 Patent. ACS has further relied upon the exact same documents and declarations for diligence and reduction to practice, including the material omissions and material representations detailed above. As such, the inequitable conduct during the prosecution of the '107 Patent and the '669 Patent has immediate and necessary relation to the enforcement of the '155 patent. Specifically, the '155 patent is therefore unenforceable under the doctrine of infectious unenforceability in view of the circumstances set forth here and above.

236.    JPMorgan is entitled to a declaratory judgment that the manufacture, use, offer for

sale, sale or importation of JPMorgan's child support payment services does not infringe any claim of the '669 Patent, the '107 Patent, and the '155 Patent, because each of the aforementioned is unenforceable due to ACS's, John Polk's or its predecessor's inequitable conduct as described above.

## PATENT INFRINGEMENT CLAIMS

### COUNT XII

### Infringement of United States Patent No. 7,174,315

237.   JPMorgan repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

238.   JPMCB is the assignee and lawful owner of all right, title and interest in and to the '315 Patent, subject to exclusive license to JPMorgan EFS.   In addition, JPMorgan EFS, in accordance with its exclusive license, also has rights to enforce the '315 Patent against infringers.

239.   Each of the Defendants makes, uses, sells, offers to sell and/or imports into the United States for subsequent sale or use products, services, methods or processes that infringe, directly and/or indirectly, or which employ systems, components and/or steps that make use of systems or processes that infringe, directly and/or indirectly, one or more of the claims of the '315 Patent.

240.   Each of the Defendants has been and continues infringing one or more of the claims of the '315 Patent through the aforesaid acts, and will continue to do so unless enjoined by this Court.   Defendants' wrongful conduct has caused JPMorgan to suffer irreparable harm resulting from the loss of its lawful patent rights to exclude others from making, using, selling,

offering to sell and importing the patented inventions.   As such, Plaintiffs are entitled to an injunction barring ACS from continued infringement of the above-mentioned patent.

241.   Plaintiffs are entitled to recover damages adequate to compensate for the infringement.

## COUNT XIII

### Infringement of United States Patent No. 7,165,049

242.   JPMorgan repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

243.   JPMCB is the assignee and lawful owner of all right, title and interest in and to the '049 Patent, subject to exclusive license to JPMorgan EFS.   In addition, JPMorgan EFS, in accordance with its exclusive license, also has rights to enforce the '049 Patent against infringers.

244.   Each of the Defendants makes, uses, sells, offers to sell and/or imports into the United States for subsequent sale or use products, services, methods or processes that infringe, directly and/or indirectly, or which employ systems, components and/or steps that make use of systems or processes that infringe, directly and/or indirectly, one or more of the claims of the '049 Patent.

245.   Each of the Defendants has been and continues infringing one or more of the claims of the '049 Patent through the aforesaid acts, and will continue to do so unless enjoined by this Court.   Defendants' wrongful conduct has caused JPMorgan to suffer irreparable harm resulting from the loss of its lawful patent rights to exclude others from making, using, selling, offering to sell and importing the patented inventions.   As such, Plaintiffs are entitled to an injunction barring ACS from continued infringement of the above-mentioned patent.

246.   Plaintiffs are entitled to recover damages adequate to compensate for the infringement.

## COUNT XIV

### Infringement of United States Patent No. 6,615,190

247.   JPMorgan repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

248.   JPMCB is the assignee and lawful owner of all right, title and interest in and to the '190 Patent, subject to exclusive license to JPMorgan EFS.  In addition, JPMorgan EFS, in accordance with its exclusive license, also has rights to enforce the '190 Patent against infringers.

249.   Each of the Defendants makes, uses, sells, offers to sell and/or import into the United States for subsequent sale or use products, services, methods or processes that infringe, directly and/or indirectly, or which employ systems, components and/or steps that make use of systems or processes that infringe, directly and/or indirectly, one or more of the claims of the '190 Patent.

250.   Each of the Defendants has been and continues infringing one or more of the claims of the '190 Patent through the aforesaid acts, and will continue to do so unless enjoined by this Court.  Defendants' wrongful conduct has caused JPMorgan to suffer irreparable harm resulting from the loss of its lawful patent rights to exclude others from making, using, selling, offering to sell and importing the patented inventions.  As such, Plaintiffs are entitled to an injunction barring ACS from continued infringement of the above-mentioned patent.

Plaintiffs are entitled to recover damages adequate to compensate for the infringement.

## COUNT XV

### Infringement of United States Patent No. 7,317,823

251.     JPMorgan repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

252.     JPMCB is the assignee and lawful owner of all right, title and interest in and to the '823 Patent, and thus, has the right to enforce the '823 Patent against infringers.

253.     Each of the Defendants makes, uses, sells, offers to sell and/or imports into the United States for subsequent sale or use products, services, methods or processes that infringe, directly and/or indirectly, or which employ systems, components and/or steps that make use of systems or processes that infringe, directly and/or indirectly, one or more of the claims of the '823 Patent.

254.     Each of the Defendants has been and continues infringing one or more of the claims of the '823 Patent through the aforesaid acts, and will continue to do so unless enjoined by this Court. Defendants' wrongful conduct has caused JPMorgan to suffer irreparable harm resulting from the loss of its lawful patent rights to exclude others from making, using, selling, offering to sell and importing the patented inventions. As such, Plaintiffs are entitled to an injunction barring ACS from continued infringement of the above-mentioned patent.

255.     Plaintiffs are entitled to recover damages adequate to compensate for the infringement.

## COUNT XVI

### Infringement of United States Patent No. 5,917,965

256.   JPMorgan repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

257.   JPMCB is the assignee and lawful owner of all right, title and interest in and to the '965 Patent, and thus, has the right to enforce the '965 Patent against infringers.

258.   Each of the Defendants makes, uses, sells, offers to sell and/or imports into the United States for subsequent sale or use products, services, methods or processes that infringe, directly and/or indirectly, or which employ systems, components and/or steps that make use of systems or processes that infringe, directly and/or indirectly, one or more of the claims of the '965 Patent.

259.   Each of the Defendants has been and continues infringing one or more of the claims of the '965 Patent through the aforesaid acts, and will continue to do so unless enjoined by this Court.  Defendants' wrongful conduct has caused JPMorgan to suffer irreparable harm resulting from the loss of its lawful patent rights to exclude others from making, using, selling, offering to sell and importing the patented inventions.  As such, Plaintiffs are entitled to an injunction barring ACS from continued infringement of the above-mentioned patent.

260.   Plaintiffs are entitled to recover damages adequate to compensate for the infringement.

## COUNT XVII

### Willful Patent Infringement

261.   JPMorgan repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

262.    ACS's ongoing infringement has been and is willful, deliberate, and in disregard of JPMorgan's patent rights.  ACS has knowledge of JPMorgan's patent rights, yet continues its infringement, despite an objectively high likelihood that its actions constitute infringement of valid patents.

**PRAYER FOR RELIEF**

WHEREFORE, JPMorgan respectfully requests that this Court enter a judgment for Plaintiffs, and against Defendants:

A.    Declaring that the claims of U.S. Patent No. 5,946,669 are invalid;

B.    Declaring that no valid claim of U.S. Patent No. 5,946,669 has been infringed by JPMorgan directly, by inducement of infringement, or otherwise;

C.    Declaring that the claims of U.S. Patent No. 6,119,107 are invalid;

D.    Declaring that no valid claim of U.S. Patent No. 6,119,107 has been infringed by JPMorgan directly, by inducement of infringement, or otherwise;

E.    Declaring that the claims of U.S. Patent No. 7,225,155 are invalid;

F.    Declaring that no valid claim of U.S. Patent No. 7,225,155 has been infringed by JPMorgan directly, by inducement of infringement, or otherwise;

G.    Declaring that each of U.S. Pat. Nos. 5,946,669; . 6,119,107; 7,225,155; and upon issuance, any continuations, divisionals, or other applications related under 35 U.S.C. § 120, are, and or, would be unenforceable.

H.    Declaring that the claims of U.S. Patent No. 6,567,821 are invalid;

I.    Declaring that no valid claim of U.S. Patent No. 6,567,821 has been infringed by JPMorgan directly, by inducement of infringement, or otherwise;

J.      Declaring that the claims of U.S. Patent No. 7,072,909 are invalid;

K.      Declaring that no valid claim of U.S. Patent No. 7,072,909 has been infringed by JPMorgan directly, by inducement of infringement, or otherwise;

L.      Decreeing that the U.S. Patent No. 7,174,315 is valid and enforceable against each of the Defendants, that U.S. Patent No. 6,615,190 is valid and enforceable against each of the Defendants, that U.S. Patent No. 7,165,049 is valid and enforceable against each of the Defendants, that U.S. Patent No. 7,317,823 is valid and enforceable against each of the Defendants, and that U.S. Patent No. 5,917,965 is valid and enforceable against each of the Defendants;

M.      Decreeing that each of the Defendants has infringed, directly and indirectly, U.S. Patent Nos. 7,174,315, 6,615,190, 7,165,049, 7,317,823, and 5,917,965;

N.      Permanently enjoining each of the Defendants, and their parents, subsidiaries, affiliates, successors and assigns, and each of their officers, directors, employees, representatives, agents, and attorneys, and all persons acting in concert or active participation with, or on their behalf, or within their control, from making, using, selling, offering to sell, importing, or advertising products and/or services and/or employing systems, hardware, software and/or components and/or making use of systems or processes that infringe any of the claims of the JPMorgan Patents, or otherwise engaging in acts of infringement of the JPMorgan Patents, all as alleged herein;

O.      Ordering an accounting, including a post-verdict accounting, to determine the damages to be awarded to JPMorgan as a result of each of the Defendants' infringement;

P.      Awarding, pursuant to 35 U.S.C. § 284, JPMorgan such damages as it shall prove at trial against each of the Defendants that is adequate to compensate JPMorgan for said

infringement, said damages to be no less than a reasonable royalty together with interest and costs;

Q.      Awarding enhanced damages, pursuant to 35 U.S.C. § 284, for Defendants' willful infringement;

R.      Assessing pre-judgment and post-judgment interest and costs against each of the Defendants, together with an award of such interest and costs, in accordance with 35 U.S.C. § 284;

S.      Declaring this case to be exceptional and directing Defendants to pay JPMorgan's attorneys' fees incurred in connection with this lawsuit pursuant to 35 U.S.C. § 285; and

T.      Granting to JPMorgan such other, further, and different relief as may be just and proper.

## JURY DEMAND

JPMorgan demands a trial by jury of all matters to which it is entitled to trial by jury pursuant to Fed. R. Civ. P. 38.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Scott L. Robertson
Jennifer A. Albert
Thomas J. Scott, Jr.
Stephen T. Schreiner
Eleanor M. Hynes
GOODWIN PROCTER LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 346-4000

Dated:  October 8, 2009
Date Filed per Order:  October 14, 2009
Public Version:  October 21, 2009

By: /s/ Philip A. Rovner
      Philip A. Rovner (#3215)
      Hercules Plaza
      P.O. Box 951
      Wilmington, Delaware  19899
      (302) 984-6000
      provner@potteranderson.com

*Attorneys for Plaintiffs*
*JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A., and*
*JPMorgan Chase Electronic*
*Financial Services, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on October 21, 2009, the within document

was filed with the Clerk of the Court using CM/ECF which will send notification of such

filing(s) to the following; that the document was served on the following counsel as indicated;

and that the document is available for viewing and downloading from CM/ECF.

### BY CM-ECF AND E-MAIL

Collins J. Seitz, Jr., Esq.
Kevin F. Brady, Esq.
Connolly Bove Lodge & Hutz LLP
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE  19899
cseitz@cblh.com
kbrady@cblh.com

I hereby certify that on October 21, 2009 I have sent by E-mail the foregoing

document to the following non-registered participants:

Lewis T. LeClair, Esq.
Mike McKool, Esq.
Phillip M. Aurentz, Esq.
McKool Smith
300 Crescent Court, Suite 1500
Dallas, TX  75201
lleclair@mckoolsmith.com
mmckool@mckoolsmith.com
paurentz@mckoolsmith.com

Brett E. Cooper, Esq.
McKool Smith
399 Park Avenue
New York, NY  10022
bcooper@mckoolsmith.com

/s/ Philip A. Rovner
Philip A. Rovner  (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com