## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JPMORGAN CHASE & CO.,<br>JPMORGAN CHASE BANK, N.A. and<br>JPMORGAN CHASE ELECTRONIC<br>FINANCIAL SERVICES, INC.,<br><br>     *Plaintiffs,*<br><br>     v.<br><br>AFFILIATED COMPUTER SERVICES, INC. and<br>ACS STATE & LOCAL SOLUTIONS, INC.,<br><br>     *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 08-189-SLR |

## JPMORGAN'S OPENING CLAIM CONSTRUCTION BRIEF

Philip A. Rovner (#3215)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, Delaware  19899
(302) 984-6000
provner@potteranderson.com

*Attorneys for Plaintiffs*
*JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A., and*
*JPMorgan Chase Electronic*
*Financial Services, Inc.*

OF COUNSEL:

Scott L. Robertson
Thomas J. Scott, Jr.
Stephen T. Schreiner
Eleanor M. Hynes
GOODWIN PROCTER LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 346-4000

Michael S. DeVincenzo
Andrew N. Stein
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(202) 346-4000

Dated:  November 6, 2009

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................1

II. LEGAL PRINCIPLES OF CLAIM CONSTRUCTION .................................3

    A.  **Claim Language is the Starting Point for Construction**...................................4

    B.  **Intrinsic Evidence is the Most Significant Source for Claim Construction** .....4

        1.  It is Improper to Read Limitations Into the Claims from the Specification 5

    C.  **Construction of Means-Plus-Function Claim Limitations**................................6

III. U.S. Pat. No. 7,317,823 ....................................................................................6

    A.  **Background and Asserted Claims** .....................................................................6

    B.  **Construction of the Disputed Limitations of Independent Claim 1** .................8

        1.  "Lockbox processing system".................................................................8

        2.  "Document capture component".............................................................10

        3.  "Document data record" ........................................................................13

        4.  "Document capture memory" .................................................................15

        5.  "Check capture component" ...................................................................16

        6.  "Check data record"...............................................................................19

        7.  "Check capture memory".......................................................................20

        8.  "Logically associating".........................................................................21

        9.  "Logically associating the check data record, the document data record, the check image and the document image"............................24

    C.  **Construction of the Disputed Limitation of Dependent Claim 4**....................25

        1.  "Bulk file interface" ..............................................................................25

IV. U.S. Pat. No. 5,917,965 ..................................................................................25

    A.  **Background** .....................................................................................................25

    B.  **Construction of Disputed Non-Means-Plus-Function Limitations**.................26

        1.  "Decoded magnetic ink coded data"......................................................26

        2.  "Tagged image file format (TIFF) file" and "Tag field in the TIFF file"..27

        3.  "Binary large object (BLOB)" ..............................................................29

    C.  **Construction of Disputed Means-Plus-Function Limitations** .........................30

        1.  "Means for searching said BLOB index . . ." ...........................................32

        2.  "Means for verifying each request . . ."...................................................33

3.   "Means for comparing the account number . . ."......................................34

4.   "Means for determining the platter associated with each request...".........35

5.   "Means for determining if there is a request for an image corresponding to any electronic images on a platter currently being searched . . ."..............36

6.   "Means for determining the platter associated with the most image requests . . ."...........................................................................................37

7.   "Means for searching each other platter associated with image requests . . ."..............................................................................................................38

8.   "Means for determining if there is a request associated with a second side of the platter . . ." ....................................................................................39

V.   CONCLUSION...........................................................................................................40

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*,
   340 F.3d 1298 (Fed. Cir. 2003) ..................................................................... 28

*BorgWarner, Inc. v. New Venture Gear, Inc.*,
   237 F. Supp. 2d 919 (N.D. Ill. 2002) ............................................................. 31

*Budde v. Harley-Davidson, Inc.*,
   250 F.3d 1369 (Fed. Cir. 2001) ....................................................................... 5

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
   296 F.3d 1106 (Fed. Cir. 2002) ........................................................... 33, 34, 35

*CCS Fitness, Inc. v. Brunswick Corp.*,
   288 F.3d 1359 (Fed. Cir. 2002) ..................................................................... 10

*Electro Med. Sys. S.A. v. Cooper Life Scis., Inc.*,
   34 F.3d 1048 (Fed. Cir. 1994) ......................................................................... 5

*Finisar Corp. v. DirecTV Group, Inc.*,
   523 F.3d 1323 (Fed. Cir. 2008), *cert. denied* 129 S. Ct. 754 (2008) ................... 30

*Garmin LTD. v. TomTom, Inc.*,
   No. 06-C-0062-C (W.D. Wis Aug. 24, 2006) ................................................... 31

*Harris Corp. v. Ericsson Inc.*,
   417 F.3d 1241 (Fed. Cir. 2005) ............................................................... passim

*Hoganas AB v. Dresser Indus., Inc.*,
   9 F.3d 948 (Fed. Cir. 1993) ............................................................................ 5

*In re Freeman*,
   573 F.2d 1237 (C.C.P.A. 1978) ..................................................................... 30

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
   381 F.3d 1111 (Fed. Cir. 2004) ....................................................................... 4

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001) ....................................................................... 4

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
   382 F.3d 1354 (Fed. Cir. 2004) ..................................................................... 10

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) ............... 3, 4, 5, 6

*Micro Chem., Inc. v. Great Plains Chem. Co.*,
   194 F.3d 1250 (Fed. Cir. 1999) ................................................................. 31, 32

*Network Commerce, Inc. v. Microsoft Corp.*,
   422 F.3d 1353 (Fed. Cir. 2005) ................................................................. 11, 17

*Oatey Co. v. IPS Corp.*,
    514 F.3d 1271 (Fed. Cir. 2008) ................................................................. 23

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...................................... passim

*Rexnord Corp. v. Laitram Corp.*,
    274 F.3d 1336 (Fed. Cir. 2001) .................................................................. 5

*Serrano v. Telular Corp.*,
    111 F.3d 1578 (Fed. Cir. 1997) ................................................................ 37

*Sjolund v. Musland*,
    847 F.2d 1573 (Fed. Cir. 1988) ........................................................... 5, 13

*South Corp. v. United States*,
    690 F.2d 1368 (Fed. Cir. 1982) (*en banc*) ............................................ 30

*SuperSpeed, L.L.C v. Int'l Bus. Machs. Corp.*,
    C.A. No. 2-07-cv-89 (E.D. Tex. Feb. 11, 2009) ................................... 31

*WMS Gaming, Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999) ................................................................ 30

**Statutes**

35 U.S.C. § 112 ........................................................................................... passim

**Other Authorities**

MICROSOFT PRESS COMPUTER DICTIONARY (Kim Fryer, et al. eds., 1997) ................................. 10

THE ILLUSTRATED DICTIONARY OF ELECTRONICS (Stan Gibilisco ed., 1997) .............................. 10

WEBSTER'S NEW WORLD DICTIONARY OF COMPUTER TERMS ................................................. 14, 19

## I.   INTRODUCTION

Plaintiffs JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and JPMorgan Chase Electronic Financial Services, Inc. (collectively, "JPMorgan"), submit their Opening Claim Construction Brief in support of their constructions of certain claim terms of U.S. Patent Nos. 5,917,965 ("the '965 Patent" or "Check Imaging Patent") and 7,317,823 ("the '823 Patent" or "Lockbox Patent") (collectively, "the Patents-in-Suit" or "JPMorgan Patents"). After conferring with Defendants Affiliated Computer Services, Inc. and ACS State & Local Solutions, Inc. (collectively "ACS"), the parties have agreed on a number of constructions.[1]   However, other terms are still disputed.[2]

ACS provides check imaging and lockbox services to large and mid-sized government and corporate customers.   JPMorgan was a pioneer in the field of check imaging and lockbox services and remains one of the foremost innovators and service providers in these areas.   As discussed in more detail below, check imaging systems and lockbox systems like the ones patented by JPMorgan are designed to accelerate the collection, processing, and deposit of check payments received through the mail.   They are also designed to make electronic versions of check payments and associated documents quickly available to the clients for account reconciliation and servicing of customer service inquiries.   For example, a municipality may designate an address for citizens who owe fines.   A lockbox system would collect and process the payments sent to that address as well as process payment stubs or other accompanying documents with the payment.   Prior to the inventions described in the JPMorgan Patents,

---

[1] After the parties filed their Joint Claim Construction Statement ("JCCS") on September 18, 2009 (D.I. 328), they agreed that U.S. Patent Nos. 5,946,669, 6,119,107, 7,225,155, 7,174,315, 6,615,190, and 7,165,049 will be dropped from the case.   The parties are preparing a stipulated motion to dismiss to be filed with the Court shortly.   The parties also agreed that certain additional disputed claim terms no longer require construction by the Court (e.g., the '823 Patent claim term "document").

[2] In support of their respective briefs, the parties submit a Joint Appendix (referred to herein as "JA") of exhibits containing, *inter alia*, copies of the Patents-in-Suit and their respective file histories.

however, check imaging and lockbox processing systems typically involved several manual, labor intensive, error prone, paper-based operations coupled with awkward automated electronic processes.

As previewed in the parties' Joint Claim Construction Statement filed with the Court in September (see fn. 1, *supra*), JPMorgan proposed definitions of claim terms that reflect the customary meaning of terms as supported by the intrinsic evidence.  In particular, JPMorgan relies upon the intrinsic evidence, including the claims and specifications of the Patents-in-Suit, to support its constructions for the disputed claim terms.  As explained below, most of the claim terms have ordinary meanings such that no special explanation is required for the jury.  The rest can be defined pursuant to their customary meaning in the field consistent with intrinsic evidence that is merely confirmed by extrinsic sources.  The result of this methodical application of the relevant legal principles is a set of constructions that makes sense and that will assist the jury.

On the other hand, ACS repeatedly and improperly imports limitations into, and otherwise unduly restricts, the claims.  Instead of construing the terms of the asserted claims, ACS abandons all pretenses of a proper claim construction and repeatedly reads extraneous limitations directly into the disputed claim terms from the specification, the prosecution history, irrelevant extrinsic evidence, or from whole cloth.  In the aggregate, ACS's claim construction positions boil down to the erroneous proposition that the Court should import unwritten limitations into the broadly stated claims from various disclosed embodiments in the specification.

ACS's proposed constructions must be summarily rejected as contrary to law.  It has been held as a bedrock principle of patent law that the claims of a patent define the inventions to which the patentee is entitled the right to exclude.  Seminal cases hold that while the

specification is used to discern how the person of ordinary skill would have understood the claim terms, a Court must avoid impermissibly using the specification to import limitations into the claim so as to limit it to disclosed embodiments.  Indeed, the Federal Circuit has opined that a departure from the claim language is only justified if there are expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.  As discussed in more depth below, the Federal Circuit has expressly rejected ACS's approach to claim construction.  Therefore, this Court should apply the full scope of the claim language pursuant to the intrinsic evidence.

It will quickly become clear to the Court that ACS's proposed constructions are transparent attempts to avoid a finding of infringement.  In order to manufacture as many non-infringement arguments as possible, ACS ignores the "heavy presumption" that claim terms have their ordinary, customary meaning and asks this Court to construe many common terms that do not require construction.  Trying to shoe horn non-infringement positions into claim terms, ACS also asks the Court to ignore well-established principles of claim construction and improperly limit the scope of the Patents-in-Suit.  Every single one of ACS's proposed constructions adds an unnecessary limitation to a claim in an obvious attempt to support some "outcome determinative" argument.  The Court should reject ACS's tactic and the result it would produce.

In sum, ACS proposes narrow, often confusing constructions that are barely-disguised attempts to create non-infringement positions, as contrasted to the ordinary and customary meaning approach proposed by JPMorgan.

## II.   LEGAL PRINCIPLES OF CLAIM CONSTRUCTION

Patent claim construction is an issue of law, to be decided by the court.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).  Claim terms must be defined by a court as a person of ordinary skill in the relevant art would understand and interpret them.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed.

Cir. 2005) (*en banc*); *Markman*, 52 F.3d at 986.

### A.      Claim Language is the Starting Point for Construction

The patent claims define the patented invention "to which the patentee is entitled the right to exclude." 35 U.S.C. § 112(2); *see also Phillips*, 415 F.3d at 1312; *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004); *Markman*, 517 U.S. at 373. Thus, claim construction begins with the words of the claim. *See Phillips*, 415 F.3d at 1312; *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.'").

The focus during claim construction should be on how the patentee used the claim term. *Phillips*, 415 F.3d at 1323. Claim terms "are generally given their ordinary and customary meaning[, which] is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (*citing, inter alia, Innova/Pure Water*, 381 F.3d at 1116). As the Federal Circuit has explained, "the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321.

### B.      Intrinsic Evidence is the Most Significant Source for Claim Construction

Intrinsic evidence of claim construction includes the claims, the patent specification, and the prosecution history. "[The] claims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (*quoting Markman*, 52 F.3d at 978), *id.* at 1313 ("[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the

specification."). "In construing terms used in patent claims, it is necessary to consider the specification as a whole, and to read all portions of the written description, if possible, in a manner that renders the patent internally consistent." *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379-80 (Fed. Cir. 2001).

### 1. It is Improper to Read Limitations Into the Claims from the Specification

While the specification may be used to define or interpret existing claim language, limitations from the specification (or anywhere else) must not be read into claims. *See Sjolund v. Musland*, 847 F.2d 1573, 1581 (Fed. Cir. 1988) ("[W]hile it is true that claims are to be interpreted *in light of* the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims"). "It is improper for a court to add 'extraneous' limitations to a claim, that is, limitations added 'wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.'" *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993) (*quoting E.I. du Pont de Nemours & Co. v. Phillips Petro. Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988)). The Federal Circuit has explained that "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323; *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) ("particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments"). Succinctly stated, "[s]pecifications teach. Claims claim." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001) (*quoting SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985)).

Along with the claims and specification, the prosecution history is a source of intrinsic

evidence to be used to understand the claim terms. *See Phillips*, 415 F.3d at 1313 (the person of ordinary skill construes the customary meaning of the terms in the context of the claims, specification, and file history.)   Although the prosecution history can and should be used to understand the language used in the claims, it too cannot 'enlarge, diminish, or vary' the limitations in the claims." *Markman*, 52 F.3d at 967 [internal citations omitted].   Under *Phillips* the prosecution history is less useful for claim construction purposes than the specification because it represents an ongoing negotiation between the Patent & Trademark Office ("PTO") and the applicant, not the final product, and is thus lacks the clarity of the specification. *Id.*

### C.   Construction of Means-Plus-Function Claim Limitations

Many of the claim terms of the '965 Patent contain elements written in means-plus-function format pursuant to 35 U.S.C. § 112, ¶ 6 and should be construed accordingly.   Some of these means-plus function claim elements are performed by a computer executing an algorithm. For such computer-implemented means-plus-function elements, the court should examine the specification for specific steps or algorithms, and identify those specific items as part of the structure corresponding to recited function. *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005).

## III.   U.S. PAT. NO. 7,317,823

### A.   Background and Asserted Claims

Lockbox is a collection and processing service provided to billers by banks or other lockbox providers that collect mailed-in check payments from a dedicated postal box to which the biller directs its customers to send payments.   JA00080, 1:23-35.

The '823 Patent is directed to a system for imaging and capturing information from a lockbox remittance, e.g., a check and a payment coupon/invoice/stub associated with a check. JA00073, Abstract.   Besides processing the received remittances, a lockbox processing system

should provide the company with timely information regarding the checks and documents received. (*See* JA00080, 1:37-45.)

The invention of the '823 Patent provided an innovative lockbox processing system that scanned checks and remittance documents (e.g., invoices or coupons), created data records for the check and the remittance documents, and then electronically associated all the information – check image, data image, check data record, and document data record – so that a client could view everything soon after receipt. JPMorgan's invention allowed clients to efficiently search for and view electronic copies of checks and remittance documents, as well as data records describing the contents of the items, in order to address customer service inquiries and resolve problems in real-time. Additionally, JPMorgan's patented lockbox processing system shortened the amount of time necessary to process customer payments because one entity opened the payment envelopes, processed checks, scanned remittance documents, created the descriptive data records, and deposited payments directly into the client's account quickly.

JPMorgan asserts that ACS infringes claims 1 – 4 of the '823 Patent. Claim 1 recites (*see* JA00083, 7:40-8:25):[3]

---

1. A **lockbox processing system** for processing lockbox remittances, the lockbox remittances comprising a check and at least one document associated with the check, the check and at least one document forming a group, the check having a check number associated therewith, the system comprising:

a **document capture component**, the document capture component scanning the at least one document thereby generating a document image, the document capture component further generating a **document data record** that identifies the at least one document;

a **document capture memory** coupled to the document capture component and storing the document image and the document data record;

a **check capture component**, the check capture component scanning the check thereby generating a check image, the check capture component further generating a **check data record** that identifies the check;

---

[3] The disputed terms are underlined. There are no disputed limitations in dependent claims 2-3.

a **check capture memory** coupled to the check capture component and storing the check image and the check data record;

and a processor coupled to the check capture memory and the document capture memory, the processor **logically associating the check data record, the document data record, the check image and the document image**;

wherein the processor further retrieves the check image and the check data record from the check capture memory and stores the check image and the check data record in the document capture memory, and wherein the logical association is performed on the document capture memory.

4.   The system of claim 1, further comprising an **bulk file interface** coupled to the document capture memory, wherein bulk file interface is capable of transmitting to a customer the document data records, the check images and the document images associated with the customer.

*Id.*, 8:39-43.

## B.   Construction of the Disputed Limitations of Independent Claim 1

### 1.   "Lockbox processing system"

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| lockbox processing system | a system that processes payments in the form of checks and documents associated with checks | a system that processes payments in the form of checks and documents associated with checks such that the check need not be separately processed by a conventional financial processing system |

JPMorgan's construction of "lockbox processing system" is the customary meaning in the field as supported by the intrinsic evidence consisting of the claims, the specification, and the file history.

First, JPMorgan's construction is consistent with the plain language of Claim 1.  The claim specifically describes a "lockbox processing system" as a system that processes a check and at least one document associated with a check.  *See* JA00083, 7:40-43.  In particular, the claim defines a lockbox processing system as a "system for processing lockbox remittances."

*Id.*, 7:40-41 (emphasis added).   The preamble further explains that a "lockbox remittance[]" comprises a check and at least one document associated with a check." *Id.*, 7:41-43 (Claim 1). Including the claim's description of "lockbox remittance" in the definition of "lockbox processing system" yields a readily understandable construction of "lockbox processing system," i.e., "a system that processes payments in the form of checks and documents associated with checks." All of this is consistent with the customary understanding of lockbox processing in this field.

Second, JPMorgan's construction is informed by and entirely consistent with the specification. *See* JA00080, 1:26-30 (describing a company that would use a lockbox processing system as one that mails out invoices and receives payment on those invoices via checks.); *Id.,* 2:19-28 (explaining how a lockbox remittance is processed by receiving a check with an invoice).   The field of the invention refers to "checks and other documents associated with lockbox processing operations." *See id.*, 1:15-19.   In sum, the specification plainly reflects that a lockbox processing system is one that processes remittances including checks and associated documents.

Third, there is nothing in the file history that contradicts JPMorgan's customary meaning construction of "lockbox processing system." Finally, there is no disclaimer in the specification or file history that would negate the customary meaning dictated by the intrinsic evidence.

ACS's construction deviates from customary meaning by tacking on the additional limitation that a lockbox system must operate in such a fashion that "the check need not be separately processed by a conventional financial processing system." There is no support in the claim for superimposing this puzzling requirement.   Nor is there any basis in the specification or file history for finding that the inventors assigned a special definition to this term, or that there

was some clear disavowal of claim scope leading to this definition that would confuse most jurors and vex the person of ordinary skill in this field.

In sum, JPMorgan's proposed construction is consistent with the claim language, the specification, and the file history.  In contrast, there is no basis in any of the intrinsic evidence for ACS's superimposed negative limitation that the lockbox processing system operate "such that the check need not be separately processed by a conventional financial processing system," and, as such, JPMorgan's construction should be adopted.

### 2.   "Document capture component"

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION[4] |
|---|---|---|
| document capture component | a scanner that captures document images and a processor programmed to generate a document data record | a scanner that images documents and a workstation to generate a document data record that are separate from the check capture component |

JPMorgan's proposed construction of "document capture component" is consistent with the intrinsic evidence.

First, JPMorgan's construction is consistent with the plain language of Claim 1.  The claim states that a "document capture component" performs three tasks:  "scanning the . . .

---

[4] ACS also proposes a construction in means-plus-function format.  However, because the claim term does not use the word "means," there is a rebuttable presumption that the term should not be construed according to 35 U.S.C. § 112, ¶ 6.  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002); *see Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1360 (Fed. Cir. 2004) ("[T]he fact that a particular mechanism...is defined in functional terms is not sufficient to convert a claim element containing that term into a 'means for performing a specified function' within the meaning of 112(6)." (*quoting Greenberg v. Ethicon Endo-Surgery, Inc.,* 91 F.3d 1580, 1583 (Fed. Cir.1996)).  Further, the "presumption flowing from the absence of the term 'means' is a **strong one that is not readily overcome**." *Lighting World,* 382 F.3d at 1358 (emphasis added).  Because it is ACS's burden to overcome this strong presumption, JPMorgan will not address the errors of ACS's proposed means-plus-function construction in its Opening Brief.  A person of ordinary skill in the art would understand the term to connote sufficient structure for performing the recited function, and so much is even acknowledged by ACS as it proposed a non-means-plus-function construction of this disputed term.  Indeed, a "component" was known by those skilled in the art at the time of the invention to have structure.  *See, e.g.,* THE ILLUSTRATED DICTIONARY OF ELECTRONICS, 134-35 (Stan Gibilisco ed., 1997), at JA02847-8 and MICROSOFT PRESS COMPUTER DICTIONARY, 106 (Kim Fryer, et al. eds., 1997), at JA02851 (defining "component").

document"; generating a[n] . . . image" of the document; and "generating a . . . data record" of the document. *See* JA00083, 8:1-5. Further, the claim recites that the document capture portion of the system is "coupled to" another part of the system – the "document capture memory." *See id.*, 8:6-7 (Claim 1). Thus, the claim language itself defines in ordinary terms what the "document capture component" does, how it does it, and how it is connected to other parts of the overall system. *See Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1358-61 (Fed. Cir. 2005). Based on the claim, one of ordinary skill in the art would understand that the "document capture component" is an element in the overall lockbox processing system responsible for performing the specified tasks.

Second, JPMorgan's proposed construction is informed by and entirely consistent with the specification. Specifically, the specification supports JPMorgan's interpretation by teaching that a "scanner" scans the documents received into the lockbox processing system, and that the scanner outputs image files that represent the scanned documents. JA00081, 4:6-13. A person of ordinary skill would understand, then, that a scanner is the part of the system that scans the document and generates an image of the document. Further, as described in the specification, a processor will be involved to either control manual data entry or to control character recognition processes, in order to generate data records. *See id.,* 4:62-65. Thus, the specification supports JPMorgan's construction of the term to include a scanner and processor.

Next, the file history does not contradict JPMorgan's construction of "document capture component." Finally, there is no disclaimer in the specification or file history that would negate JPMorgan's construction.

ACS's proposed construction is contrary to both the claim language and the specification, as well as being difficult to comprehend. ACS's construction attempts to improperly restrict the claim's scope based solely on selected embodiments described in the specification.

First, ACS's construction advances a notion of separateness – that the "document capture component" is a wholly separate structure than the "check capture component." This "separateness" requirement appears nowhere in the claim language. Moreover, there is nothing in the specification or file history to support ACS's "separateness" limitation. The illustration of an invention using diagrams with various system blocks (*see, e.g.*, see JA000079, Figure 1) is standard practice in patent prosecution and in engineering designed to show the various functional elements of a system. The person of skill in the art readily understands that system blocks can be combined, subdivided, or otherwise in connection with actual implementations of an invention.

Second, ACS references a "workstation" in its construction, but the claim language does not recite a "workstation." The specification mentions in one example that, in conjunction with a scanner, a workstation may be used by an operator to manually generate records of data harvested from the scanned documents. JA00082, 5:32-37. However, the specification also teaches that a processor 180 may process scanned documents 120 containing document information. JA00081, 4:47-50, 5:14-20. Thus, the specification describes document data records input at workstations as well as created by processors. Also, the specification references such workstations as computers, so a person of ordinary skill in the art would understand that workstations contain processors that allow them to generate the document data records. *See* JA00078, Fig. 2 at 115, 145, and 160.

Nothing in the specification or file history suggests that the invention of Claim 1 must create a document data record only using a "workstation," as opposed to a processor or other types of computers. It is well-established that embodiments disclosed in the specification should not be read into the claims so as to limit them to the preferred embodiment. *See Sjolund*, 847 F.2d at 1581 ("[W]hile it is true that claims are to be interpreted *in light of* the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims") (emphasis in original).

In sum, JPMorgan's proposed construction is consistent with the claim language, the specification, and the file history, and should be adopted on that basis..

### 3.    "Document data record"

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| document data record | identifying information from a document | a record that stores manually input identifying information from a document associated with a check |

JPMorgan's proposed construction of "document data record" reflects the customary meaning in the field as supported by the intrinsic evidence.

First, JPMorgan's construction is consistent with the plain language of Claim 1. The claim recites that the "document data record [] identifies the [] document." JA00083, 8:4-5. Second, it is supported by the specification. The written description discloses that "identifying information from each of the documents (e.g., the invoice number on the document)...creat[es] a data record for each document." JA00080, 2:40-43. Thus, the claims and the specification, read together, indicate that a "document data record" is "identifying information from a document." Nothing in the file history is inconsistent with this construction, nor does the specification or file history evidence a disavowal.

JPMorgan's construction of this term is further confirmed by extrinsic evidence. For example, Webster's New World Dictionary of Computer Terms defines "data record" as a "unit of related data items stored in named data fields" and that one "contains all the information related to the item the database is tracking." *See* JA02852-54 at JA02854. Accordingly, if a "document data record" contained "identifying information from a document," such information is related to the item (the document) that is processed and tracked in the lockbox processing system.

ACS's proposed construction adds incorrect and/or superfluous limitations. For example, ACS posits that the "document data record" must be "manually input." This is an improper attempt by ACS to import a limitation into the claim from the specification. *See Phillips*, 415 F.3d at 1320, 1323. The claim does not state that the document data record is manually input. Moreover, the specification describes multiple approaches to creating data records, manual as well as non-manual. In the specification, the inventors explain that identifying information may be <u>automatically</u> harvested from a document or check being processed in the claimed system. *See, e.g.*, JA00081, 4:34-35 (describing one approach as having the benefit of "thereby obviating the need for any entry with respect to the documents.") First, the inventors explain that OCR may be used to harvest data automatically from a document. JA00081, 4:22-24 (disclosing a "conventional [OCR] process"). Then the specification teaches a Magnetic Ink Character Recognition (MICR) reader may be used to automatically read the MICR data from a check being processed in the system. JA00082, 5:25-27. The specification also teaches that a processor 180 may automatically process scanned documents 120 containing document information. JA00081, 4:50-51, 5:14-20. Elsewhere in the specification, semi-automation and

full automation are discussed at length. JA000082: 6:1-29. Accordingly, these teachings, taken together, refute the limitation ACS seeks to superimpose that the data must be manually input.

ACS's further add-on that the document data record is "from a document associated with a check" is an unnecessary limitation that is likely to confuse a jury. Because the remainder of the claim sets forth language relating the document, check, and other elements of the claim limitation, it is not necessary to describe these relationships in connection with individual terms.

In sum, JPMorgan's proposed construction is consistent with the claim language, the specification, and the file history. There is no basis in any of the intrinsic evidence for ACS's limitation that the data record must be manually input.

### 4.     "Document capture memory"

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| document capture memory | This claim term should be accorded its plain and ordinary meaning as understood by one skilled in the art, i.e., a memory that stores images and data relating to documents | memory separate from the check capture memory that stores document images and data records |

JPMorgan's proposed construction of "document capture memory" reflects customary meaning in the field as supported by the intrinsic evidence.

First, the claim language supports JPMorgan's construction in that it specifically recites that the document capture memory "stor[es] the document image and the document data record." JA00083, 8:6-7. Second, the specification supports JPMorgan's proposed construction. The specification describes that "a data record is generated for each document 110…and is included in database 170 [(or database 135)]." JA00082, 5:32-35; see 5:42-46; see also 5:59-61; JA00079, Figure 1: (computer 115 input into database 135). Document images, according to the written description, are stored on an image file server "in the document capture memory 130." JA00081, 4:13-14. Thus, one of ordinary skill in the art would understand, after reading the patent, that the

document capture memory includes a storage area for the document data records, and a storage area for the document images, which can be in the same, or different locations, and that these storage areas comprise the claimed "document capture memory."

ACS's proposed construction imposes an additional limitation, namely, that the claimed "document capture memory" be "separate from the check capture memory[.]"  Neither the claim nor other intrinsic evidence supports this restriction.  Thus, ACS's proposal to limit the definition of "document capture memory" violates the rule against importing a limitation into the claim from the specification.  *See Phillips*, 415 F.3d at 1320, 1323.  Moreover, the specification's disclosure that document data records may be stored in the same database as check data records contradicts ACS's proposed construction that the check capture memory and the document capture memory must be "separate."  JA00082, 5:33-35; *see* 5:59-61; *see also* 5:42-46.  Finally, the summary of the invention describes the document data records being stored in "a database" and the check data records being stored in "a database," contradicting ACS's suggestion that there must be "separate" memories or databases.  JA000802, 2:40-49.

In contrast, JPMorgan's straightforward construction – "a memory that stores images and data relating to documents" – is consistent with the specification and other intrinsic evidence, and should be adopted.

**5.     "Check capture component"**

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION[5] |
|---|---|---|
| check capture component | a scanner that captures check images and a processor programmed to generate a check data record | a scanner that images checks in parallel with the scanning of the documents by the document capture component and a workstation used to manually input data from each check to generate a check data record |

---

[5] ACS again proposed an alternative construction for this term according to a means-plus-function analysis.  Unless and until ACS overcomes the strong presumption against construing this term according to Section 112, ¶ 6, JPMorgan will defer that argument for its response to ACS's Opening Brief.  *See supra*, note 5.

JPMorgan's proposed construction of "check capture component" is supported by the intrinsic evidence. JPMorgan's construction of "check capture component" follows the same logic as its construction for "document capture component." *See supra*, Section III.2; *see also Network Commerce,* 422 F.3d at 1358-61 (Fed. Cir. 2005).

First, the claim language recites that the "check capture component" performs three tasks in the lockbox processing system: scan the check; generate an image of the check; and generate a data record of the check. *See* JA00083, 8:9-12. Thus, the claim itself defines in general terms what the check capture component does and how it operates consistent with JPMorgan's construction. *See Network Commerce*, 422 F.3d at 1358-59.

Second, the specification teaches that a "scanner" scans the checks received into the lockbox processing system, and that the scanner outputs images files that represent the scanned checks. JA00082, 5:27-31. Thus, a scanner scans the documents in order to capture check images. In conjunction with the scanner, the specification discloses that a "workstation" generates a data record based on each scanned document, and that in a preferred embodiment, the workstation includes a MICR reader "which reads the MICR line contained on a check...." *id.*, 5:20-27. Thus, the specification teaches not only that the data record may be generated at the workstation manually, but also automatically via the use of a MICR reader. Regardless of the method employed to generate the data record, a processor will be involved to either control the manual data entry or to control the MICR reader.

Thus, the specification and the claims, when read together, teach a person of ordinary skill in the art that a processor is involved in the check capture component with a scanner to accomplish the recited tasks. *See Network Commerce*, 422 F.3d at 1360-61. As a final check,

the file history is not inconsistent with JPMorgan's construction, nor is there any evidence of disclaimer.

In contrast, ACS attempts to improperly superimpose two limitations from the specification onto the claim.[6]   The first is that the check capture component must operate "in parallel" with the document capture component.  Starting with the claim language (Claim 1), nowhere does it recite that the check capture component must work "in parallel" with the document capture component.  This parallelism requirement is blatantly and improperly adopted from an embodiment described in the specification.  *See* JA00082, 5:17-19.  Moreover, the specification teaches away from such a restriction by repeatedly emphasizing that the operations of the invention can take place in various sequences.  *See, e.g.*, JA00080, 2:40 ("Either before or after the documents are scanned . . ."); JA00082: 5:2-4 ("After the scanning process is complete . . . (or alternatively during real time during the scanning process"), 5:40 ("there is no preferred order").  There is no basis for limiting the claim to the preferred embodiment in the specification in this regard.

ACS also attempts to limit the generation of the check data record to only manual data entry.  Not only is this concept found nowhere in the claim's plain language, it is also directly contrary to the automatic generation of a check data record disclosed by the specification with the MICR reader discussed above.  *Id.*, 5:25-27

In sum, JPMorgan's proposed construction is consistent with the claim language, the specification, and the file history.  There is no basis in any of the intrinsic evidence for the limitations ACS's seeks to graft onto the claim.

---

[6] ACS urges an alternative construction according to a means-plus-function analysis.  For the same reasons "document capture component" should not be construed according to section 112, ¶ 6, neither should "check capture component" and those reasons will not be repeated here.  *See supra* Section III.2; *see also supra* at note 5.

6.    **"Check data record"**

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| check data record | identifying information from a check | a record that stores manually input identifying information from checks, including the check number |

JPMorgan's proposed construction of "check data record" is consistent with customary understanding in the field as supported by the intrinsic evidence.

Starting with the claim language, claim 1 recites that the "check data record [] identifies the [] check." JA00083, 8:12. This is consistent with JPMorgan's common sense construction. JPMorgan's construction is also supported by the specification, which discloses "identifying information from each of the checks (e.g., the check number, the amount, etc.)…creat[es] a data record for each check." JA00073, Abstract; JA00080 2:46-49. The "e.g." is a signal that identifying information could be any of the listed items, or any other identifying items from a check. Thus, the claims and the specification, read together, indicate that a "check data record" is "identifying information from a check." Further, nothing in the patent's file history provides a contrary understanding, nor is there any disclaimer that would negate this construction.

JPMorgan's construction of this term is also consistent with the extrinsic evidence. For example, Webster's New World Dictionary of Computer Terms defines "data record" as a "unit of related data items stored in named data fields" and that one "contains all the information related to the item the database is tracking." JA02852-54 at JA02854. Accordingly, if a "check data record" contained "identifying information from a check," such information is related to the item (the check) that is processed in the lockbox processing system.

In the competing construction, ACS proposes that a "check data record" must be "manually input" and must "includ[e] the check number." Once again, ACS is urging a construction that improperly imports multiple limitations into the claim from the specification.

*See Phillips*, 415 F.3d at 1320, 1323.  First, the claim's plain language does not include a limitation of manual data input.  Second, the inventors specifically contemplated that identifying data could be <u>automatically</u> read from checks by explaining that a preferred embodiment could "include a Magnetic Ink Character Recognition (MICR) reader which reads the MICR line contained on a check."  JA00082, 5:25-27.  Further, any construction requiring the check data record to contain the check number, as ACS has proposed, would be contrary to the specification, which unambiguously states that one <u>example</u> ("e.g.") of identifying information from a check is the "check number."  JA00080, 2:47.

In sum, JPMorgan's proposed construction is consistent with the intrinsic record.  There is no basis for the limitations ACS's seeks to graft onto the claim.

### 7.    "Check capture memory"

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| check capture memory | This claim term should be accorded its plain and ordinary meaning as understood by one skilled in the art, i.e., a memory that stores images and data relating to checks | memory separate from the document capture memory that stores check images and data records |

JPMorgan's proposed construction of "check capture memory" reflects customary understanding as supported by the intrinsic evidence.  The competing constructions proposed for "check capture memory" are similar to those proposed for "document capture memory," discussed above.  As with its proposal on "document capture memory," ACS's proposed construction for "check capture memory" includes an additional limitation that appears nowhere in the claim.

First, JPMorgan's construction is supported by the claim, which specifically recites that the check capture memory "stor[e] the check image and the check data record."  JA00083, 8:14-15. Second, the specification is consistent in teaching that "a [check] data record is generated in

database 170 for each check 105" and that "check images are [] stored on an image file server 175 and the check images are linked to their respective check data record in database 170." JA00082, 5:23-31. Thus, the patent explains that the check capture memory, referenced in Fig. 1, includes a storage area for the check data records, and a storage area for the check images, and these storage areas comprise the claimed "check capture memory."

There is nothing in the file history or specification inconsistent with JPMorgan's construction or that would reflect a disclaimer. Thus, JPMorgan's construction is consistent with the intrinsic evidence.

ACS's construction imposes the restriction that the claimed "check capture memory" be "separate from the document capture memory[.]" As discussed above in connection with the "document capture memory," limiting "check capture memory" in this manner improperly imports a limitation into the claim from the specification. *See Phillips*, 415 F.3d at 1320, 1323.

### 8.    "Logically associating"

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| logically associating | This claim term should be accorded its plain and ordinary meaning as understood by one skilled in the art, i.e., creating a logical, rather than physical, relation between | for a single document or single data record, automatically creating a logical connection by searching the document capture memory for documents that have a key corresponding to the check number, batch number or check amount reflected in the check data record, or for multiple documents with multiple data records, manually creating a logical connection through an operator at a workstation |

JPMorgan's proposed construction of "logically associating" reflects customary understanding supported by the intrinsic evidence.

JPMorgan's construction is consistent with the plain language of the claim while ACS's construction introduces a grab-brag of limitations that are generally described in the specification, but are found nowhere in the recited claim language. Further, ACS's construction

is needlessly complicated, and would make this term exceptionally difficult for a jury to understand.

The claim language supports JPMorgan's construction. The recited language describes "logically associating" as a process performed by a processor that results in a non-physical connection between four different items, that is, the check image, document image, check data record, and document data record. *See* JA00083, 8:17-19. Next, the specification, consistent with the claim, broadly teaches that "[p]roper association means that all of the data and images reflect a group **102** as it was received by the system." JA00082, 5:65-67. In other words, the documents and checks which arrived at the lockbox processing system physically associated together in an envelope, are electronically associated "such that the system recreates an electronic version of the original batch of physical papers." JA00073, Abstract. Thus, the items are logically, as opposed to physically, associated.

The specification's broad support for electronically associating records ("logically associating") is supported in multiple places: first, the linkage between these items may occur through the use of "standard database techniques" JA00082, 6:7; second, data records may be linked "through the use of a common data field" *id.*, 6:9-10; third, data records and images are linked through the use of database "key[s]" *id.*, 6:19; and fourth, a "logical connection" is created between the data records and the images *id.*, 6:25. Thus, JPMorgan's construction – "creating a logical, rather than physical, relation between" – is consistent with the broad disclosure of "logical association" both in the claims and its description in the specification.

ACS's construction of "logically associating" is flawed by its inclusion of multiple limitations selected from the specification that are found nowhere in the recited claim language.

ACS's construction addresses two cases of association – (i) a single document case; and (ii) a multiple document case.

For the single document case, ACS urges that the logical association be limited to a particular searching algorithm described in the specification *id.*, 6:11-29.  However, ACS draws its limitation from the specification's description of "an example of the association process" which is pictured in Fig. 3. *Id.*, 6:1 (emphasis added).  Because this is but one example of how association may occur in the claimed system, it would be improper to use such an example to limit the scope of the claims.  *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification. . . . At leas[t] where claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary.").

For the multiple document case, ACS urges that the logical association be limited to a disclosed manual association process, *id.*, 6:30-48.  However, ACS ignores the disclosed description of an embodiment where barcodes are imprinted on each document, such that the bar code "would greatly speed the association process" and would cause a processor performing the association to be "able to read and recognize each document."  JA00081, 4:25-35; JA00082, 6:61-62.  Thus, the association process could occur without any manual intervention.  *See* JA00081, 4:34-35.  Because of these disclosed alternatives, ACS's construction would be contrary to the intrinsic evidence, and would improperly limit the claim to a scope when there is no evidence of any intent by the inventors to do so. *See id.*

Accordingly, JPMorgan submits ACS's proposed construction should be rejected in favor of JPMorgan's construction which is not only consistent with the intrinsic evidence, but also is more easily understood by a jury.

### 9. "Logically associating the check data record, the document data record, the check image and the document image"

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| logically associating the check data record, the document data record, the check image and the document image | This claim term should be accorded its plain and ordinary meaning as understood by one skilled in the art, i.e., creating a logical, rather than physical, relation between the check data record, the document data record, the check image and the document image | logically associating the check data record, the document data record, the check image, and the document image that requires associating the check number with the other documents that accompanied the check |

JPMorgan believes that this phrase needs no construction separate from the construction of the subsidiary phrase "logically associating" above. ACS, on the other hand, proposes a construction that incorporates its proposed construction of "logically associating" and also includes additional limitations improperly imported from the specification. Specifically, ACS's construction further includes a requirement that the check number be used in the association operation. ACS's proposed construction is contrary to the intrinsic evidence.

ACS's proposed construction, which requires that the check number be used in the association requirement, finds no support in the plain language of the claim, which does not mention "check number." The claim states that the items are logically associated, it does not mandate that they are logically associated using the check number. Second, ACS's proposed construction is contrary to the specification because the inventors made clear that the check number is but one example of a "key" that could be used to logically associate the images and the data records. JA00082, 6:20. Further, the inventors contemplated that association can be accomplished without using a check number – for example, the "barcode" embodiment JA00081, 4:25-39 would encode the "key" used to logically associate the data records and images.

Because ACS's restriction of the logical association to use of the check number is contradicted by the specification, it may not be a part of the proper construction.

### C.  Construction of the Disputed Limitation of Dependent Claim 4

#### 1.  "Bulk file interface"

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| bulk file interface | a connection between at least two computer systems, e.g., the Internet, private network, LAN, WAN, VAN, or dial-up connection, allowing for the transmission of data, e.g., FTP | an Internet, private network, or dial up connection between the work station and the customer system for transmitting all of the data and images for a customer in a single file |

JPMorgan's proposed construction is the customary meaning in the field as supported by the intrinsic evidence.

JPMorgan and ACS agree that a "bulk file interface" relates to a connection between two computer systems; that the Internet, a private network, or a dial-up connection may be used; and that data is transmitted using the recited interface. However, ACS urges that data transmission via a bulk file interface occurs only through the transmission of a single file. There is simply no support for ACS's additional "single file" requirement in the plain language of the claim or the specification. In contrast, JPMorgan's construction is proper because it does not import such extraneous limitations not required by the claim or customary meaning. Accordingly, ACS's proposed construction should be rejected.

## IV.  U.S. PAT. NO. 5,917,965

### A.  Background

The '965 Patent describes methods and systems for storing electronic images of documents having a magnetic ink code ("MICR") line, such as a check. *See, e.g.,* Fig. 1 below. Prior to the invention described in the '965 patent, there was no way to efficiently search or

retrieve stored check images.  If customer inquired about a payment, image archives would have to be manually searched one by one until the right check was found.

Figure 1.



The inventors of the '965 Patent developed an improved technology for archiving and retrieving checks upon request.  Specifically, the '965 Patent discloses a system and process for forming an electronic image of a document, reading and decoding the MICR line to form decoded MICR data, and merging the electronic image and decoded MICR data into a tagged image file format (TIFF) file.  This system and process allows checks to be easily retrieved by searching the decoded MICR data in the TIFF file that accompanies the images of both check sides.

**B.    Construction of Disputed Non-Means-Plus-Function Limitations**

1.    **"Decoded magnetic ink coded data"**

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| decoded magnetic ink coded data | This claim term should be accorded its plain and ordinary meaning as understood by one skilled in the art, e.g., decrypted magnetic ink coded data. | machine recognized data based on the magnetic signal created by each magnetic ink character's unique shape |

JPMorgan and ACS agree that the proper construction for the term "magnetic ink code line" is "a series of alpha numeric digits encoded in magnetic ink."[7]  Consistent with this,

---

[7] *See* Joint Claim Construction Statement, D.I. 328.

JPMorgan's construction of "decoded" magnetic ink coded data includes the additional requirement that such digits are converted from code.

JPMorgan's plain meaning construction is consistent with the claim language, which refers to "decoding" the MICR data to form the "decoded magnetic ink coded data." The specification also supports this construction by using the term "decoded" to identify the data decoded from the magnetic ink code line. *See* JA00047, 9:5-9 ("[D]ocuments comprise checks each having a magnetic ink code line thereon, and the invention further comprises electronically reading and decoding the magnetic ink code line to form decoded magnetic ink coded data ..."); JA00049, 14:65-67 ("When the check 1 reaches the MICR reader 205, the MICR is magnetically decoded, as is known in the art.").

ACS, in contrast, incorporates numerous limitations into the term "decoded magnetic ink coded data" that are not in the claims, appear nowhere in the specification, and are inconsistent with the parties' agreed upon construction of magnetic ink code line. For example, neither the claims nor the specification require that that "the series of alpha numeric digits encoded in magnet ink" each have a "unique shape." Nor does the claim state that the data is read using a "magnetic signal"; on the contrary, the specification teaches that the MICR data may be read via an OCR operation. *Id.*, 14:65-67; JA00051, 17:63-67. Accordingly, ACS's proposed construction should be rejected.

2.    **"Tagged image file format (TIFF) file" and "Tag field in the TIFF file"**

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| tagged image file format (TIFF) file | a file format for storing images and data in tag fields | a standard file format for storing images and data in tag fields currently under the control of Adobe Systems |
| tag field in the TIFF file | a data field in a TIFF file | a data field defined by the TIFF standard that is merged into the same TIFF file and stored in the same physical electronic storage device as the image data |

JPMorgan and ACS largely agree on the construction of a "tagged image file format file." ACS's definition, however, requires that such file format be a "standard" format "currently under the control of Adobe Systems." The intrinsic evidence does not support these extraneous requirements.

The intrinsic evidence shows that the tagged image file format is not limited to "standard" Tagged Image File Formats. The claims do not state anything about "standard" files or Adobe Systems and the specification contradicts such requirements. For example, when describing a preferred embodiment, JA00051, 17:68-58, the specification indicates that an image from a scanner can be converted to a "standard Tagged Image File Format." *Id.*, 18:40-46. Yet in the claims and other locations in the specification, the term tagged image file format is used generally, i.e., without any requirement that a TIFF is a standard TIFF. *See* JA00069, Claim 1, ("tagged image file format (TIFF) file"); JA00050, 15:1-4 ("In accordance with the preferred embodiment of the invention, the digital images of the front and back of the check 1 are merged, by the control computer 201, into a single TIFF (Tagged Image File Format) file 22"). "[V]aried use of a disputed term in the written description attests to the breadth of a term rather than providing a limiting definition." *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003).

Consistent with the specification, the prosecution history indicates that "new fields" were developed for use with the present invention that "were not available in standard file formats." JA00591. As the claims are plainly not limited to a "standard" TIFF under the control of Adobe Systems and the intrinsic evidence makes plain that fields "not available in standard file formats" may be used, ACS's attempt to import this limitation, in contradistinction to these teachings, must be rejected. *See Anchor Wall*, 340 F.3d at 1308.

With respect to the term "tag field in the TIFF file," the parties largely agree on what a "tag field in the TIFF file" is, *i.e.*, a data field of the TIFF file. However, ACS's proposed construction improperly adds various functional requirements concerning the "merging" and "storing" of the tag field.

For example, the claims contain separate limitations concerning the "merging" and "storing" of the "TIFF file." *See, e.g.,* JA00069, Claim 1 ("merging said electronic image;" "storing the TIFF file"). Either ACS's attempt to add these functional requirements onto the term "tag field in the TIFF file" is inconsistent with the claim 1's language or it renders the additional language redundant. Regardless, it is improper and is likely to confuse the jury. Accordingly, JPMorgan's construction should be adopted.

### 3.     "Binary large object (BLOB)"

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| binary large object (BLOB) | a collection of binary data stored as an entity in a database | a collection of TIFF images stored as a single entity in a database |

The parties agree that the term "binary large object (BLOB)" is a collection of data stored as an entity in a database. However, ACS's construction improperly limits a BLOB to a collection of "TIFF images" stored as a "single" entity in a database.

ACS's construction contradicts the plain language of the claims. Specifically, with respect to Claim 3, "a plurality of … TIFF *files*" are grouped as a binary large object or BLOB. JA00069, 54:46-51. ACS's construction of binary large object inexplicably recasts the language of the claims, inserting TIFF *images* for TIFF *files*, and adding a separate requirement that the TIFF *images* "be stored as single entity." Accordingly, JPMorgan's construction should be adopted.

## C.    Construction of Disputed Means-Plus-Function Limitations

The parties agree that there are eight means-plus functions limitations in the '965 Patent, and each function recital is agreed-upon.   The parties also agree that the limitations are "computer implemented" means-plus-function limitations, and that the specification discloses an algorithm for performing each of the recited functions.   The parties' sole disagreement concerns identifying the specific steps or algorithm for performing the recited function.

"A computer-implemented means-plus-function term encompasses the corresponding structure disclosed in the specification and equivalents thereof" including any algorithm, or steps performed by the computer.   *Harris Corp.* at 1253 (emphasis added); *see also WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999).   The algorithm requirement for computer-implemented means elements is liberally construed to encompass any description sufficient to allow the person of ordinary skill to program a computer to perform the applicable function, as stated in *Finisar Corp. v. DirecTV Group, Inc.,* 523 F.3d 1323, 1340 (Fed. Cir. 2008):

> Thus the patent must disclose, at least to the satisfaction of one of ordinary skill in the art, enough of an algorithm to provide the necessary structure under § 112, ¶ 6.  This court permits a patentee to express that algorithm in any understandable terms including as a mathematical formula, in prose, *see In re Freeman*, 573 F.2d 1237, 1245-46 (C.C.P.A. 1978)[8], or as a flow chart, or in any other manner that provides sufficient structure.

*cert. denied*, 129 S. Ct. 754 (2008).

In *Harris*, the Federal Circuit construed a "time domain processor means" for "simulating the time domain effect ... by deducing prescribed characteristics" and "for producing estimates ...." 417 F.3d at 1253.  The Federal Circuit first identified where the specification disclosed an algorithm for performing the recited function.  *Id.* at 1254 (finding that the algorithm is described

---

[8] Decisions of the Court of Customs and Patent Appeals (C.C.P.A.) are binding precedent on the Federal Circuit. *South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (*en banc*).

"in Figures 8A, 8B, and 9 and described at col. 7, l. 18-col. 8, l. 38; col. 13, l. 45-col. 14, l. 20; and col. 15, l. 2-col. 16, l. 11.") The Federal Circuit then determined the necessary steps of the algorithm to perform the function. *Id.* (noting that "[a]spects of this algorithm can vary based on implementation and that the algorithm was not limited to the specific equations disclosed in the specification.) Finally, the Court determined that, of the three figures and associated text disclosing the algorithm, the proper construction was a two-step process for performing the recited function. *Id.*; *see also SuperSpeed, L.L.C v. Int'l Bus. Machs. Corp.*, C.A. No. 2-07-cv-89, 2009 WL 383255, at *9-10 (E.D. Tex. Feb. 11, 2009) (rejecting accused infringers attempt to read entire figures into claims based upon *Harris*). District courts must similarly determine the steps necessary to perform the recited function and restate those steps in a manner that a jury can understand. *See, e.g., BorgWarner, Inc. v. New Venture Gear, Inc.*, 237 F. Supp. 2d 919, 928-53 (N.D. Ill. 2002); *Garmin LTD. v. TomTom, Inc.*, No. 06-C-0062-C, 2006 WL 6005801, at *89-90 (W.D. Wis Aug. 24, 2006) (finding that party "correctly identified each of the steps ... necessary to perform the recited function" of the disclosed algorithm.); *see also, e.g., Micro Chem., Inc. v. Great Plains Chem. Co.,* 194 F.3d 1250, 1258 (Fed. Cir. 1999) (reversing district court for defining the "structure" with extraneous features).

Contrary to the proper process for construing computer implemented means-plus-function limitations, ACS identifies multiple paragraphs of the specification and figures as the disclosed algorithm for performing each of the eight recited functions, but ACS fails to identify the algorithm that performs each particular function at issue.

ACS attempts to identify neither the "necessary" steps of the algorithm nor the steps of the disclosed algorithms that perform the recited function. Instead, ACS reads large portions of

the specification into the claims with complete disregard for whether such portions actually

perform the recited function.  Accordingly, ACS's proposed constructions should be rejected.

1.    **"Means for searching said BLOB index . . ."**

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| means for searching said BLOB index by using the account number and check number of the requested check | The parties agree that this term should be construed pursuant to § 112, ¶ 6:<br><br>function: searching said BLOB index by using the account number and check number of the requested check<br><br>structure: computer programmed to search an index database for a check request using an account number and a check number, and its equivalents. | The parties agree that this term should be construed pursuant to § 112, ¶ 6:<br><br>function: searching said BLOB index by using the account number and check number of the requested check<br><br>structure: computer programmed to perform the Requester Process algorithm on TIFF files |

JPMorgan identifies the steps necessary to perform the recited function of searching the

BLOB index.  The specification discloses that this function is performed by performing a search

of the index database for each check request and determining whether or not the check image

resides on the image storage device.  *See* JA00057, 29:20-33.  The specification further discloses

that the above request may be performed using, among other fields, the account and check

number.  *See id.*  As such, JPMorgan identifies the necessary steps that perform the recited

function.  *See Harris Corp.,* 417 F.3d at 1253-4.

While the algorithm identified by JPMorgan is part of the Requester Process, the

Requester Process contains various other steps for performing different functions than that

recited for the present means term.  *E.g.,* JA00055, 25:47-50 (steps for reading check requests;

*id.,* 25:4-15 (steps for processing a search wherein more than one TIFF file is located and

wherein no TIFF files are located).  In fact, as used in a first embodiment, the Requester Process

does not even utilize BLOBs.  *Id.,* 25:40 – 26:15.

ACS's failure to identify which steps of the Requestor Process actually perform the

recited function renders its construction improper.  *See Micro Chem.,* 194 F.3d at 1258 (holding

that district court improperly identified structure unnecessary to perform the recited function); *Cardiac Pacemakers,Inc., v. St. Jude Med., Inc.,* 296 F.3d 1106, 1116 (Fed. Cir. 2002) (holding that features that do not perform the recited function do not constitute corresponding structure and may not serve as claim limitations); *Harris,* 417 F.3d at 1254 (identifying and construing algorithm disclosed in numerous paragraphs of text as a two-step process). Accordingly, ACS's proposed construction should be rejected.

### 2.   "Means for verifying each request . . ."

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| means for verifying each request for a check to insure that the user placing the request is authorized | The parties agree that this term should be construed pursuant to § 112, ¶ 6:<br><br>function: verifying each request for a check to insure that the user placing the request is authorized<br><br>structure: computer programmed to verify the request against a valid accounts file, and its equivalents. | The parties agree that this term should be construed pursuant to § 112, ¶ 6:<br><br>function: verifying each request for a check to insure that the user placing the request is authorized<br><br>structure: computer programmed to perform the Retrieval Process algorithm on TIFF files |

JPMorgan identifies the steps necessary to perform the recited function of verifying each request for a check. The specification discloses that the "check to confirm that the user is authorized is done by verifying that the account with which the request check is associated in on the user's valid accounts file." *See* JA00055, 26:35-45. Consistent with *Harris*, JPMorgan identifies these steps as performing the recited function.

In contrast, ACS identifies the entire "Retrieval Process" as the necessary steps to perform the recited function. The "Retrieval Process" is disclosed in ten paragraphs of text and three figures and performs numerous functions in addition to the recited function. ACS's construction even recognizes that the Retrieval Process performs numerous functions in addition to verifying each request for a check because it identifies the same "Retrieval Process" as performing the function for at least five other different means-plus function elements. *See* §§

33

IV.C.2 – IV.C.8, *infra* (ACS points to same Retrieval Process for "means for verifying", "means for comparing", "means for determining . . . a platter", "means for determining . . . a request", "means for searching [the] platter", etc.).  ACS's disregard for the specific steps of the "Retrieval Process" that perform the specifically recited function renders its construction improper.  *See Cardiac Pacemakers*, 296 F.3d at 1116.  Accordingly, ACS's proposed construction should be rejected.

### 3. "Means for comparing the account number . . ."

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| means for comparing the account number in the request to the list to determine if the requester is authorized to make requests from the account specified by the account number | The parties agree that this term should be construed pursuant to § 112, ¶ 6:<br><br>function: comparing the account number in the request to the list to determine if the requester is authorized to make requests from the account specified by the account number<br><br>structure: computer programmed to compare the account number of the request with a valid accounts file, and its equivalents | The parties agree that this term should be construed pursuant to § 112, ¶ 6:<br><br>function: comparing the account number in the request to the list to determine if the requester is authorized to make requests from the account specified by the account number<br><br>structure: computer programmed to perform the Retrieval Process algorithm on TIFF files |

JPMorgan identifies the steps necessary to perform the recited function of "comparing the account number ...."  The specification discloses that the portion of the Retrieval Process that performs the recited function compares the account number of the request with a valid accounts file, *see* JA00055, 26:35-45, and that this confirmation is accomplished by referencing the list of accounts a user is permitted to access, which is maintained in an account file.  *See id.*  This analysis is consistent with *Harris*.

In contrast, ACS again identifies the entire "Retrieval Process" as the steps of the disclosed algorithm for performing the recited function.  As detailed above, ACS's attempt to read numerous paragraphs of text and figures from the '965 Patent – and its disregard for the

steps that perform the recited function – render its proposed construction improper. *See Cardiac Pacemakers*, 296 F.3d at 1116. Accordingly, ACS's proposed construction should be rejected.

4.      **"Means for determining the platter associated with each request..."**

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| means for determining the platter associated with each request and forming a listing of the requests for each platter | The parties agree that this term should be construed pursuant to § 112, ¶ 6:<br><br>function: determining the platter associated with each request and forming a listing of the requests for each platter<br><br>structure: database controller, image storage controller, or a computer programmed to interrogate the storage space to determine the platter associated with the request, and its equivalents | The parties agree that this term should be construed pursuant to § 112, ¶ 6:<br><br>function: determining the platter associated with each request and forming a listing of the requests for each platter<br><br>structure: computer programmed to perform the Requester Process algorithm on TIFF files |

JPMorgan identifies the steps necessary to perform the recited function of "determining the platter ... and forming a listing of the requests." The specification discloses an algorithm which uses the account number, check number, and/or the amount of the requested check into a path and file name and then locating the corresponding path and file name, if it exists. *See* JA00055, 25:50 – 56. The specification further discloses interrogating the meta-data to determine the platter upon which the requested TIFF file is present. *See Id.*, 25: 56 – 60. The algorithm then sorts all of the requests by platter and platter side. *See Id.*, 26:25-27. Alternatively, the specification discloses an algorithm that performs a search of the index database 30 for each check image request in the request queue to determine whether or not an index record exists corresponding to that request, and thus, the check image is present on the image storage device. *See* JA00057, 29:20-25. Finally, the specification discloses obtaining the location of the check image from the index record and interrogating the stored meta-data to

determine the platter and side upon which the corresponding TIFF file is located. *See Id.*, 29:36-41.

In each of the disclosed embodiments, the algorithm may be generally described as "interrogating the storage space to determine the platter associated with the request." *See Harris,* 417 F.3d at 1254 (generally describing and construing disclosed algorithm in light of detailed disclosure in numerous paragraphs of specification and figures).

In contrast, ACS's proposed structure disregards the recited function and the steps necessary for performing the recited function, and should be rejected.

### 5. "Means for determining if there is a request for an image corresponding to any electronic images on a platter currently being searched . . ."

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| means for determining if there is a request for an image corresponding to any electronic images on a platter currently being searched of said electronic storage device, and if so, for retrieving the image | The parties agree that this term should be construed pursuant to § 112, ¶ 6:<br><br>function: determining if there is a request for an image corresponding to any electronic images on a platter currently being searched of said electronic storage device, and if so, for retrieving the image<br><br>structure: database controller, image storage controller, or a computer programmed to sort requests by platter and platter side, check if there are requests pending for the platter currently in the drive, check if there are any requests for the side of the platter currently being read, check if there are any requests for the other side of the platter, and retrieve the requested image, and its equivalents | The parties agree that this term should be construed pursuant to § 112, ¶ 6:<br><br>function: determining if there is a request for an image corresponding to any electronic images on a platter currently being searched of said electronic storage device, and if so, for retrieving the image<br><br>structure: computer programmed to perform the Retrieval Process algorithm on TIFF files |

JPMorgan identifies the steps necessary to perform the recited function of "determining if there is a request for an image ...." For example, the specification discloses that this function is performed by checking if there are check image requests pending for the platter currently in the

drive, and, if there are, checking to see if there are any requests for the side of the platter currently under the read heads of the optical storage device. *See* JA00055, 26:27–34.   In addition to disclosing an algorithm for performing the recited function, the specification further discloses that the recited function is performed by the database controller and the image storage controller. *See* JA000056, 27:51-67; 28:47-50; *Serrano v. Telular Corp.*, 111 F.3d 1578, 1583 (Fed. Cir. 1997) (When multiple embodiments in the specification correspond to the claimed function, proper application of Section 112, ¶ 6 reads the claim element to embrace each of them).

Once again, ACS improperly reads entire portions of the specification into its proposed construction irrespective of the recited function.   Accordingly, ACS's proposed construction should be rejected.

**6.      "Means for determining the platter associated with the most image requests . . ."**

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| means for determining the platter associated with the most image requests and searching the platter associated with the most requests for the requested images and for retrieving the requested images | The parties agree that this term should be construed pursuant to § 112, ¶ 6:<br><br>function: determining the platter associated with the most image requests and searching the platter associated with the most requests for the requested images and for retrieving the requested images<br><br>structure: database controller, image storage controller, or a computer programmed to request the platter with the most outstanding requests in the request data structure, mount that platter, and retrieve the requested image, and its equivalents | The parties agree that this term should be construed pursuant to § 112, ¶ 6:<br><br>function: determining the platter associated with the most image requests and searching the platter associated with the most requests for the requested images and for retrieving the requested images<br><br>structure: computer programmed to perform the Retrieval Process algorithm on TIFF files |

JPMorgan identifies the steps necessary to perform the recited function of "determining the platter associated with the most image requests ...." For example, the specification discloses

that this function is performed by sorting all the requests by platter and then by side, *See* JA00055, 26:25 – 27, inspecting the request data structure to see if there are other requests pending for the platter currently in the drive, and fulfilling them. *See Id.*, 26:56 – 59. The specification further discloses that once the requests for the current platter are fulfilled, the platter with the most outstanding requests in the request data structure is requested and the images are retrieved. *See Id.*, 26:59 – 62. Consistent with *Harris*, JPMorgan identifies and construes these steps as performing the recited function, whereas ACS identifies numerous paragraphs of the specification irrespective of whether the steps actually perform the recited function. Accordingly, ACS's proposed construction should be rejected.

### 7. "Means for searching each other platter associated with image requests . . ."

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| means for searching each other platter associated with image requests in an order determined by the number of requests per platter such that a platter having the most requests is searched first | The parties agree that this term should be construed pursuant to § 112, ¶ 6:<br><br>function: searching each other platter associated with image requests in an order determined by the number of requests per platter such that a platter having the most requests is searched first<br><br>structure: database controller, image storage controller, or a computer programmed to request the platter with the most outstanding requests in the request data structure, mount that platter, and retrieve the requested image, and its equivalents | The parties agree that this term should be construed pursuant to § 112, ¶ 6:<br><br>function: searching each other platter associated with image requests in an order determined by the number of requests per platter such that a platter having the most requests is searched first<br><br>structure: computer programmed to perform the Retrieval Process algorithm on TIFF files |

JPMorgan identifies the steps necessary to perform the recited function of "searching each other platter associated with image requests ...." For example, the specification discloses that this function is performed sorting all the requests by platter and then by side, *see* JA00055, 26:25 – 27, inspecting the request data structure to see if there are other requests pending for the

platter currently in the drive, and fulfilling them. *See id.*, 26:56 – 59. Once the requests for the

current platter are fulfilled, the specification teaches that the platter with the most outstanding

requests in the request data structure is mounted and the requested images are retrieved. *See id.*,

26:59 – 62.

8.    **"Means for determining if there is a request associated with a second side of the platter . . ."**

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| means for determining if there is a request associated with a second side of the platter, and if so, for searching the second side of the platter for a request prior to searching another platter | The parties agree that this term should be construed pursuant to § 112, ¶ 6:<br><br>function: determining if there is a request associated with a second side of the platter, and if so, searching second side of the platter for a request prior to searching another platter<br><br>structure: database controller, image storage controller, or a computer programmed to sort requests by platter and platter side, check if there are requests pending for the platter currently in the drive, check if there are any requests for the side of the platter currently being read, check if there are any requests for the other side of the platter, and retrieve the requested image, and its equivalents | The parties agree that this term should be construed pursuant to § 112, ¶ 6:<br><br>function: determining if there is a request associated with a second side of the platter, and if so, searching the second side of the platter for a request prior to searching another platter<br><br>structure: computer programmed to perform the Retrieval Process algorithm on TIFF files |

JPMorgan identifies the steps necessary to perform the recited function of "determining

the platter associated with the most image requests …." For example, the specification discloses

that this function is performed by checking if there are check image requests pending for the

platter currently in the drive, and, if there are, checking to see if there are any requests for the

side of the platter currently under the read heads of the optical storage device. *See Id.*, 26:27 –

34. The specification further discloses flipping the platter if there are no requests for the current

side and then retrieving the image. *See* 26:53 – 55.

## V.    CONCLUSION

For the foregoing reasons, JPMorgan respectfully requests that the Court adopt its

proposed constructions.

POTTER ANDERSON & CORROON LLP

*OF COUNSEL*:

Scott L. Robertson
Thomas J. Scott, Jr.
Stephen T. Schreiner
Eleanor M. Hynes
GOODWIN PROCTER LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 346-4000

Michael S. DeVincenzo
Andrew N. Stein
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(202) 346-4000

Dated:  November 6, 2009
941211

By: /s/ Philip A. Rovner
    Philip A. Rovner (#3215)
    Hercules Plaza
    P.O. Box 951
    Wilmington, Delaware  19899
    (302) 984-6000
    provner@potteranderson.com

*Attorneys for Plaintiffs*
*JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A., and*
*JPMorgan Chase Electronic*
*Financial Services, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on November 6, 2009, the within

document was filed with the Clerk of the Court using CM/ECF which will send notification of

such filing(s) to the following; that the document was served on the following counsel as

indicated; and that the document is available for viewing and downloading from CM/ECF.

### BY CM-ECF AND E-MAIL

Collins J. Seitz, Jr., Esq.
Kevin F. Brady, Esq.
Connolly Bove Lodge & Hutz LLP
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE  19899
cseitz@cblh.com
kbrady@cblh.com

I hereby certify that on November 6, 2009 I have sent by E-mail the foregoing

document to the following non-registered participants:

| | |
|---|---|
| Lewis T. LeClair, Esq. | Brett E. Cooper, Esq. |
| Mike McKool, Esq. | McKool Smith |
| Phillip M. Aurentz, Esq. | 399 Park Avenue |
| David Sochia, Esq. | New York, NY  10022 |
| McKool Smith | bcooper@mckoolsmith.com |
| 300 Crescent Court, Suite 1500 | |
| Dallas, TX  75201 | |
| lleclair@mckoolsmith.com | |
| mmckool@mckoolsmith.com | |
| paurentz@mckoolsmith.com | |
| dsochia@mckoolsmith.com | |

/s/ Philip A. Rovner
Philip A. Rovner  (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000