## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JPMORGAN CHASE & CO., | ) | |
| JPMORGAN CHASE BANK, N.A., and | ) | |
| JPMORGAN CHASE ELECTRONIC | ) | |
| FINANCIAL SERVICES, INC., | ) | |
| | ) | C.A. No. 08-189-SLR |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AFFILIATED COMPUTER SERVICES, INC. and | ) | JURY TRIAL DEMANDED |
| ACS STATE & LOCAL SOLUTIONS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT ACS'S OPENING BRIEF ON CLAIM CONSTRUCTION

Collins J. Seitz, Jr. (Bar No. 2237)
Kevin F. Brady (Bar No. 2248)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street, P.O. Box 2207
Wilmington, DE 19899
Telephone: (302) 658-9141
cseitz@cblh.com
kbrady@cblh.com

November 6, 2009

**TABLE OF CONTENTS**

I.      INTRODUCTION .......................................................................................... 1

II.     THE    '823    PATENT    CREATES    EFFICIENCIES    BY
        PROCESSING DOCUMENTS AND CHECKS SEPARATELY ..................... 1

III.    PROPOSED CONSTRUCTIONS FOR THE '823 PATENT ........................... 5

        A.      "Document capture component" and "Check capture
                component" Are Separate Scanners ......................................................... 5

                1.      Claim Language Requires Separate Document and
                        Check Capture Components ...................................................... 6

                2.      Specification Requires Separate Document and
                        Check Capture Components ....................................................... 7

                3.      Prosecution History Requires Separate Document
                        and Check Capture Components ............................................... 10

        B.      "Document capture memory" and "Check capture memory"
                Are Separate Memory Devices ............................................................ 12

                1.      Claim Language Requires Separate Document and
                        Check Capture Memory ........................................................... 13

                2.      Specification Requires Separate Document and
                        Check Capture Memory ........................................................... 15

                3.      Prosecution History Requires Separate Document
                        and Check Capture Memory .................................................... 17

        C.      "Lockbox    processing    system"    Disclaims    Systems
                Requiring    Processing    by    the    Conventional    Financial
                Processing System ............................................................................... 18

        D.      "Logically associating the check data record, the document
                data record, the check image and the document image"
                Requires    Associating    the    Check    Number    with    the
                Documents ........................................................................................... 20

        E.      "Logically    associating"    is    a    Process    Defined    in    the
                Specification ........................................................................................ 22

        F.      "Document data record" and "Check data record" Are
                Manually Input ................................................................................... 25

G.    "Bulk file interface" Transmits All of the Data and Images in a File.................................................................................................27

IV.    '965 PATENT TEACHES STORING MAGNETICALLY DECODED MICR DATA IN A TAG FIELD IN A TIFF FILE....................................27

V.    PROPOSED CONSTRUCTIONS FOR THE '965 PATENT........................................30

A.    "Tagged image file format (TIFF) file" is a Standard File Format Controlled by Adobe...............................................................30

B.    "Tag field in the TIFF file" is a Data Field Defined by the Standard ........................................................................................32

C.    "Decoded magnetic ink coded data" Uses Magnetic Signals ..............................33

D.    "Binary large object (BLOB)" is a Collection of TIFF Images ..................................................................................................34

E.    Corresponding Structure for the Means-Plus-Function Terms is the Requester Process or the Retrieval Process Algorithm ...............................................................................................35

VI.    CONCLUSION............................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Acumed LLC v. Stryker Corp.*,  483 F.3d 800 (Fed. Cir. 2007) .....................................................6

*Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008) ...............................................................................................................................35

*Biedermann Motech GmbH v. Acme Spine, LLC*, No. CV 06-3619 SJO, 2007 WL 6210841 (C.D. Cal. Aug. 31, 2007)...........................................................................22

*Chimie v. PPG Indus. Inc.*, 402 F.3d 1371 (Fed. Cir. 2005)..........................................................7

*Edwards Lifesciences LLC v. Cook Inc.*, No. 2009-1006, 2009 U.S. App. LEXIS 20906 (Fed. Cir. Sept. 22, 2009) ..............................................................................7

*Gaus v. Conair Corp.*, 363 F.3d 1284 (Fed. Cir. 2004).......................................................passim

*Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241 (Fed. Cir. 2005) ..................................................35

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312 (Fed. Cir. 2006) ....................................7

*Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313 (Fed. Cir. 2005) .........................................13

*Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307 (Fed. Cir. 2007).......................................21, 22

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*).....................................passim

*RFID Tracker, Ltd. v. Wal-Mart Stores, Inc.*, No. 2008-1412, 2009 WL 2502792 (Fed. Cir. Aug. 18, 2009) ...............................................................................21, 22

*Salazar v. Procter & Gamble Co.*, 414 F.3d 1342 (Fed. Cir. 2005)................................ 11, 17, 18

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001) ..................................................................................................................7, 20

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ...................................7, 23

## TABLE OF EXHIBITS

Joint Appendix:

J.A. 1          U.S. Patent No. 5,917,965

J.A. 2          U.S. Patent No. 7,317,823

J.A. 3          File History for U.S. Patent No. 5,917,965

J.A. 4          File History for U.S. Patent No. 7,317,823

J.A. 5          File History for Parent Patent of U.S. Patent No. 7,317,823

J.A. 6          TIFF Revision 6.0 Final - June 3, 1992, available at partners.adobe.com/
                public/developer/tiff/index.html.


ACS Appendix:

Ex. 1          Comparison Chart of Parties' Claim Construction Proposals for the '823 Patent

Ex. 2          Comparison Chart of Parties' Claim Construction Proposals for the '965 Patent

Ex. 3          What is MICR?, available at www.whatismicr.com

I.      **INTRODUCTION**

Pursuant to the Court's Scheduling Order, Defendants Affiliated Computer Services, Inc. and ACS State & Local Solutions, Inc., (collectively, "ACS") respectfully submit this Opening Brief on the proper construction of disputed claim terms of United States Patents Nos. 7,317,823 ("the '823 patent") and 5,917,965 ("the '965 patent").  J.A. 2 ('823 patent) and J.A. 1 ('965 patent).  ACS also submits herewith, for the Court's convenience, a chart for each patent providing the claims and the parties' respective proposed constructions.  Ex. 1 ('823 patent Comparison Chart) and Ex. 2 ('965 patent Comparison Chart).

ACS proposes constructions of the patents-in-suit in accordance with long-established principles of claim construction—giving a claim term its ordinary meaning that one of skill in the art, at the time of the invention and in light of the patent's claims, specification and prosecution history, would have given it.  *E.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316–17 (Fed. Cir. 2005) (*en banc*).  JPMorgan, on the other hand, ignores the intrinsic record—relying instead on extrinsic evidence—in an attempt to broaden the scope of the asserted claims beyond the system enabled by the intrinsic record and re-capture claim scope disclaimed in the specification and prosecution history.  Because the Court is familiar with the law of claim construction, ACS will discuss specific claim construction principles only where applicable to the facts of this case.

II.     **THE '823 PATENT CREATES EFFICIENCIES BY PROCESSING DOCUMENTS AND CHECKS SEPARATELY**

Lockbox processing is employed by companies that receive a large number of checks as payment along with other documents associated with the check such as an invoice.  An example of a company that makes use of lockbox processing would be a

telephone company that mails out a large number of invoices and receives payment from its customers via checks.  J.A. 2 ('823 patent) at 1:23-30.  Lockbox processing requires gathering information related to the check payment and storing this information in a computer database.  In addition to the data associated with a check, lockbox processing also requires providing an image of the check.  "[T]he informational data associated with the check and the image of the check are cross referenced such that the data and the check image can be simultaneously retrieved and reviewed.  Such check imaging capability is well known in the art."  *Id.* at 1:55-59.

The '823 patent criticizes prior art lockbox processing systems that serially imaged the checks and their associated documents, explaining that

> [s]ome prior art systems have attempted to image the checks and the documents received in an envelope in a lockbox processing center.  One such system placed the check and its associated documents on a conveyer belt type arrangement for imaging.  Such a system is not suitable for a high volume lockbox processing center since the checks must again be separately processed by the conventional financial processing systems.  The redundancies therefore induced by this prior art system are not acceptable for any high volume processing center.

*Id.* at 1:60-2:2.  The '823 Patent teaches a more efficient system than the prior art conveyor belt type arrangement using a single scanner to scan the checks and documents serially.  The claimed invention scans the checks "[i]n <u>parallel</u> to the scanning of the documents" to eliminate redundancies and improve processing efficiency.  *Id.* at Abstract; 5:17-19 (emphasis added).[1]

The Abstract summarizes the invention as a system for imaging documents and checks contained in a lockbox remittance wherein

---

[1]  As discussed in more detail herein, JPMorgan's claim construction proposals improperly attempt to re-capture the prior art conveyor belt type scanner disclaimed by the applicants.

> [i]n parallel to the scanning of the documents, the checks are scanned and
> images are created for each of the checks.  Additionally, identifying
> information from each of the checks (e.g., the check number, the amount,
> etc.) is manually input into a database, thus creating a data record for each
> check.  Once all of the data entry and scanning has been completed, an
> automatic association process takes place in which the check data records,
> the check images, the document data records and the document images are
> all automatically associated and cross-referenced such that the system
> recreates an electronic version of the original batch of physical papers.

*Id.* at Abstract (emphasis added).

"FIG. 1 illustrates the system of the present invention"—a dual-path processing system for separately imaging checks and documents.  As shown in FIG. 1 below,[2] the documents 110 are scanned using document scanner 125 and stored in document capture memory 130.  *Id.* at 3:27-28, 4:6-14.  In parallel, checks 105 are scanned using check scanner 155 and stored in the check capture memory 165.  *Id.* at Abstract; 5:17-31.  An operator manually creates a document data record using workstation 160 and a check data record using workstation 145.  *Id.* at 2:40-49; 5:32-35, 40-41.

---

[2] Figure 1 as shown herein is enhanced with additional color, white spacing and labels to illustrate particular aspects of the invention, but the substance of the figure is unchanged.



## III.   PROPOSED CONSTRUCTIONS FOR THE '823 PATENT

### A.   "Document capture component" and "Check capture component" Are Separate Scanners

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| document capture component [claim 1] | a scanner that images documents and a workstation to generate a document data record that are separate from the check capture component | a scanner that captures document images and a processor programmed to generate a document data record |
| check capture component [claim 1] | a scanner that images checks in parallel with the scanning of the documents by the document capture component and a workstation used to manually input data from each check to generate a check data record | a scanner that captures check images and a processor programmed to generate a check data record |

ACS's constructions are consistent with the principles taught in *Phillips*—a construction consistent with "the words of the claims themselves, the remainder of the specification [and] the prosecution history[.]"  *Phillips*, 415 F.3d at 1315 (citation and quotation marks omitted).

JPMorgan's proposals are inconsistent with the principles taught in *Phillips*. JPMorgan fails to recognize that the "document capture component" and the "check capture component" are separate components operating in parallel to reduce the inefficiency of imaging documents and checks using a single scanner.   JPMorgan's reliance on dictionary definitions of "component" is misplaced for two reasons:   1) dictionaries do not speak to whether the document capture component and check capture component are separate; and 2) extrinsic evidence such as dictionary definitions are "less significant than the intrinsic record in determining the legally operative meaning of claim language."  *Id.* at 1317 (citations and quotation marks omitted).  JPMorgan's attempt to

disregard the intrinsic record and broaden the claim—and re-capture disclaimed devices—should be rejected.

### 1. Claim Language Requires Separate Document and Check Capture Components

"When construing claims, a court must begin by 'look[ing] to the words of the claims themselves ... to define the scope of the patented invention.'" *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007) (quoting *Phillips*, 415 F.3d at 1312). "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1315. Claim 1 is explicit in the requirement of both a document capture component and a check capture component:

> a <u>document</u> capture component, the document capture component scanning the at least one document thereby generating a document image, the document capture component further generating a document data record that identifies the at least one document…

> a <u>check</u> capture component, the check capture component scanning the check thereby generating a check image, the check capture component further generating a check data record that identifies the check[.]

J.A. 2 ('823 patent) at 8:1-5, 9-12.

The '823 claim language at issue is on all-fours with the claim language the Federal Circuit examined in *Gaus v. Conair Corp.*, 363 F.3d 1284 (Fed. Cir. 2004). In *Gaus*, the claim required "an electrical operating unit and a pair of spaced-apart electrically exposed conductive probe networks." Judge Bryson explained that "we focus on the critical claim language" which

> lists the 'electrical operating unit' separately from the 'pair of spaced-apart electrically exposed conductive probe networks,' and does not suggest that the 'pair of ... probe networks' consists in part of a portion of the 'electrical operating unit.' Rather, the clear implication of the claim

> language is that the pair of probe networks is a distinct component, separate from the electrical operating unit of the claimed invention.

*Gaus*, 363 F.3d at 1288.

Similarly, the claim language in claim 1 of the '823 patent separately lists the "document capture component" and "check capture component" and does not suggest that these two components may be the same. The terms "document capture component" and "check capture component" specifically cover two different devices—one for documents and one for checks. Applicants' use of these terms in the same claim demonstrates an understanding that the terms cover two different, separate devices. As in *Gaus*, "the clear implication of the claim language is that" the document capture component is a distinct component, separate from the check capture component. *See id.*

### 2. Specification Requires Separate Document and Check Capture Components

The '823 specification further illustrates that the "document capture component" and "check capture component" are two separate devices. The patent specification "is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Importantly, Figure 1 is not simply an illustration of a preferred embodiment, but rather "FIG. 1 illustrates the system of the present invention[.]"[3] J.A. 2 ('823 patent) at 3:27-28 (emphasis added). FIG. 1 illustrates

---

[3] "[W]hen the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment." *Edwards Lifesciences LLC v. Cook Inc.*, No. 2009-1006, 2009 U.S. App. LEXIS 20906, at *18 (Fed. Cir. Sept. 22, 2009) (quoting *Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1379 (Fed. Cir. 2005); *see also Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (construing term to include feature characterized as "the invention" or "the present invention"); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001) (same). Moreover, applicants understood how to reference "embodiments" as opposed to the "present invention." *E.g.*, J.A. 2 ('823 patent) at 5:43-46.

the document scanner portion of the document capture component as 125 and the check scanner portion of the check capture component as 155. The document capture component receives documents 110 and the check capture component receives checks 105.

The '823 specification teaches that the invention employs a separate check processing and document processing portion. J.A. 2 ('823 patent) at 4:2-5 ("[once header sheets have been prepared] the checks 105 may be separated from their associated documents 110 and sent to the check processing portion of the system of the present invention"). The specification further explains the operation of the separate document processing and check processing of the invention occurs in <u>parallel</u>:

> When the stack of documents 110 separated by header sheets 120 for each of the groups 102 have been assembled, they are ready for scanning using an optical scanner 125. In a preferred embodiment of the present invention, scanner 125 is a high speed scanner such as those available from Bell & Howell<sup>TM</sup>. The output of scanner 125 are image files representative of the header page 120 and the documents 110. The image files are stored on the image file server 140 in the Document Capture memory 130.
> ***
> In <u>parallel</u> with the above described scanning process of documents 110, the checks 105 from each of the groups 102 are processed. Checks 105 are processed similar to the processing of documents 110…. In addition to capturing the data from the check, each check 105 is imaged using scanner 155. The check images are then stored on an image file server 175 and the check images are linked to their respective check data record in database 170.



*Id.* at 4:6-14, 5:17-31 (emphasis added).   As illustrated and described, the parallel operation of "the present invention" requires a separate document capture component and check capture component.

*Gaus* again affirms ACS's construction.   In *Gaus*, following the analysis of the claim language, Judge Bryson explained that the specification confirms the interpretation of the two components as separate and distinct because "[n]othing in the descriptions of those two components [in the specification] suggests that their structures or functions overlap.   To the contrary, the specification plainly describes the two components as separate."   *Gaus*, 363 F.3d at 1288.   Moreover, the Federal Circuit noted that the description in the specification that "plainly contemplate[d]" two separate components was "a structural separation that is essential to the operation of the device in the prescribed manner."   *Id.* at 1389.

Again, the '823 specification is strikingly similar to *Gaus* in this regard.   Nothing in the descriptions of the imaging portion of the document capture component and the check capture component in the '823 patent "suggests that their structures or functions overlap."   *See Gaus*, 363 F.3d at 1288.   To the contrary, the specification—and in particular "the present invention" depicted in Figure 1—plainly describes the two components as separate.   *Id.*

Significantly, as with *Gaus*, "the specification describes one of the principal advantages of the claimed invention in a way that excludes" the document capture component and the check capture component from being a single scanner for checks and documents.   *See Gaus*, 363 F.3d at 1289.   The '823 specification teaches that systems that use a conveyer belt type scanner for imaging check <u>and</u> documents are "not suitable for a

high volume lock box processing center since the checks must again be separately processed by the conventional financial processing systems.  The redundancies therefore induced by this prior art system are not acceptable for any high volume processing center."  J.A. 2 ('823 patent) at 1:64-2:2.  Construing the claims to allow the document capture component and check capture component to be a single scanner would exclude the principle advantage of the invention of reducing redundancies in the prior art.  As such, the document capture component and the check capture component must be separate scanners.

### 3.    Prosecution History Requires Separate Document and Check Capture Components

The applicants described the overall operation of the invention in the "Summary of Claimed Subject Matter" section of their Appeal Brief to the USPTO during the prosecution of the parent patent.  As the applicants explained in their Summary, "[t]here are substantially five steps in the processing operation."

- First, …the check and its associated documents can be <u>separated</u>.

- Second, …each of the documents in the batch, including the header sheet, is scanned 125.  The scanned images are stored on an image file server 140.

- Third, either before or after the documents are scanned, identifying information from each of the documents…is manually input into a database 170, to create a data record for each document.

- Fourth, <u>concurrent</u> with the scanning of the documents, the checks are scanned and images 525 are created for each of the checks.

- Finally, identifying information from each of the checks (e.g., the check number, the amount, etc.) is input into a database, thus creating a data record for each check.

*See* J.A. 5 (Appeal Brief filed in parent patent) at JA02087-088 (emphasis added).  In other words, consistent with the specification, applicants explained that the invention

uses two scanners to image the documents and checks separately.   "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention[.]"  *Phillips*, 415 F.3d at 1317.

The examiner also understood the separation between the document and check components of the invention.   In the parent application, the applicants attempted to claim a check capture component that generates a document data record.   The examiner rejected the claim as indefinite, explaining that "[t]he claim limitation of 'a check scanner that generates the check image; and a <u>check</u> workstation that generates the <u>document</u> data record' is unclear.   <u>It is understood by the examiner, the document data record is</u> <u>generated by the document capture component, rather than a check capture component</u>. Applicant is advised to provide explanation from the specification to clarify the confusion."   J.A. 5 (Office Action) at JA02627 (emphasis added).   In other words, the examiner understood the document capture component and check capture component as two separate components performing different functions.   "Statements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed."  *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005).

In summary, the claim language, specification and prosecution history all lead to the same conclusion:  the document capture component and the check capture component are separate scanners.  JPMorgan's proposals improperly expand the scope of the present

invention beyond that enabled by the intrinsic record.[4]   Moreover, JPMorgan's proposals attempt to re-capture a scanner for imaging documents and checks that the applicants expressly disclaimed.   J.A. 2   ('823 patent) at 1:60-2:2.   Accordingly, ACS's constructions should be adopted.

### B.   "Document capture memory" and "Check capture memory" Are Separate Memory Devices

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| document capture memory [claim 1] | memory separate from the check capture memory that stores document images and data records | This term should be accorded its plain and ordinary meaning as understood by one skilled in the art, i.e., a memory that stores images and data relating to documents |
| check capture memory [claim 1] | memory separate from the document capture memory that stores check images and data records | This term should be accorded its plain and ordinary meaning as understood by one skilled in the art, i.e., a memory that stores images and data relating to checks |

The claim language, specification and prosecution history are all in accord:  the "document capture memory" and "check capture memory" are separate memory devices. ACS's construction is again consistent with the principles taught in *Phillips*—a construction consistent with the entire intrinsic record.

JPMorgan argues that these terms should be "accorded [their] plain and ordinary meaning as understood by one skilled in the art" as though that incantation permits the court to ignore the intrinsic record.  "We cannot look at the ordinary meaning of the term…in a vacuum.  Rather, we must look at the ordinary meaning in the context of the

---

[4] Because the '823 patent fails to enable and describe a system wherein the "document capture component" and the "check capture component" may be the same component, the '823 patent is invalid under 35 U.S.C. § 112 if JPMorgan successfully convinces the Court to adopt its proposals for these terms.

written description and the prosecution history." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005); *Phillips*, 415 F.3d at 1321 ("Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent."). JPMorgan's reliance on dictionary definitions of "memory" is again misplaced for the reasons discussed above:  1) the dictionary does not speak to whether the document capture memory and check capture memory are separate; and 2) extrinsic evidence is "less significant than the intrinsic record." *Phillips*, 415 F.3d at 1317 (citations and quotation marks omitted).

### 1.    Claim Language Requires Separate Document and Check Capture Memory

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms," *Phillips*, 415 F.3d at 1315, and claim 1 is explicit in the requirement of both a document capture component and a check capture component:

> a <u>document</u> capture memory coupled to the document capture component and storing the document image and the document data record…
>
> a <u>check</u> capture memory coupled to the check capture component and storing the check image and the check data record[.]

J.A. 2 ('823 patent) at 8:6-8, 13-15 (emphasis added).  Claim 1 recites both a "document capture memory" and a "check capture memory"; the claim does not recite a memory for storing images of documents and checks.

The claim language, however, further illustrates the separateness of the "document capture memory" and "check capture memory" by requiring that the check images are retrieved from the check capture memory and stored in the document capture memory.  This retrieval process is necessary because the claimed system requires that the

logical association of the check images and document images is performed on the document capture memory as opposed to the check capture memory:

> wherein the processor further <u>retrieves</u> the check image and the check data record <u>from the check capture memory</u> and <u>stores</u> the check image and the check data record <u>in the document capture memory</u>, and

> wherein the logical association is performed <u>on the document capture memory</u>.

*Id.* at 8:20-25 (emphasis added).

In order for the processor to "retrieve" the check images from the check memory and store the check images in the document memory, two memory devices are required. The claim language would be nonsensical if construed to allow the processor to "retrieve…from" and "store…in" the same memory. Moreover, the claim limitation differentiates between performing the logical association process "on the document capture memory" as opposed to on the check capture memory. Again, "the clear implication of the claim language is that" the document capture memory is a distinct component, separate from the check capture memory. *See Gaus*, 363 F.3d at 1288.

Consider if the claim required a "document" bucket and a "check" bucket. Further, the claim required retrieving the checks from the check bucket and storing them in the document bucket. Finally, the claim requires banding the checks and documents together in the check bucket. Could the document bucket and check bucket be the same bucket in this claim? The answer, of course, is no. Yet, JPMorgan's construction permits just such a nonsensical interpretation. ACS's construction is correct based solely on the claim language and should be adopted.

2.      **Specification Requires Separate Document and Check Capture Memory**

The '823 specification further illustrates that the "document capture memory" and "check capture memory" are two separate memory devices.  As shown in Figure 1, the document capture memory is 130 and the check capture memory is 165.

The specification explains the purpose of the separate document capture memory and check capture memory:

> The output of scanner 125 are image files representative of the header page 120 and the documents 110.  The image files are stored on the image file server 140 in the <u>Document Capture memory 130</u>…. In an alternative embodiment of the present invention,[5] the workstation 160 is coupled to the document capture memory 130, and the data from documents 110 is inputted into database 135.
> ***
> Workstation 145 is used to capture the data from each check 105 for inclusion in database 170 in the <u>check capture memory 165</u>…. The check images are then stored on an image file server 175 and the check images are linked to their respective check data record in database 170.



J.A. 2 ('823 patent) at 4:11-14, 5:43-46,

---

[5] Claim 1 covers this alternative embodiment as the claim requires "a document capture memory coupled to the document capture component and storing the document image <u>and the document data record</u>".  J.A. 2 ('823 patent) at 8:6-8 (emphasis added).

5:20-31 (emphasis added).  Consistent with Figure 1, the written specification describes the memory components as two separate memory devices—one for document images and data and another for check images and data.

Furthermore, as required by claim 1, processor 180 performs the steps of 1) retrieving the check image and the check data record from the check capture memory, 2) storing the check image and the check data record in the document capture memory, and 3) performing the logical association on the document capture memory.  The specification explains that the retrieval step is performed by importing the check images into the document memory:

> [P]rocessor 180 is further used to import the check and document data and the check images from the check capture memory 165 into the document capture memory 130 so that the all of the data records (both check and document) and images (checks) for each group 102 can be associated and cross referenced.  In performing this operation, processor 180 continuously parses the directories of the check capture memory 165 in order to detect any new or updated files.  If such files are detected, processor 180 imports the files from check capture memory 165 into document capture memory 130.

*Id.* at 5:48-58 (emphasis added).  This process of importing the check images moves the check image files from the check memory to the separate document memory.  If, as JPMorgan apparently contends, the document memory and check memory could be the same memory device, no importation could be possible.

In sum, nothing in the descriptions of the document capture memory and the check capture memory in the '823 patent "suggests that their structures or functions overlap."  *See Gaus*, 363 F.3d at 1288.  To the contrary, the specification—and in particular "the present invention" depicted in Figure 1—plainly describes the two memory devices as separate.  *See id.*

### 3. Prosecution History Requires Separate Document and Check Capture Memory

The "wherein" limitations requiring separate document memory and check memory, along with the retrieving, storing and associating steps, provided the sole distinction over the prior art relied upon by the examiner during prosecution. The examiner rejected claim 27 (as filed) that included every limitation of issued claim 1 except the "wherein" limitations. The examiner found that claim 27 was anticipated by the prior art. The examiner allowed claim 31 (as filed)—a dependent claim adding the "wherein" limitations—if the applicants re-wrote the claim as an independent claim. The examiner explained his reasons for allowing the claim:

> Claim 31 calls for the processor retrieves the check image and the check data record from the check capture memory and stores the check image and the check data record in the document capture memory, and wherein the logical association is performed on the document capture memory. Burns teaches the machine readable data, OCR and MICR data of remittance document and check, is stored in memory 18, which is separate from image storage of memory 22. Green teaches transmitting MICR data from host controller 18 to PC 26 to combine the MICR data with the image data. Neither Burns nor Green teaches the above features recited in claim 31 because of structural and functional differences.

J.A. 4 (Office Action) at JA01903 (emphasis added). In other words, claim 31 issued as claim 1 because the examiner found that requiring one memory for the document images and a separate memory for check images provided a structural difference over the prior art, and the requirement to perform the retrieving step and the storing and associating steps on the document memory provided a functional difference. "Statements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed." *Salazar*, 414 F.3d at 1347.

Additionally, the examiner recognized the document capture memory and check capture memory as separate memories.  The examiner explained that "it appears to the examiner by performing the logical association <u>at the document capture memory</u> does not provide any significant advantage over which <u>at the check capture memory</u> or <u>any other memory</u>."[6]  J.A. 5 (Office Action in parent patent) at JA02134-135.  This statement provides further "evidence of how one of skill in the art understood" the document capture memory and check capture memory terms.  *See Salazar*, 414 F.3d at 1347.

In summary, the claim language, specification and prosecution history all lead to the same conclusion:  the document capture memory and the check capture memory are separate and distinct memory devices.  JPMorgan's proposals improperly expand the scope of the present invention beyond that enabled by the claim language, specification and the prosecution.[7]  Accordingly, ACS's constructions should be adopted.

**C.    "Lockbox processing system" Disclaims Systems Requiring Processing by the Conventional Financial Processing System**

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| lockbox processing system [claim 1] | a system that processes payments in the form of checks and documents associated with checks such that the check need not be separately processed by a conventional financial processing system | a system that processes payments in the form of checks and documents associated with checks |

---

[6] As discussed above, the examiner ultimately allowed claim 1 of the 823 patent based on this distinction despite the lack of a significant advantage in practicing the claim.

[7] Because the '823 patent fails to enable and describe a system wherein the "document capture memory" and the "check capture memory" may be the same memory, the '823 patent is invalid under 35 U.S.C. § 112 if JPMorgan successfully convinces the Court to adopt its proposals for these terms.

The parties' proposals are identical except that ACS's construction correctly adds the applicants' disclaimer that the "lockbox processing system" is "such that the check need not be separately processed by a conventional financial processing system." The specification disclaims systems that require separate processing of the checks because the claimed system "overcome[s] the deficiencies" of these prior art systems. J.A. 2 ('823 patent) at 1:60-2:18.

In more detail, the specification explains the problem with the prior art systems that scanned the document and check together on a conveyer belt type system:

> Some prior art systems have attempted to image the checks and the documents received in an envelope in a lockbox processing center. One such system placed the check and its associated documents on a conveyer belt type arrangement for imaging. <u>Such a system is not suitable for a high volume lock box processing center since the checks must again be separately processed by the conventional financial processing systems.</u> The redundancies therefore induced by this prior art system are not acceptable for any high volume processing center.

*Id.* at 1:60-2:2 (emphasis added). The applicants teach "overcom[ing] the deficiencies of the prior art" with "the present invention[.]" *Id.* at 2:13-14.

Accordingly, the applicants disclaimed systems that require the check to be processed by the conventional financial processing system, such as conveyer belt type imaging systems. The specification does not merely describe this as a benefit of one embodiment, but rather explains that "the present invention" overcomes the deficiency in the prior art that required separate processing of the check by the conventional financial processing system. *Id.* at 2:13-14. "[T]he specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Phillips*, 415 F.3d at 1316; *SciMed*, 242

F.3d at 1343-44.  ACS's construction incorporating the disclaimer of systems that require separate processing of the check by the conventional financial processing systems is proper and should be adopted.

> **D.** **"Logically associating the check data record, the document data record, the check image and the document image" Requires Associating the Check Number with the Documents**

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| logically associating the check data record, the document data record, the check image and the document image [claim 1] | logically associating the check data record, the document data record, the check image, and the document image that requires associating the check number with the other documents that accompanied the check | This term should be accorded its plain and ordinary meaning as understood by one skilled in the art, i.e., creating a logical, rather than physical, relation between the check data record, the document data record, the check image and the document image |

JPMorgan's "logical, rather than physical" proposal is an illusory straw man attempt to pretend to put some meaning behind the "logically" part of "logically associating."   In other words, JPMorgan has not really provided a construction of this term as all but merely parroted-back the term itself in an attempt to ignore the disclaimer in the specification.   The '823 specification expressly disclaims systems that do not perform the logical association by associating the check number with the documents.[8]

ACS's construction, on the other hand, properly incorporates the prosecution disclaimer that requires the logical association to associate the check number with the other documents that accompanied the check.  "Prosecution disclaimer may [] arise from

---

[8] Moreover, JPMorgan's attempt to contrast "logical" with "physical" finds no support in the intrinsic record.   Other than referencing physically separating the document and check for processing by the two separate scanners and physical papers versus electronic documents, the specification does not mention the word "physical" much less contrast physical association with logical association.  J.A. 2 ('823 patent) at 3:38-39, 2:55-56.

an applicant's statements in a parent patent application if the parent application relates to the same subject matter as the claim language at issue." *RFID Tracker, Ltd. v. Wal-Mart Stores, Inc.*, No. 2008-1412, 2009 WL 2502792, at *2 (Fed. Cir. Aug. 18, 2009) (citing *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007). During the prosecution of the parent application, the applicants disclaimed coverage of systems that do not associate the check number with the other documents—systems such as that described in U.S. Patent No. 5,874,717 to Kern.

In arguing for allowance of claim 1 (as filed in the parent application), applicants explained that "Kern does not teach nor even suggest <u>associating the check number with the other documents that accompanied the check</u>.... Kern does not contain any teaching or suggestion that one should take the check number and associate that check number with the images of the documents that accompanied the check." J.A. 5 (Appeal Brief filed in parent patent) at JA02091 (emphasis added). With respect to claim 13, applicants stated that

> independent claim 13, similar to claim 1, requires a processor that 'logically associating the check data record, the document data record, the check image and the document image.' As described above with respect to independent claim 1, the system of Kern does not perform this association as expressly required in independent claim 13. Further, it should be noted that the check data record includes the check number. This feature is not disclosed in Kern as discussed above. <u>Therefore, Kern cannot associate anything with the check number because the check number is not included in Kern</u>.

J.A. 5 (Appeal Brief filed in parent application) at JA02092 (emphasis added).

Claim 13 as filed in the parent application is exactly the same as claim 1 in the issued '823 patent except that claim 1 adds the retrieving, storing and associating on the document capture memory limitations. As such, applicants' statements with respect to claim 13 in the parent application disclaiming systems that did not associate the

documents with the check numbers apply to the same claim limitation in claim 1 of the '823 patent. *See RFID Tracker*, 2009 WL 2502792, at *2 (citing *Ormco*, 498 F.3d at 1314). ACS's construction that incorporates the prosecution history disclaimed is proper and should be adopted.

### E.    "Logically associating" is a Process Defined in the Specification

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| logically associating [claim 1] | for a single document or single data record, automatically creating a logical connection by searching the document capture memory for documents that have a key corresponding to the check number, batch number or check amount reflected in the check data record, or<br><br>for multiple documents with multiple data records, manually creating a logical connection through an operator at a workstation | This term should be accorded its plain and ordinary meaning as understood by one skilled in the art, i.e., creating a logical, rather than physical, relation between |

The claims require that "logical association" is a step that is performed by the system. "Logical association" has no ordinary meaning in the art; yet JPMorgan again argues that this term "should be accorded its plain and ordinary meaning as understood by one skilled in the art" in an attempt to convince the court to ignore the specification. In other words, JPMorgan has yet again not really provided a construction of this term but merely parroted-back the term itself. JPMorgan's approach fails to assist the jury to understand what "logical association" means. *See Biedermann Motech GmbH v. Acme Spine, LLC*, No. CV 06-3619 SJO, 2007 WL 6210841, at *8 (C.D. Cal. Aug. 31, 2007) ("It is important, however, to recognize that claim construction orders are narrowly tailored to assist the jury in resolving infringement and validity disputes in particular cases."). The intrinsic record provides the explanation.

The '823 specification provides less than seven full columns of written disclosure and only four figures, but one full column of the written specification and one figure is dedicated to how to perform the claimed "logical association."   J.A. 2 ('823 patent) at column 6 and Fig. 3.   One skilled in the art would look to the specification to understand what it means to perform the logical association because the patent specification "is the single best guide to the meaning of a disputed term."   *Vitronics*, 90 F.3d at 1582.   ACS's construction rests on the explanation of how to perform the logical association step provided in column 6 of the specification.   The specification explains that performing this step depends on whether the transaction contains a single document with a single data record or multiple documents with multiple data records.

If the lockbox remittance contains a single document with a single data record, the specification explains how to perform the logical association automatically by searching the document capture memory for documents that have a key corresponding to the check number, batch number or check amount reflected in the check data record:

> If there is only a single document in the group 102 or if there is a single data record 505-515 for several documents in a group, the entire process is automatic. In this single document or single data record example, the files that are imported from check capture system 165 include a check data record 500, a check image 525 and a document 1 data record 505.  During the association process, the document capture system 130 searches the image database 140 (see FIG. 1) for documents that have a key corresponding to the check number (or batch number or check amount) reflected in check data record 500. During this search system 130 will only find the document image(s) 530 with a key 535 that matches. Accordingly, system 130 knows that document 1 data record 505 has to correspond to the document 1 image(s) 530 and creates the logical connection 570.   In this manner the check data record 500, the check image 525, the document 1 data record 505 and the document 1 image 530 are all logically associated and the association process is complete.

J.A. 2 ('823 patent) at 6:11-29.

If the lockbox remittance includes multiple documents with multiple data records, the specification teaches that the process cannot be performed automatically, but rather must be performed manually because of the difficulty of associating the multiple images and data records:

> A difficulty occurs when there is more than one document 110 contained in a group 102 that generate more than one document data record 505-515. In the particular example depicted in FIG. 3, when system 130 is searching for document images with keys corresponding to check data record 500, it will find three document images 530, 535 and 540.  The system could directly associate the document images 530, 535 and 540 with the check data record 500, but no one would know which of the document data records 505, 510, 515 correspond to which of the document images 530, 535 and 540…. [S]ystem 130 has no means of properly automatically associating the correct data record with the correct image.

*Id.* at 6:30-48.

The '823 patent solves this multiple documents and multiple data records problem with a system that provides an operator at a workstation to manually perform the association:

> In order to solve this problem, system 130 presents an operator at workstation with a screen containing both the unmatched document data records 505 and thumbnail prints of the unmatched document images 530, 535 and 540.  The user is then able to select the thumbnail of a document image 530, 535 and 540 in order to enlarge it.  Viewing the full size rendering of the document image 530, 535 and 540, the user is then able to manually associate the document image 530, 535 and 540 with the proper document data record 505-515.  This process is repeated for each document image 530, 535 and 540 and document data record 505-515 until the operator has manually created the logical links 570, 575 and 580.

*Id.* at 6:49-60.

ACS's construction provides meaning to a term that would otherwise be confusing and meaningless to the jury.  Applicants used the term "logical association" to describe the process necessary to re-group the document and check images following the separation of the paper for scanning by two different scanners.  One of skill in the art

would reference the specification to understand the meaning of this term; that understanding is exactly the construction proposed by ACS.

### F.   "Document data record" and "Check data record" Are Manually Input

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| document data record [claim 1] | a record that stores manually input identifying information from a document associated with a check | identifying information from a document |
| check data record [claim 1] | a record that stores manually input identifying information from checks, including the check number | identifying information from a check |

ACS's constructions recognize that the intrinsic record teaches <u>manually</u> creating the document and check data records.  Although JPMorgan's proposals for "document capture component" and "check capture component" attempt to broaden the invention to cover "a processor programmed to generate" a data record, the specification provides no teaching for programming anything to generate a data record.[9]  Moreover, JPMorgan's dictionary does not speak to whether the data records are manually input.

The specification's teaching that the data records are manually input begins with the Abstract, continues in the Summary of the Invention, and is affirmed in the Detailed Description of the Invention.  The Abstract explains that "identifying information from each of the checks…is <u>manually input</u> into a database, thus creating a data record for each check."   (emphasis added).   The Summary of the Invention expands on this explanation:

---

[9] Because the '823 patent fails to enable and describe a system wherein the "document capture component" and the "check capture component" are programmable, the '823 patent is invalid under 35 U.S.C. § 112 if JPMorgan successfully convinces the Court to adopt its proposals for these terms.

> Either before or after the documents are scanned, identifying information from each of the documents (e.g., the invoice number on the document) is <u>manually input</u> into a database, thus creating a data record for each document. In parallel to the scanning of the documents, the checks are scanned and images are created for each of the checks. Additionally, identifying information from each of the checks (e.g., the check number, the amount, etc.) is <u>manually input</u> into a database, thus creating a data record for each check.

J.A. 2 ('823 patent) at 2:40-49 (emphasis added).

The Detailed Description of the Invention affirms the patent's teaching that the data records are created manually by an operator at a workstation: "Workstation 160 is used by an operator to <u>manually input</u> data from each document 110. As with the check data, a separate data record is generated for each document 110 and is included in database 170…. There is no preferred order of scanning and <u>manual data entry</u>." *Id.* at 5:32-35, 40-41 (emphasis added). Figure 1 of "the invention" depicts the document workstation as computer 160 and the check workstation as computer 145; however, the specification does not describe these computers as "programmable to generate a data record" as JPMorgan suggests with its proposals for "document capture component" and "check capture component."

The prosecution history further affirms that the data records are manually input. As the applicants described in the Summary of Claim Subject Matter section of their Appeal Brief, "either before or after the documents are scanned, identifying information from each of the documents (e.g., the invoice number on the document) is <u>manually input</u> into a database 170, to create a data record for each document." J.A. 5 (Appeal Brief filed in parent patent) at JA02087-088 (emphasis added). Because the scope of the disclosure is limited to manually input data records, ACS's construction is proper and should be adopted.

### G.      "Bulk file interface" Transmits All of the Data and Images in a File

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| bulk file interface [claim 4] | an Internet, private network, or dial up connection between the work station and the customer system for transmitting all of the data and images for a customer in a single file | a connection between at least two computer systems, e.g., the Internet, private network, LAN, WAN, VAN, or dial-up connection, allowing for the transmission of data, e.g., FTP |

ACS's construction again provides the understanding of one skilled in the art in light of the intrinsic record.   In response the examiner's rejection of the "bulk file interface" term as indefinite, the applicants defined the bulk file interface as "either being over the Internet, through a private network, or through another dial-up connection between the work station 215 and the customer system 210 (see Figure 1)."   J.A. 5 (Response to Office Action filed in parent patent) at JA02054.   ACS's construction further defines for the jury what a bulk file is based on the applicants' teaching that a bulk electronic file includes "<u>of all of the data and images for a customer</u>."   J.A. 2 ('823 patent) at 7:17-18 (emphasis added).   JPMorgan's construction is improper for two reasons:  1) JPMorgan attempts to broaden the term by adding examples of connections that are not mentioned in the intrinsic record such as LAN and WAN connections; and 2) JPMorgan ignores the specification's teaching that a bulk file includes all of the data and images for a customer in a single file.

## IV.     '965 PATENT TEACHES STORING MAGNETICALLY DECODED MICR DATA IN A TAG FIELD IN A TIFF FILE

Payor banks maintain millions upon millions of copies of checks in their files.   At some future date, the payor may be required to produce a copy of a check as proof of payment.   This often requires that the payor retrieve the bank copy of the instrument from

the payor bank's archive.  To fulfill its customers' requests or comply with subpoenas, countless man-hours of searching are required to locate copies of the requested instruments.  To facilitate processing of checks, the banking industry has, for many years, used a Magnetic Ink Character Recognition (MICR) line on each check.

The MICR line of a check is a series of alpha-numeric digits magnetically encoded on a check using magnetic ink.  A MICR line is found along the bottom of most checks.  An exemplary check with a MICR line is shown below.



The encoded information in the MICR line usually includes the check number, bank routing number and account number.  Where the check writer (or some intermediate in the check handling process) chooses, the encoded information in the MICR line also includes the amount of the check.  Normally, when a check is processed, the information contained in the MICR line is magnetically decoded and becomes part of the bank's electronic record of the check.

The '965 patent is directed to a system which allows a user to request, retrieve and display check copies with turnaround time much faster than in the prior art by storing the magnetically decoded MICR line in a tag field in a tagged image file format (TIFF) file.  J.A. 1 ('965 patent) at 17:63-67, 18:40-64.  In other words, the '965 Patent teaches storing the check image in the TIFF format and embedding within the TIFF file a tag field that stores the magnetically decoded MICR data.  The TIFF file format includes a

number of tag fields that may be used to store information.   Using the magnetically decoded MICR data and knowing where it is stored within the TIFF file allows a user to request, retrieve and display check copies.

The application for the '965 Patent included 229 claims as originally filed.   The examiner rejected the claims at issue as obvious.   In response, applicants argued that the claims "are essentially directed to (for example) a method in which…the electronic image and the decoded magnetic ink coded data are merged <u>into a Tagged Image File Format (TIFF)</u> file[.]"   J.A. 3 (Response to Office Action) at JA00591 (emphasis in original). Furthermore, the applicants explained that the claims "require that the decoded magnetic ink coded data be stored as 'a tag field' in the TIFF file."   *Id.*

The applicants further argued that:

The Examiner may not be aware that the assignee of the present invention registered the new fields that were created specifically for the purposes of this invention with the Aldus Corporation which developed the TIFF standard.   See the disclosure at page 20, line 17 (as amended) for the reference to Aldus.   These fields were not available in the standard file formats, contrary to the assertion in the Office Action.

Indeed, Behera does not mention adding the MICR data to the TIFF file because Behera apparently <u>just added optical storage of image data</u> to an existing check processing system that already was storing the MICR data magnetically…..

For example, there is no merging of data such as image data with decoded magnetic ink coded data (MICR data) as in the present invention.   Further, this reference does not suggest the manner in which the MICR data is to be stored in a TIFF file, since this reference does not even suggest use of such files….

The instant inventors were designing a new system from the ground up, and so developed a more integrated approach by <u>placing the MICR data in the TIFF file along with the image data in the specific form indicated in the claims herein</u>.   Thereby, when the data is retrieved by a request from a customer, the customer gets all of the data needed without coordinating the retrieval with an additional, different storage medium.   This avoids

complexity. <u>At the time of the development of the instant inventions, TIFF was an emerging standard and it was not at all obvious that these fields should be added in the manner in which the inventors herein have done</u>. The absence of any reference to TIFF by Behera is testimony to this fact.

*Id.* at JA00591-593 (emphasis added). Following applicants' representation, the examiner allowed claims, which issued as claims 1-42.

## V.    PROPOSED CONSTRUCTIONS FOR THE '965 PATENT

### A.    "Tagged image file format (TIFF) file" is a Standard File Format Controlled by Adobe

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| tagged image file format (TIFF) file [claims 1 and 20] | a standard file format for storing images and data in tag fields currently under the control of Adobe Systems | a file format for storing images and data in tag fields |

The parties dispute whether the "tagged image file format (TIFF) file" is the standardized file format currently under the control of Adobe Systems (as ACS proposes), or whether it can be any general "file format for storing images and data in tag fields" (as JPMorgan proposes). Both the specification and the prosecution history explain that the TIFF file claimed by the '965 patent is the standardized format currently under the control of Adobe Systems.

A "tagged image file format (TIFF) file" is a standardized image file format that is well known in the art. The '965 specification explains that:

> The front and back check digital images are converted from the camera digital image format, e.g., NCR image format, into a <u>standard</u> Tagged Image File Format (TIFF, which is a registered trademark of ALDUS Corp.)…. The TIFF file 22 is in industry <u>standard</u> TIFF format.

J.A. 1 ('965 Patent) at 18:40-47 (emphasis added); *see also id.* at 9:10-14 ("merging the electronic image and the decoded magnetic ink coded data into a tagged image file format (TIFF®[a registered mark of Aldus Corp.]) file, with the decoded magnetic ink coded

data stored in a tag field in the TIFF file").[10]  The TIFF standard was developed by Aldus Corporation, which was subsequently acquired by Adobe Systems.  J.A. 6 (TIFF Revision 6.0 Final - June 3, 1992) at JA02729 ("Updated contact information and TIFF administration policies, since Aldus Corporation merged with Adobe Systems Incorporated on September 1, 1994.").  The TIFF Standard explains that it is "a tag-based file format for storing and interchanging raster images."  *Id.* at JA02727.

Moreover, the '965 prosecution history defines the "tagged image file format (TIFF) file" as the standardized format currently under the control of Adobe Systems.  In distinguishing the prior art reference Behera, the applicants stated:

> The Examiner may not be aware that the assignee of the present invention registered the new fields that were created specifically for the purposes of this invention with <u>the Aldus Corporation which developed the TIFF standard</u>.… <u>These fields were not available in the standard file formats</u>, contrary to the assertion in the Office Action.… At the time of the development of the instant inventions, <u>TIFF was an emerging standard</u> and it was not at all obvious that these fields should be added in the manner in which the inventors herein have done.  The absence of any reference to TIFF by Behera is testimony to this fact.

J.A. 3 (Response to Office Action) at JA00591-593 (emphasis added).  The prosecution history "inform[s] the meaning of the claim language by demonstrating how the inventor understood the invention[.]"  *Phillips*, 415 F.3d at 1317.  JPMorgan's attempt to re-capture such a broad interpretation of "tagged image file format (TIFF) file" that is contrary to the understanding of the invention as defined in the specification and prosecution history should be rejected.

---

[10]  Notably, applicants amended the '965 specification to explicitly provide that the claimed "TIFF" format was "a registered mark of Aldus Corp."  J.A. 3 (Preliminary Amendment) at JA00496.

**B.     "Tag field in the TIFF file" is a Data Field Defined by the Standard**

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| tag field in the TIFF file [claims 1 and 20] | a data field defined by the TIFF standard that is merged into the same TIFF file and stored in the same physical electronic storage device as the image data | a data field in a TIFF file |

Again the parties dispute whether the "tag field in the TIFF file" must be defined by the TIFF standard.  The parties further dispute whether the "tag field in the TIFF file" must be merged into the same TIFF file and stored in the same physical electronic storage device as the image data.   Again the intrinsic record supports ACS's proposed construction.

The '965 specification states that the TIFF tags are stored within the industry standard TIFF format file:   "The TIFF file 22 is in industry standard TIFF format. The non-image data is given TIFF tags and stored within the file as financial information." J.A. 1 ('965 Patent) at 18:40-49 (emphasis added).

Additionally, in the prosecution history, applicants distinguished the Behera prior art reference because:

> [T]here is no merging of data such as image data with decoded magnetic ink coded data (MICR data) as in the present invention.  Further, this reference does not suggest the manner in which the MICR data is to be stored in a TIFF file, since this reference does not even suggest use of such files.  Still further, as noted previously, the implication of the claims herein is that the merged MICR data and the image data necessarily are stored together with one another in the same physical memory.  That is not true of the cited reference.

J.A. 3 (Response to Office Action) at JA00592 (emphasis added).  Accordingly, the prosecution history confirms that the "tag field in the TIFF file" must be merged into the same TIFF file and stored in the same physical electronic storage device as the image

data. JPMorgan's attempt to re-capture such a broad interpretation of "tag field in the TIFF file" is contrary to the understanding of the invention as described in the specification and prosecution history and must be rejected.

### C. "Decoded magnetic ink coded data" Uses Magnetic Signals

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| decoded magnetic ink coded data [claims 1 and 20] | machine recognized data based on the magnetic signal created by each magnetic ink character's unique shape | decrypted magnetic ink coded data |

The term "decoded magnetic ink coded data" is well known in the art. The '965 specification provides a background description of a Magnetic Ink Character Recognition (MICR) line on a check, explaining that the Magnetic Ink Character Recognition (MICR) line of a check "is a series of alpha-numeric digits encoded on a check in magnetic ink." J.A. 1 ('965 Patent) at 2:54-56.

The '965 specification further explains that the MICR line is magnetically decoded with a MICR reader:

> When the check 1 reaches the MICR reader 205, the MICR is then magnetically decoded, as known in the art….MICR reader 205 captures the information magnetically encoded in the MICR line of the check for inclusion in the TIFF file 22.

*Id.* at 14:65-67, 17:63-67 (emphasis added).

The explanation provided in the specification is consistent with the understanding of one of skill in the art that MICR data is magnetically encoded and decoded: "magnetically charged printing allows each character to be recognized based on the magnetic signal created by each character's unique shape. These shapes create a unique magnetic 'fingerprint' which allows the reader-sorter machines to recognize each

character." *See e.g.*, Ex. 3 (What is MICR?) at 1.  ACS's construction assists the jury and is consistent with the specification and the understanding of one skilled in the art.

JPMorgan's proposal is inconsistent with the specification and the well known understanding in the art.  JPMorgan's proposal merely replaces the word "decoded" with "decrypted;" however, the word "decrypted" appears nowhere in the '965 patent. JPMorgan's use of the word "decrypted" is vague and indefinite and will only serve to confuse the jury.[11]

**D.    "Binary large object (BLOB)" is a Collection of TIFF Images**

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| binary large object (BLOB) [claims 3 and 22] | a collection of TIFF images stored as a single entity in a database | a collection of binary data stored as an entity in a database |

The applicants acted as their own lexicographer in defining the meaning of the term within the specification.   The '965 specification explains that "[w]hen a predetermined number of TIFF files 22, preferably for one account, are present, the image storage controller 501 groups these files into a Binary Large Object (BLOB) 26, and writes the BLOB 26 to the image storage device 502."  J.A. 1 ('965 Patent) at 27:62-65; *see also* 9:19-24; 15:44-48.   When the specification reveals "a special definition

_____

[11] JPMorgan may be seeking to avoid the "magnetic" requirement to encode/decode magnetic ink in an attempt to accuse optical character recognition (OCR) of decoding MICR data.  Such an application of the claims would be improper as the specification teaches that it is the magnetic character of the ink that permits magnetic decoding of the data.  The specification notes that "[t]he MICR line is also optically readable" but the specification properly does not equate optical character recognition with decoding magnetic ink.  Moreover, claim 1 explicitly requires "reading and decoding."  While OCR may be able to "read," OCR is not capable of "decoding."

given to a claim term by the patentee" then "the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.

ACS's proposed construction is further supported by the prosecution history. In distinguishing the prior art reference Beatty, applicants argued that:

> The instant inventors define BLOB on page 36, line 18, as a Binary Large Object, as is commonly used in the field. <u>The application combines several TIFF files into each BLOB for storage</u>.... [Beatty] simply does not deal with blobs, as that term is used in the present application and claims. <u>The reference does not suggest combining several TIFF files for storage.</u>

J.A. 3 (Response to Office Action) at JA00593-594 (emphasis added).

JPMorgan's proposal ignores the express definition provided in the specification (three times) and the prosecution history. JPMorgan's attempt to re-define the term "binary large object (BLOB)" should be rejected in light of the definition provided in the intrinsic record.

### E.    Corresponding Structure for the Means-Plus-Function Terms is the Requester Process or the Retrieval Process Algorithm

The parties agree that these terms should be construed pursuant to § 112, ¶6 and agree on the recited function for these terms.[12]   Additionally, the parties agree that these means-plus-function terms are computer-implemented. The parties disagree, however, as to the corresponding structures. The Federal Circuit mandates that "the corresponding structure for a § 112 P 6 claim for a computer-implemented function is the algorithm disclosed in the specification." *Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1334 (Fed. Cir. 2008) (quoting *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005)).

---

[12] Because the parties agree on the recited function, ACS refers the Court to Ex. 2 for the recited function for each of the means-plus-function terms.

The '965 specification defines two algorithms for requesting and retrieving check images from storage: "[r]equest file processing is performed by a pair of asynchronous processes, the Requester Process and Retrieval Process." J.A. 1 ('965 Patent) at 22:60-62 (emphasis added). The specification proceeds to carefully define the Requester Process algorithm, *id.* at 25:39-26:15; 29:9-55; Figure 5C, and the Retrieval Process algorithm, *id.* at 26:16-27:20; 29:56-30:6; Figure 5D.

JPMorgan attempts to ignore the algorithms disclosed in the specification and figures and attempts to re-define and overly generalize the disclosed algorithms. The '965 specification defines no other algorithms besides the Requester Process algorithm and the Retrieval Process algorithm to perform the recited functions to request and retrieve check images from storage. JPMorgan's approach is improper and should be rejected. ACS, on the other hand, properly identifies the Requester or Retrieval algorithm, as defined in the specification and figures, as the algorithmic portion of the corresponding structure for the means-plus-function terms.

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| means for searching said BLOB index by using the account number and check number of the requested check [claim 30] | Structure: computer programmed to perform the Requester Process algorithm on TIFF files | Structure: computer programmed to search an index database for a check request using an account number and a check |

The '965 specification explains that the Requester Process algorithm performs the function of using the account number and check number to search for the requested check:

(1) Requester Process…The Requester Process uses the algorithm, as described above, to turn the account number, check number and amount

into a path and file name of one or more TIFF files 22 which satisfy this
request (93).

*Id.* at 25:39, 53-56.  The Requester Process algorithm is the corresponding structure.

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| means for verifying each request for a check to insure that the user placing the request is authorized [claim 31] | Structure:  computer programmed to perform the Retrieval Process algorithm on TIFF files | Structure:  computer programmed to verify the request against a valid accounts file, and its equivalents |

The '965 specification explains that the Retrieval Process algorithm performs the

function of verifying the request to ensure the user is authorized:

> (2) Retrieval Process…The Retrieval Process then first verifies that the
> request is made by an authorized user (1110) or an authorized account.

*Id.* at 26:16, 35-36.  The Retrieval Process algorithm is the corresponding structure.

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| means for comparing the account number in the request to the list to determine if the requester is authorized to make requests from the account specified by the account number [claim 32] | Structure:  computer programmed to perform the Retrieval Process algorithm on TIFF files | Structure:  computer programmed to compare the account number of the request with a valid accounts file, and its equivalents |

The '965 specification explains that the Retrieval Process algorithm performs the

function of comparing the account number to the list of accounts to determine if the

requester is authorized:

> (2) Retrieval Process…Once the user has been verified, the Retrieval
> Process confirms that the account number of the check requested is in the
> user's valid accounts file.  This is done by reference to the list of the
> accounts a user is permitted to access, which is maintained in an accounts
> file on the output queue device 601.

*Id.* at 26:16, 40-45.  The Retrieval Process algorithm is the corresponding structure.

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| means for determining the platter associated with each request and forming a listing of the requests for each platter [claim 33] | Structure: computer programmed to perform the Requester Process algorithm on TIFF files | Structure: database controller, image storage controller, or a computer programmed to interrogate the storage space to determine the platter associated with the request, and its equivalents |

The '965 specification explains that the Requester Process algorithm performs the function of determining the platter associated with each request and forms a list of the requests for each platter:

> (1) Requester Process…If the TIFF file 22 exists, the meta-data on storage space 505 can be interrogated to determine the platter upon which the TIFF file 22 is present.  For each request for which a TIFF file 22 is located (94) an entry is inserted in a request data structure specifying the location of the TIFF file 22 which will satisfy the request (98).

*Id.* at 25:39, 58-64.  The Requester Process algorithm is the corresponding structure.

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| means for determining if there is a request for an image corresponding to any electronic images on a platter currently being searched of said electronic storage device, and if so, for retrieving the image [claim 33] | Structure: computer programmed to perform the Retrieval Process algorithm on TIFF files | Structure: database controller, image storage controller, or a computer programmed to sort requests by platter and platter side, check if there are requests pending for the platter currently in the drive, check if there are any requests for the side of the platter currently being read, check if there are any requests for the other side of the platter, and retrieve the requested image, and its equivalents |

The '965 specification explains that the Retrieval Process algorithm performs the function of determining if there is a request for an image on a platter currently being searched:

(2) Retrieval Process…The Retrieval Process then re-inspects the request data structure to see if any other requests for this platter are pending (1118). If there are, they are fulfilled as above (1118, 1120, 1110, 1122).

*Id.* at 26:16, 56-59. The Retrieval Process algorithm is the corresponding structure.

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| means for determining the platter associated with the most image requests and searching the platter associated with the most requests for the requested images and for retrieving the requested images [claim 33] | Structure: computer programmed to perform the Retrieval Process algorithm on TIFF files | Structure: database controller, image storage controller, or a computer programmed to perform the Retrieval Process to request the platter with the most outstanding requests in the request data structure, mount that platter, and retrieve the requested image and its equivalents |

The '965 specification explains that the Retrieval Process algorithm performs the function of determining the platter with the most requests and searches the platter with the most requests:

(2) Retrieval Process…If there are no other requests for the current platter, the Retrieval Process requests the platter (1128) with the most outstanding requests in the request data structure, and mounts that platter (1130).

*Id.* at 26:16, 59-62. The Retrieval Process algorithm is the corresponding structure.

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| means for searching each other platter associated with image requests in an order determined by the number of requests per platter such that a platter having the most requests is searched first [claim 33] | Structure: computer programmed to perform the Retrieval Process algorithm on TIFF files | Structure: database controller, image storage controller, or a computer programmed to perform the Retrieval Process to request the platter with the most outstanding requests in the request data structure, mount that platter, and retrieve the requested image, and its equivalents |

The '965 specification explains that the Retrieval Process algorithm performs the function of searching in an order determined by the number of requests per platter:

(2) Retrieval Process…If there are no other requests for the current platter, the Retrieval Process requests the platter (1128) with the most outstanding requests in the request data structure, and mounts that platter (1130).

*Id.* at 26:16, 59-62.  The Retrieval Process algorithm is the corresponding structure.

| Claim Term | ACS's Construction | JPMorgan's Proposal |
|---|---|---|
| means for determining if there is a request associated with a second side of the platter, and if so, for searching the second side of the platter for a request prior to searching another platter [claim 34] | Structure:  computer programmed to perform the Retrieval Process algorithm on TIFF files | Structure:  database controller, image storage controller, or a computer programmed to sort requests by platter and platter side, check if there are requests pending for the platter currently in the drive, check if there are any requests for the side of the platter currently being read, check if there are any requests for the other side of the platter, and retrieve the requested image, and its equivalents |

The '965 specification explains that the Retrieval Process algorithm performs the function of searching the second side of the platter prior to searching another platter:

(2) Retrieval Process…If there are, the Retrieval Process then checks to see if there are any requests for the side of the platter currently under the read heads of the optical storage device (1120).  If there are no requests for the current side, the platter is then flipped (1124).

*Id.* at 26:16, 30-34.  The Retrieval Process algorithm is the corresponding structure.

## VI.    CONCLUSION

ACS's constructions for the disputed terms follow established principles of claim construction, giving effect to the claim language, specification and prosecution history. JPMorgan's proposals ignore the intrinsic record in an attempt to broaden the scope of the asserted claims beyond the system enabled by the intrinsic record and re-capture claim scope disclaimed in the specification and prosecution history.   Accordingly, ACS respectfully requests that the Court adopt its construction of the asserted claims as set forth herein and in the claim chart contained in the accompanying Ex. 1 and Ex. 2.

Dated:  November 6, 2009                    **CONNOLLY BOVE LODGE & HUTZ LLP**

                                               _____*/s/ Kevin F. Brady*_____
Collins J. Seitz, Jr.  (Bar. No. 2237)
Kevin F. Brady (Bar No. 2248)
1007 North Orange Street, P.O. Box 2207
Wilmington, DE 19899
Telephone: (302) 658-9141
Facsimile: (302) 656-0116
cseitz@cblh.com
kbrady@cblh.com

*Attorneys for Defendants Affiliated Computer Services, Inc., and ACS State & Local Solutions, Inc.*

**OF COUNSEL:**

Mike McKool
Lewis T. LeClair
Theodore Stevenson, III
Bradley Caldwell
Phillip Aurentz
McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

John Campbell
McKool Smith, P.C.
300 W. 6th Street, Suite 1700
Austin, Texas 78701
Telephone: (512) 692-8700
Facsimile: (512) 692-8744

Brett E. Cooper
McKool Smith, P.C.
399 Park Avenue, Suite 3200
New York, New York 10022
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on November 6, 2009, a copy of ACS's Opening Brief on Claim Construction was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the following counsel and that the document is available for viewing and downloading from CM/ECF.

**BY CM/ECF AND E-MAIL**
Philip A. Rovner, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
provner@potteranderson.com

I hereby certify that on November 6, 2009 I have forwarded the foregoing document by E-mail the following non-registered participants:

Scott L. Robertson
Jennifer A. Albert
Thomas J. Scott, Jr.
Stephen T. Schreiner
Eleanor M. Hynes
Goodwin Proctor LLP
901 New York Avenue, NW
Washington, DC 20001

_/s/ Kevin F. Brady_
Kevin F. Brady (Bar No. 2248)
kbrady@cblh.com