**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JPMORGAN CHASE & CO., | ) | |
| JPMORGAN CHASE BANK, N.A., and | ) | |
| JPMORGAN CHASE ELECTRONIC | ) | |
| FINANCIAL SERVICES, INC., | ) | |
| | ) | C.A. No. 08-189-SLR |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AFFILIATED COMPUTER SERVICES, INC. and | ) | JURY TRIAL DEMANDED |
| ACS STATE & LOCAL SOLUTIONS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT ACS'S CLAIM CONSTRUCTION ANSWERING BRIEF**

Collins J. Seitz, Jr. (Bar No. 2237)
Kevin F. Brady (Bar No. 2248)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street, P.O. Box 2207
Wilmington, DE 19899
Telephone: (302) 658-9141
cseitz@cblh.com
kbrady@cblh.com

December 8, 2009

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     PROPOSED CONSTRUCTIONS FOR THE '823 PATENT .......................................... 3

      A.     "Document capture component" and "Check capture
            component" are Separate Scanners ...................................................................... 3

            1.      Intrinsic Record Teaches that the Document
                    Capture Component and Check Capture Component
                    are Separate ........................................................................................ 3

            2.      JPMorgan Attempts to Recapture Disclaimed
                    Subject Matter .................................................................................... 7

      B.     "Document capture memory" and "Check capture memory"
            are Separate Memory Devices .............................................................................. 8

            1.      Intrinsic Record Teaches that the Document
                      Capture Memory and Check Capture Memory are
                      Separate ............................................................................................. 8

      C.     "Lockbox processing system" Disclaims Systems
            Requiring Processing by the Conventional Financial
            Processing System ............................................................................................. 11

      D.     "Logically associating" Requires Associating the Check
            Number with the Documents ............................................................................... 12

      E.     "Logically associating" is a Process Defined in the
            Specification ..................................................................................................... 13

      F.     "Document data record" and "Check data record" are
            Manually Input ................................................................................................. 15

      G.     "Bulk file interface" Transmits All of the Data and Images
            in a File ............................................................................................................ 16

III.    PROPOSED CONSTRUCTIONS FOR THE '965 PATENT ....................................... 16

      A.     "Tagged image file format (TIFF) file" is a Standard File
            Format Controlled by Adobe .............................................................................. 16

      B.     "Decoded magnetic ink coded data" Uses Magnetic Signals .............................. 17

      C.     "Binary large object (BLOB)" is a Collection of TIFF Files ............................... 18

D.      JPMorgan's Identification of Alternative Corresponding
        Structures is Not Supported by the Specification.................................................19

IV.    CONCLUSION.............................................................................................................20

Austin 54913v1

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Gaus v. Conair Corp.*,
363 F.3d 1284 (Fed. Cir. 2004) .................................................................................. passim

*Ormco Corp. v. Align Tech., Inc.*,
498 F.3d 1307 (Fed. Cir. 2007) .......................................................................................... 12

*Playtex Products, Inc. v. Procter & Gamble Co.*,
400 F.3d 901 (Fed. Cir. 2005) ............................................................................................. 5

*RFID Tracker, Ltd. v. Wal-Mart Stores, Inc.*,
No. 2008-1412, 2009 WL 2502792 (Fed. Cir. Aug. 18, 2009) ............................................ 12

**TABLE OF EXHIBITS**

Joint Appendix:

J.A. 1          U.S. Patent No. 5,917,965

J.A. 2          U.S. Patent No. 7,317,823

J.A. 3          File History for U.S. Patent No. 5,917,965

J.A. 4          File History for U.S. Patent No. 7,317,823

J.A. 5          File History for Parent Patent of U.S. Patent No. 7,317,823

J.A. 6          TIFF Revision 6.0 Final - June 3, 1992, available at partners.adobe.com/
                public/developer/tiff/index.html.


ACS Appendix (included with Opening Brief):

Ex. 1          Comparison Chart of Parties' Claim Construction Proposals for the '823 Patent

Ex. 2          Comparison Chart of Parties' Claim Construction Proposals for the '965 Patent

Ex. 3          What is MICR?, available at www.whatismicr.com


ACS Appendix (included with Response Brief):

Ex. 4          Transcript of Court Teleconference on December 3, 2009

# I.    INTRODUCTION

JPMorgan repeatedly insists that its proposals are "consistent" with the claims and the specification, and not "contradicted" by the prosecution history.  *E.g.* D.I. 401 at 8, 9. JPMorgan's insistence is belied by its attempts to ignore portions of the claims, specification, and prosecution history that illustrate the proper meaning of the claim terms.

As an example of JPMorgan's disregard of the claim language, a search of JPMorgan's brief reveals that JPMorgan simply ignores the last two limitations of claim 1 of the '823 patent that recite:

> [f]    wherein the processor further <u>retrieves</u> the check image and the check data record <u>from</u> the <u>check capture memory</u> and <u>stores</u> the check image and the check data record <u>in the document capture memory</u>, and

> [g]    wherein the logical association is performed <u>on the document capture memory</u>.

The requirement imposed by these limitations to "retrieve…from," "store…in," and "logically associate…on" conclusively demonstrates that the "document capture memory" and "check capture memory" must be separate memory devices.

As an example of JPMorgan's disregard of the specification, JPMorgan simply ignores Figure 1 that "illustrates <u>the system of the present invention</u>[.]"  Figure 1, as well as the entire textual specification, demonstrates that the present invention requires two separate scanners (a document scanner and a check scanner) and two separate memories (a document memory and a check memory) to create a parallel processing system that overcomes the inefficiencies of the prior art system utilizing a single conveyor belt type scanner.

Finally, JPMorgan simply ignores the entire prosecution history of the '823 patent and its parent application.  Applicants filed an Appeal Brief during the prosecution of the parent application to the '823 patent that included a section titled "Summary of Claimed Subject Matter."   JPMorgan fails to address or consider the Appeal Brief in any way whatsoever.  Furthermore, the Examiner highlighted limitations [f] and [g] above in his reasons for allowance of the claims at issue.   But JPMorgan entirely ignores the prosecution history.

On the rare occasions that JPMorgan actually looks to the specification for support, JPMorgan mischaracterizes the specification.  For example, JPMorgan asserts the specification "teaches away" from being a parallel processing system by "repeatedly emphasizing that the operations of the invention can take place in various sequences." D.I. 401 at 8, 9.  JPMorgan then parenthetically quotes carefully selected snippets of the specification out of context.   A review of those snippets within the specification, however, reveals only that the patent teaches no preferred order for the manual entry of data versus scanning.  *E.g.* J.A. 2 ('823 patent) at 5:40-41 ("There is no preferred order of scanning and manual entry.").   The patent does not teach, as JPMorgan implies, that the documents and checks may be scanned on a single device and stored together on a single device after scanning.  Rather, the processing of the documents and checks is in parallel, and it is only within the separate processing of the documents and the checks that there is no preferred order of scanning versus data entry.

## II.     PROPOSED CONSTRUCTIONS FOR THE '823 PATENT

### A.     "Document capture component" and "Check capture component" are Separate Scanners

ACS's Opening Brief on Claim Construction methodically walked through the claims, specification, and prosecution history to demonstrate that the entire intrinsic record teaches that the "document capture component" and "check capture component" are separate components required by the invention to overcome the inefficiencies in the prior art.  D.I. 403 at 5-12.

JPMorgan acknowledges in its Opening Claim Construction Brief that the "document capture component" and "document capture memory" are separate parts of the claimed system, D.I. 401 at 11 ("the claim recites that the document capture portion of the system is 'coupled to' another part of the system—the 'document capture memory'"), but argues that the "document capture component" and "check capture component" are not required to be separate components.  JPMorgan's argument suffers from two basic problems:  1) JPMorgan's attempt to broaden the claim by reading out "document" and "check" is inconsistent with the intrinsic record that teaches that the document capture component and check capture component are separate components; and  2) JPMorgan's proposal would improperly recapture disclaimed systems.  JPMorgan's attempt to disregard the intrinsic record, broaden the claim, and re-capture disclaimed devices should be rejected.

### 1.     Intrinsic Record Teaches that the Document Capture Component and Check Capture Component are Separate

Claim 1 is explicit in the requirement of two different components—a document capture component and a check capture component:

[a]     <u>a document capture component</u>, the document capture component
        scanning the at least one document thereby generating a document
        image, the document capture component further generating a
        document data record that identifies the at least one document;

[c]     <u>a check capture component</u>, the check capture component scanning
        the check thereby generating a check image, the check capture
        component further generating a check data record that identifies
        the check;

J.A. 2 ('823 patent) at 8:1-5, 9-12.

Significantly, JPMorgan's counsel agrees that the claim requires a <u>separate</u> check

scanning component.  As JPMorgan's counsel explained during a discovery hearing,

> So, for example, the main claim in the lockbox patent has a component
> that receives and scans documents, creating a scan of a document and
> records for the document.
>
> **And there's a separate component, or there's another component,**
> **including -- that scans in the check**.  So the claim literally recites
> scanning in the document, scanning in the check.  You know, creating
> these records.

Ex. 4 (Transcript of Court Teleconference) at 8:23-9:4.  JPMorgan's acknowledgment of

the separateness of the claimed document capture component and check capture

components accurately reflects the claim language.  The claim language of the '823

patent separately lists the "document capture component" and "check capture

component" and does not suggest that these two components may be the same.  *See Gaus*

*v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004) (claim language separately lists

components and does not suggest one is part of the other).

JPMorgan argues that the "'separateness' requirement appears nowhere in the

claim language," D.I. 401 at 12, but the claim terms "document capture component" and

"check capture component" specifically cover two different devices—one for documents

and one for checks.  "[T]he clear implication of the claim language is that" the document

capture component is a distinct component, separate from the check capture component. *See id.* JPMorgan impermissibly seeks to broaden the claim by reading out the words "document" and "check", and collapsing two different limitations into one. *Playtex Products, Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 908 (Fed. Cir. 2005) ("We think this view reads out the essence of the claim limitation 'substantially flattened' as it equates 'flattened' with 'flat.' Such an interpretation contradicts the unambiguous meaning of the term and cannot obtain here.").

The '823 specification further illustrates that the "document capture component" and "check capture component" are two separate devices. "FIG. 1 illustrates <u>the system of the present invention</u>[.]" J.A. 2 ('823 patent) at 3:27-28 (emphasis added). Figure 1 shows the document scanner portion of the document capture component as 125 and the separate check scanner portion of the check capture component as 155. The specification further explains that the separate check processing of the invention occurs "[i]n <u>parallel</u> with the above described scanning process of documents[.]" *Id.* at 4:6-14, 5:17-31 (emphasis added). As illustrated and described, the parallel operation of "the present invention" requires a separate document capture component and check capture component.

The patent never describes or mentions checks and documents being scanned on the same component. *See Gaus*, 363 F.3d at 1288 (noting that "the specification plainly describes the two components as separate"). Tellingly, JPMorgan does not argue otherwise. To the contrary, the specification—and in particular "the present invention" depicted in Figure 1—plainly describes the two components as separate. *Id.* JPMorgan simply ignores this description of the present invention and argues—without support—

that one of skill in the art would understand these two components may be combined. Contrary to JPMorgan's assertion, one of skill in the art would understand that combining these two components would destroy the claimed efficiencies of the proposed system and would reject any attempt to combine components in this invention.

The '823 file history further illustrates that the "document capture component" and "check capture component" are two separate devices.  As the applicants explained in their "Summary of Claimed Subject Matter" section of their Appeal Brief during the prosecution of the parent patent, "[t]here are substantially five steps in the processing operation."

- First, …the check and its associated documents can be **<u>separated</u>**.

- Second, …each of the documents in the batch, including the header sheet, is scanned 125.  The scanned images are stored on an image file server 140.

- Third, either before or after the documents are scanned, identifying information from each of the documents…is manually input into a database 170, to create a data record for each document.

- Fourth, **<u>concurrent</u>** with the scanning of the documents, the checks are scanned and images 525 are created for each of the checks.

- Finally, identifying information from each of the checks…is input into a database, thus creating a data record for each check.

*See* J.A. 5 (Appeal Brief filed in parent patent) at JA02087-088 (emphasis added). JPMorgan simply ignores applicants' summary of the invention.

JPMorgan also ignores the Examiner's understanding of the invention.  The Examiner also understood the separation between the document and check components of the invention explaining that "[i]t is understood by the examiner, the document data record is generated by the document capture component, <u>rather than</u> a check capture component."  J.A. 5 (Office Action) at JA02627 (emphasis added).  Since the check

capture component *does not* generate the *document* data record—and the document capture component *does*—the claimed check capture component and the document capture component cannot be the same scanner.

### 2.   JPMorgan Attempts to Recapture Disclaimed Subject Matter

JPMorgan argues, without any support, that "[t]he person of skill in the art readily understands that system blocks can be combined, subdivided, or otherwise in connection with actual implementations of the invention." D.I. 401 at 12. The intrinsic record belies JPMorgan's unsupported assertion because one of skill in the art would understand that the invention requires separate processing paths for documents and checks to overcome the inefficiencies in the prior art.

Significantly, "the specification describes one of the principal advantages of the claimed invention in a way that excludes" the document capture component and the check capture component from being a single scanner for checks and documents. *See Gaus*, 363 F.3d at 1289. The '823 specification teaches that systems that use a conveyer belt type scanner[1] for imaging checks <u>and</u> documents are "not suitable for a high volume lock box processing center since the checks must again be separately processed by the conventional financial processing systems. The redundancies therefore induced by this prior art system are not acceptable for any high volume processing center." J.A. 2 ('823 patent) at 1:64-2:2. Construing the claims to allow the document capture component and check capture component to be a single scanner would exclude the principle advantage of the invention of reducing redundancies in the prior art. As such, the document capture component and the check capture component must be separate scanners. Again, one of

---

[1] These same conveyer belt systems that serially scan checks and documents make up the majority of JPMorgan's infringement allegations for the '823 patent.

skill in the art would not understand the invention to permit combining elements of the system that destroys the principal advantage of the system.

## B.   "Document capture memory" and "Check capture memory" are Separate Memory Devices

ACS's Opening Brief on Claim Construction methodically walked through the claims, specification and prosecution history to demonstrate that the entire intrinsic record teaches that the "document capture memory" and "check capture memory" are separate components required by the invention to overcome the inefficiencies in the prior art.  D.I. 403 at 12-18.

JPMorgan acknowledges that the "document capture memory" and "document capture memory" are separate parts of the claimed system, D.I. 401 at 11, but argues that the "document capture memory" and "check capture memory" are not required to be separate components.   JPMorgan's argument is again inconsistent with the intrinsic record because the intrinsic record teaches that the document capture memory and check capture memory are separate memory devices.   JPMorgan's attempt to disregard the intrinsic record, broaden the claim, and re-capture disclaimed devices should be rejected.

## 1.   Intrinsic Record Teaches that the Document Capture Memory and Check Capture Memory are Separate

Claim 1 is explicit in the requirement of both a document capture component and a check capture component:

> [b]    a document capture memory coupled to the document capture component and storing the document image and the document data record;

> [d]    a check capture memory coupled to the check capture component and storing the check image and the check data record; and

J.A. 2 ('823 patent) at 8:6-8, 13-15 (emphasis added).   The claim language further illustrates the separateness of the "document capture memory" and "check capture memory" by requiring that the check images are "retrieved from" the check capture memory and "stored in" the document capture memory.   This retrieval process is necessary because the claimed system requires that the logical association of the check images and document images is performed on the <u>document</u> capture memory as opposed to the <u>check</u> capture memory:

> [f]    wherein the processor further <u>retrieves</u> the check image and the check data record <u>from</u> the <u>check capture memory</u> and <u>stores</u> the check image and the check data record <u>in</u> the <u>document capture memory</u>, and
>
> [g]    wherein the <u>logical association</u> is performed on the <u>document capture memory</u>.

*Id.* at 8:20-25 (emphasis added).

JPMorgan simply ignores these claim limitations, but in order for the processor to "retrieve…from" the check memory and "store…in" the document memory, two different memory devices are required.   The claim language would be nonsensical if construed to allow the processor to "retrieve…from" and "store…in" the same memory. Moreover, the claim limitation differentiates between performing the logical association process "on the document capture memory" as opposed to on the check capture memory. This language that was crafted to add a very particular limitation would be nonsensical and meaningless if the logical association could be performed on any memory device, such that "retrieve from A and store in B" might as well be "retrieve from B and store in A" or even "retrieve from A and store in A."

The '823 specification further illustrates that the "document capture memory" and "check capture memory" are two separate memory devices as listed claim 1.   The output

from the document capture component is "stored on the image file server 140 in the <u>Document Capture memory 130</u>."  J.A. 2 ('823 patent) at 4:11-14, 5:43-46, 5:20-31 (emphasis added).  The output of the check capture component is "stored on an image file server 175" that is part of check capture memory 165.  *Id.* at 4:11-14, 5:43-46, 5:20-31. Consistent with the depiction of "the present invention" in Figure 1, the written specification describes the memory components as two separate memory devices—one for document images and another for check images.

JPMorgan argues that "the specification's disclosure that the document data records may be stored in the same database as check data records contradicts ACS's proposed construction that the check capture memory and the document capture memory must be 'separate.'"  D.I. 401 at 16.  Actually, the opposite is true.  The specification's teaching that the document data records may be stored in either the document capture memory <u>**or**</u> the check capture memory shows applicants' understanding that these two memory devices are separate devices, not the same device.  J.A. 2 ('823 patent) at 5:43-46. Moreover, the claim language requires that the check data record and check image must be "retrieved…from" the check capture memory and "stored…in" the document capture memory.  If the document capture memory and check capture memory could be a single device in the claim, this limitation would be nonsensical.

The prosecution history—also ignored by JPMorgan—demonstrates the Examiner's understanding that the document capture memory and check capture memory are separate.  The Examiner explained his reasons for allowing claim 1:

> Claim [1] calls for the processor <u>retrieves</u> the check image and the check data record <u>from</u> the check capture memory and <u>stores</u> the check image and the check data record *in* the document capture memory, and wherein the logical association is performed <u>on the document capture memory</u>.

> Burns teaches the machine readable data, OCR and MICR data of remittance document and check, is stored in memory 18, <u>which is separate from image storage of memory 22.</u>  Green teaches transmitting MICR data from host controller 18 to PC 26 to combine the MICR data with the image data.  Neither Burns nor Green teaches the above features recited in claim 31 because of structural and functional differences.

J.A. 4 (Office Action) at JA01903 (emphasis added).  In other words, claim 1 issued because the Examiner found that requiring one memory for the document images and a separate memory for check images provided a structural difference over the prior art, and the requirement to perform the retrieving step and the storing and associating steps on the document memory provided a functional difference.

In summary, the claim language, specification and prosecution history all lead to the same conclusion:  the document capture memory and the check capture memory are separate and distinct memory devices.  JPMorgan's proposals improperly expand the scope of the present invention beyond that enabled by the claim language, specification and the prosecution history.  Accordingly, ACS's constructions should be adopted.

### C.    "Lockbox processing system" Disclaims Systems Requiring Processing by the Conventional Financial Processing System

The specification explains the problem with the prior art systems that scanned the document and check together on a conveyer belt type system:

> Some prior art systems have attempted to image the checks <u>and</u> the documents received in an envelope in a lockbox processing center.  One such system placed the check and its associated documents on a conveyer belt type arrangement for imaging.  <u>Such a system is not suitable for a high volume lock box processing center since the checks must again be separately processed by the conventional financial processing systems.</u>  The redundancies therefore induced by this prior art system are not acceptable for any high volume processing center.

*Id.* at 1:60-2:2 (emphasis added).  The applicants teach "overcom[ing] the deficiencies of the prior art" with "the present invention[.]"  *Id.* at 2:13-14.  Accordingly, the applicants

disclaimed systems that require the check to be processed by the conventional financial processing system, such as conveyer belt type imaging systems.   Because JPMorgan simply ignores the specification's clear disavowal of claim scope requiring that "the check need not be separately processed by a conventional financial processing system," ACS refers the Court to its Opening Claim Construction Brief at pages 18-20.

**D.     "Logically associating" Requires Associating the Check Number with the Documents**

ACS's construction properly incorporates the prosecution disclaimer that requires the logical association to associate the check number with the other documents that accompanied the check.   In arguing for allowance of claim 1 (as filed in the parent application), applicants explained that "Kern does not teach nor even suggest <u>associating the check number with the other documents that accompanied the check</u>…. Kern does not contain any teaching or suggestion that one should take the check number and associate that check number with the images of the documents that accompanied the check."   J.A. 5 (Appeal Brief filed in parent patent) at JA02091 (emphasis added).   With respect to claim 13[2], applicants stated that

> independent claim 13, similar to claim 1, requires a processor that 'logically associating the check data record, the document data record, the check image and the document image.'   As described above with respect to independent claim 1, the system of Kern does not perform this association as expressly required in independent claim 13.   Further, it should be noted that the check data record includes the check number.

---

[2] Claim 13 as filed in the parent application is exactly the same as claim 1 in the issued '823 patent except that claim 1 adds the retrieving, storing and associating on the document capture memory limitations.   As such, applicants' statements with respect to claim 13 in the parent application disclaiming systems that did not associate the documents with the check numbers apply to the same claim limitation in claim 1 of the '823 patent.   *See RFID Tracker, Ltd. v. Wal-Mart Stores, Inc.*, No. 2008-1412, 2009 WL 2502792, at *2 (Fed. Cir. Aug. 18, 2009) (citing *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007).

This feature is not disclosed in Kern as discussed above.  <u>Therefore, Kern cannot associate anything with the check number because the check number is not included in Kern.</u>

J.A. 5 (Appeal Brief filed in parent application) at JA02092 (emphasis added).

Because JPMorgan simply ignores the clear disavowal of claim scope in the prosecution history requiring "associating the check number with the other documents that accompanied the check," ACS refers the Court to its Opening Claim Construction Brief at pages 24-25.

### E.     "Logically associating" is a Process Defined in the Specification

JPMorgan argues that the specification "broadly teaches that '[p]roper association' means that all of the data and images reflect a group 102 as it was received by the system." D.I. 401 at 22. While this may be a broad teaching of the result of "logically associating", it does not explain what it means to perform the logical association step.[3] JPMorgan does not dispute that the specification teaches that the logical association step is performed differently depending on whether the transaction includes a single document or multiple documents. For the single document case, JPMorgan argues that the specification teaches only an example, D.I. 401 at 23, but JPMorgan fails to recognize that this is the only teaching in the specification for the single document case.

The multiple document scenario is even more telling. JPMorgan argues that "ACS ignores the disclosed description of an embodiment where bar codes are imprinted

---

[3] Although claim 1 is drafted as a system claim, limitations [f] and [g] define certain steps that must be performed by a processor including performing the logical association on the document capture memory. J.A. 2 ('823 patent) at 8:20-25.

on each document." D.I. 401 at 23.  Below is the quote from the specification regarding logical association with multiple documents with bar codes:

> In the alternative embodiment described above, if each of the documents have a bar code imprinted thereon, the data

J.A. 2 ('823 patent) at 6:61-62.  The block quote above is not a typo—the specification simply trails off after "data" and provides no teaching of how to logically associate in the multiple document scenario with bar codes.   Absent such a teaching, the proper construction of "logically associating" is the teaching within the specification.

Construing the claim as JPMorgan proposes would improperly allow applicants to claim a solution to a problem that they could not solve:  automatically performing the logical association process when the lockbox remittance includes multiple documents.  If the lockbox remittance includes multiple documents with multiple data records, the specification teaches that the process cannot be performed automatically, but rather must be performed manually because of the difficulty of associating the multiple images and data records: "A difficulty occurs when there is more than one document 110 contained in a group 102 that generate more than one document data record 505-515….. [S]ystem 130 has no means of properly automatically associating the correct data record with the correct image." *Id.* at 6:30-48.

The '823 patent solves this multiple documents and multiple data records problem with a system that provides an operator at a workstation to manually perform the association: "In order to solve this problem, system 130 presents an operator at workstation with a screen containing both the unmatched document data records 505 and thumbnail prints of the unmatched document images 530, 535 and 540." *Id.* at 6:49-60.

**F.    "Document data record" and "Check data record" are Manually Input**

The specification's teaching that the data records are manually input begins with the Abstract, continues in the Summary of the Invention, and is affirmed in the Detailed Description of the Invention.  J.A. 2 ('823 patent) at Abstract, 2:40-49, 5:32-35, 5:40-41. The prosecution history further affirms that the data records are manually input.  As the applicants described in the Summary of Claim Subject Matter section of their Appeal Brief, "identifying information from each of the documents…is manually input into a database 170, to create a data record for each document."  J.A. 5 (Appeal Brief filed in parent patent) at JA02087-088 (emphasis added).

JPMorgan repeatedly mischaracterizes the specification in an attempt to broaden the disclosure.  For example, JPMorgan argues that an alternative embodiment discloses "obviating the need for any data entry with respect to documents."  D.I. 401 at 14.  This alternative embodiment, however, requires a bar code imprinted on the documents and then discloses that the processor 180 would read the bar code.  Significantly, in the context of claim 1, the processor is not part of the "document capture component" and it is the "document capture component" that must "generate[] a document data record."  As another example, JPMorgan states "that OCR may be used to harvest data automatically from a document."  D.I. 401 at 14.  The specification actually teaches away from using OCR, stating that "conventional Optical Character Recognition process is not as accurate [as] the preferred bar code recognition process."  J.A. 2 ('823 patent) at 2:40-49.  In other words, the specification teaches only one way to "generate[] a document data record" using the "document capture component"—through manual entry of the data using a workstation.

G.      **"Bulk file interface" Transmits All of the Data and Images in a File**

Contrary to JPMorgan's assertion that "[t]here is simply no support for ACS's additional 'single file' requirement", D.I. 401 at 25, the specification teaches that "a bulk electronic file includes of **all of the data and images** for a customer."  J.A. 2 ('823 patent) at 7:17-18 (emphasis added).  The purpose of the bulk file interface is to transmit all of the data and images in a single bulk file (as opposed to multiple smaller files).

## III.    PROPOSED CONSTRUCTIONS FOR THE '965 PATENT

The '965 Patent teaches storing the check image in the TIFF format and embedding within a tag field the TIFF file that stores the magnetically decoded MICR data.  The TIFF file format includes a number of tag fields that may be used to store information.  Using the magnetically decoded MICR data and knowing where it is stored within the TIFF file allows a user to request, retrieve and display check copies.  According to applicants, the claims "are essentially directed to (for example) a method in which…the electronic image and the decoded magnetic ink coded data are merged <u>into a Tagged Image File Format (TIFF)</u> file[.]" J.A. 3 (Response to Office Action) at JA00591 (emphasis in original).  Furthermore, the claims "require that the decoded magnetic ink coded data be stored as 'a tag field' in the TIFF file."  *Id.*

A.      **"Tagged image file format (TIFF) file" is a Standard File Format Controlled by Adobe**

JPMorgan argues that "the term tagged image file format is used generally, i.e., without any requirement that a TIFF is a standard TIFF."  D.I. 401 at 28.  ACS can only wonder what JPMorgan is alluding to as the only type of TIFF file discussed in the intrinsic record—or known to ACS for that matter—is the standard <u>T</u>agged <u>I</u>mage <u>F</u>ile <u>F</u>ormat (TIFF) maintained by Adobe.  The '965 specification explains that

> [t]he front and back check digital images are converted from the camera
> digital image format, e.g., NCR image format, into a <u>standard</u> Tagged
> Image File Format (TIFF, which is a registered trademark of ALDUS
> Corp.).… The TIFF file 22 is in industry <u>standard</u> TIFF format.

J.A. 1 ('965 Patent) at 18:40-47 (emphasis added); *see also id.* at 9:10-14 ("merging the

electronic image and the decoded magnetic ink coded data into a tagged image file format

(TIFF®[a registered mark of Aldus Corp.]) file, with the decoded magnetic ink coded

data stored in a tag field in the TIFF file").  In fact, applicants argued that the claims were

allowable because they registered a tag field for MICR data with Aldus (the predecessor

to Adobe).  J.A. 3 (Response to Office Action) at JA00591-593 ("the assignee of the

present invention registered the new fields that were created specifically for the purposes

of this invention with the Aldus Corporation which developed the TIFF standard").

     JPMorgan argues that "the claims are plainly not limited to a 'standard' TIFF

under the control of Adobe Systems," D.I. 401 at 28, but the prosecution history makes

clear that TIFF is a standard:  "At the time of the development of the instant inventions,

<u>TIFF was an emerging standard</u> and it was not at all obvious that these fields should be

added in the manner in which the inventors herein have done."  J.A. 3 (Response to

Office Action) at JA00591-593 (emphasis added).  Contrary to JPMorgan's implication

that both standard and non-standard TIFFs are available, a reference to TIFF is a

reference to a standard; there is no such thing as a standard TIFF and a non-standard

TIFF.  Accordingly, ACS's construction should be adopted.

    **B.**    **"Decoded magnetic ink coded data" Uses Magnetic Signals**

     The '965 specification explains that the MICR line is magnetically decoded with a

MICR reader:  "When the check 1 reaches the MICR reader 205, the MICR is then

<u>magnetically decoded</u>, as known in the art….MICR reader 205 captures the information

magnetically encoded in the MICR line of the check for inclusion in the TIFF file 22."
*Id.* at 14:65-67, 17:63-67 (emphasis added).  The magnetic character of the data permits
decoding the data using a magnetic signal.

As ACS expected, JPMorgan is seeking to avoid the "magnetic" requirement to
encode/decode magnetic ink in an attempt to accuse optical character recognition (OCR)
of decoding MICR data.  D.I. 401 at 27.  Such an application of the claims is improper as
the specification teaches that it is the magnetic character of the ink that permits magnetic
decoding of the data.  The specification notes that OCR may "decode the MICR
characters optically," but the MICR data is then "magnetically decoded" using a MICR
reader.  J.A. 1 ('965 Patent) at 16:62-67.  In other words, only a MICR reader can "read[]
and decode[] said magnetic ink code line to form decoded magnetic ink coded data."  *Id.*
at 54:35-36, 56:12-13 (claims 1 and 20).

### C.      "Binary large object (BLOB)" is a Collection of TIFF Files

The fact that a BLOB is a single entity is based on the applicants' teaching the
creation of "a" BLOB and writing "the" BLOB:  "the image storage controller 501
groups these files into **a** Binary Large Object (BLOB) 26, and writes **the** BLOB 26 to the
image storage device 502."  J.A. 1 ('965 Patent) at 27:62-65; *see also* 9:19-24; 15:44-48.
ACS's construction that a BLOB is a single entity is further supported by the prosecution
history.  In distinguishing the prior art reference Beatty, applicants explained that "[t]he
application combines several TIFF files into each BLOB for storage…. The [prior art]
reference does not suggest combining several TIFF files for storage."  J.A. 3 (Response
to Office Action) at JA00593-594.[4]

---

[4] JPMorgan's quibble with ACS's construction as replacing "images" with "files" is a
red-herring.  ACS will agree to replace the word "images" with "files."

**D.     JPMorgan's Identification of Alternative Corresponding Structures is Not Supported by the Specification**

JPMorgan argues that it identifies the "necessary" steps of the algorithm to perform the recited function.  D.I. 401 at 31.  JPMorgan, however, does not identify the necessary steps, but rather identifies "alternative" structures that are not tied to performing the recited function.  Despite agreeing with ACS that the means-plus-function limitations are "computer-implemented" limitations that require identifying the algorithm performed by the computer, D.I. 401 at 30, JPMorgan repeatedly attempts to include a "database controller" and "image storage controller" as alternative structures that perform multiple functions.

In particular, JPMorgan identifies the "database controller" and "image storage controller" as alternative structures for the following means-plus-function limitations:

- means for determining the platter associated with each request and forming a listing of the requests for each platter ("means for determining no. 1") [claim 33]

- means for determining if there is a request for an image corresponding to any electronic images on a platter currently being searched of said electronic storage device, and if so, for retrieving the image ("means for determining no. 2") [claim 33]

- means for determining the platter associated with the most image requests and searching the platter associated with the most requests for the requested images and for retrieving the requested images ("means for determining no. 3") [claim 33]

- means for searching each other platter associated with image requests in an order determined by the number of requests per platter such that a platter having the most requests is searched first ("means for determining no. 4") [claim 33]

- means for determining if there is a request associated with a second side of the platter, and if so, for searching the second side of the platter for a request prior to searching another platter ("means for determining no. 5") [claim 34]

JPMorgan does not even attempt to justify its inclusion of the "database controller" and "image storage controller" as alternative structures for these means-plus-

function limitations except for means for determining no. 2.  D.I. 401 at 35-39.  Even with this limitation, JPMorgan cites to portions of the specification that do not suggest that the "database controller" and "image storage controller" perform the recited function. D.I. 401 at 37.  Rather, according to the specification, the image storage controller groups TIFF files into a BLOB and writes the BLOB to the image storage device.  J.A. 1 ('965 Patent) at 27:51-67.  The database controller creates an index record for each TIFF file in the BLOB.  *Id.* at 28:47-50.  While the functions performed by the "database controller" and "image storage controller" may be necessary parts of the recited functions of the means-plus-function claim limitations, the "database controller" and "image storage controller" are not alternate structures for performing the recited functions of any of the disputed means-plus-function terms.

## IV.    CONCLUSION

ACS's constructions for the disputed terms follow established principles of claim construction, giving effect to the claim language, specification and prosecution history. JPMorgan's proposals ignore the intrinsic record in an attempt to broaden the scope of the asserted claims beyond the system enabled by the intrinsic record and re-capture claim scope disclaimed in the specification and prosecution history.  Accordingly, ACS respectfully requests that the Court adopt its construction of the asserted claims as set forth herein and in the claim chart contained in Exhibits 1 and 2.

Dated:  December 8, 2009

**CONNOLLY BOVE LODGE & HUTZ LLP**

_____/s/ Kevin F. Brady_____
Collins J. Seitz, Jr.  (Bar. No. 2237)
Kevin F. Brady (Bar No. 2248)
1007 North Orange Street, P.O. Box 2207
Wilmington, DE 19899
Telephone: (302) 658-9141
Facsimile: (302) 656-0116
cseitz@cblh.com
kbrady@cblh.com

*Attorneys for Defendants Affiliated Computer Services, Inc., and ACS State & Local Solutions, Inc.*

**OF COUNSEL:**

Mike McKool
Lewis T. LeClair
Theodore Stevenson, III
David Sochia
Bradley Caldwell
Phillip Aurentz
**McKool Smith, P.C.**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

John Campbell
300 W. 6th Street, Suite 1700
Austin, Texas 78701
Telephone: (512) 692-8700
Facsimile: (512) 692-8744

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that on December 8, 2009 a copy of ACS's

Claim Construction Answering Brief was served to all counsel of record.


_____/s/ Kevin F. Brady ._____
Kevin F. Brady (Bar No. 2248)
<u>kbrady@cblh.com</u>