## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JPMORGAN CHASE & CO.,<br>JPMORGAN CHASE BANK, N.A. and<br>JPMORGAN CHASE ELECTRONIC<br>FINANCIAL SERVICES, INC., | )<br>)<br>)<br>)<br>) | |
| *Plaintiffs,* | )<br>) | Civil Action No. 08-189-SLR |
| v. | )<br>)<br>) | |
| AFFILIATED COMPUTER SERVICES, INC. and<br>ACS STATE & LOCAL SOLUTIONS, INC., | )<br>)<br>) | |
| *Defendants.* | )<br>) | |


### JPMORGAN'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Scott L. Robertson
Thomas J. Scott, Jr.
Stephen T. Schreiner
Eleanor M. Hynes
GOODWIN PROCTER LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 346-4000

Michael S. DeVincenzo
Andrew N. Stein
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(202) 346-4000

Dated:  December 8, 2009

Philip A. Rovner (#3215)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, Delaware  19899
(302) 984-6000
provner@potteranderson.com

*Attorneys for Plaintiffs*
*JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A., and*
*JPMorgan Chase Electronic*
*Financial Services, Inc.*

# TABLE OF CONTENTS

Page

I.    INTRODUCTION..............................................................................................1

II.   U.S. PAT. NO. 7,317,823 .................................................................................2

    A.   The '823 Patent Specification Includes No Clear Disavowal Limiting The Meaning of "Lockbox Processing System" to a Lockbox Processing System Where Checks "Need Not Be Separately Processed By a Conventional Financial Processing System".......................................................................................................................2

    B.   Neither the Specification of the '823 Patent Nor the Prosecution History of the Parent Patent Limits The Meaning of "Logically Associating" to the Alternatives Asserted By ACS ...............................................................................................................5

        1.   *"Logically Associating" Has A Customary Meaning In the Art* ................6

        2.   *ACS Does Not Overcome The Heavy Presumption That "Logically Associating" Be Given Its Customary Meaning* .........................................7

        3.   *Limiting "Logically Associating" To Manually Creating A Connection For Multiple Documents Reads Out Of The Claims An Embodiment That Describes An Automatic Process* ................................................................8

        4.   *ACS May Not Limit "Logically Associating" By Importing Limitations From The Parent Patent's Prosecution History* .........................................9

    C.   The Specification Discloses Both Manual and Non-Manual Input of Information to Create the "Document Data Record" and the "Check Data Record" ....................11

        1.   *The "Document Data Record" Does Not Require "A Document Associated with a Check"* .......................................................................................11

        2.   *The "Check Data Record" Does Not Require "A Check Number"* ..........12

        3.   *Limiting "Check Data Record" and "Document Data Record" To Storing Manually Input Data Reads Out Of The Claims An Embodiment That Describes An Automatic Data Input Process*............................................12

    D.   The Disclosure of the '823 Patent and the Prosecution History of the Parent Do Not Limit The Meaning of "Bulk File Interface" to "Transmitting All of the Data and Images for a Customer in a Single File" .........................................................14

    E.   The Intrinsic Evidence Does Not Require That "Document Capture Memory" and "Check Capture Memory" Be Separate ...............................................................15

    F.   The Intrinsic Evidence Does Not Limit the Meaning of "Document Capture Component" and "Check Capture Component" to Two Physically Separate Scanners .......................................................................................................................21

III.  U.S. Pat. No. 5,917,965.................................................................................28

    A.   ACS's Proposed Construction of "Decoded Magnetic Ink Coded Data" Is Copied Verbatim From an Uncorroborated Website Advertisement for Toner Products and Is Inconsistent with the Claims and the Specification .........................................28

B.    The Claims, Specification, and Prosecution History Expressly Contradict ACS's Positions That "Tagged image File Format (TIFF) File" Must Be a "Standard" File Format and "Tag Field in the TIFF File" Requires "Merging" and "Storing" of Tag Fields...................................................................................................................30

C.    The Specification and Prosecution History Expressly State That the Meaning of "Binary Large Object (BLOB)" Is "As Commonly Used in the Field" ...............33

D.    ACS's Constructions for the Eight Disputed Means-Plus-Function Limitations Improperly Include Extraneous Steps Not Necessary to Perform the Recited Functions..............................................................................................................34

IV.    **CONCLUSION** ..............................................................................................................37

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*3M Innovative Props. Co. v. Avery Dennison Corp.,*
    350 F.3d 1365 (Fed. Cir. 2003) ............................................................................ 19

*Advanced Cardiovascular Sys. v. Medtronic, Inc.,*
    265 F.3d 1294, 1305-06 (Fed. Cir. 2001)...................................................................10

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
    314 F.3d 1313, 1345 (Fed. Cir. 2003)........................................................................8

*Avid Identification Sys. Inc. v. Phillips Electronics N. America Corp.,*
    2006 U.S. Dist. LEXIS 35477 (E.D. Tex.) ............................................................ 16

*Epistar Corp. v. ITC,*
    566 F.3d 1321 (Fed. Cir. May 22, 2009) ................................................................ 4

*Gaus v. Conair, Corp.,*
    363 F.3d 1284 (Fed. Cir. 2004) ............................................................................ 24

*GoLight v. Walmart Stores, Inc.,*
    355 F.3d 1327 (Fed. Cir. 2004) ............................................................................ 4

*Harris Corp. v. Ericsson Inc.,*
    417 F.3d 1241 (Fed. Cir. 2005) ....................................................................... 34, 36

*In re Am. Acad. of Sci. Tech. Ctr.,*
    367 F.3d 1359 (Fed. Cir. 2004) ............................................................................ 3

*In re Paulsen,*
    30 F.3d 1475 (Fed. Cir. 1994) .............................................................................. 23

*Invitrogen Corp. v. Clontech Labs., Inc.,*
    429 F.3d 1052 (Fed. Cir. 2005) ............................................................................ 10

*Johnson Worldwide Assocs. v. Zebco Corp.,*
    175 F.3d 985, 989-90 (Fed. Cir. 1999......................................................................22

*Lampi Corp. v. Am. Power Prods., Inc.,*
    228 F.3d 1365 (Fed. Cir. 2000) ....................................................................... 16, 22

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
    481 F.3d 1371 (Fed. Cir. 2007) ............................................................................ 21

*McCarty v. Lehigh Val. R.R.,*
    160 U.S. 110,  16 S.Ct. 240, 40 L.Ed. 358 (1895)................................................. 22

*Micro Chem., Inc. v. Great Plains Chem Co.,*
    194 F.3d 1250 (Fed. Cir. 1999) ............................................................................ 34

*Network Appliance, Inc. v. Bluearc Corp.,*
    Civ. A. No. 03-5665, 2004 WL 5651036 (N.D. Cal. Nov. 30, 2004) ...................... 22

*NTP v. Research in Motion, Ltd.,*
    418 F.3d 1282, 1297 (Fed. Cir. 2005)............................................................16, 17, 22

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) ................................................................... 6, 8, 18

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.,*
    318 F.3d 1143 (Fed. Cir. 2003), *rev'd on other grounds*, 412 F.3d 1284 (Fed. Cir. 2005) ..... 22

*Renishaw PLC v. Marposs Societa per Azioni,*
    158 F.3d 1243 (Fed. Cir. 1998) ................................................................... 21, 22

*Rexnord Corp. v. Laitram Corp.,*
    274 F.3d 1336, 60 USPQ2d 1851 (Fed. Cir. 2001) .................................................. 6

*Rodime PLC v. Seagate Technology, Inc.,*
    174 F.3d 1294 (Fed. Cir. 1999) ................................................................... 16, 22

*Salazar v. Procter & Gamble Co.,*
    414 F.3d 1342 (Fed. Cir. 2005) ................................................................... 19, 25

*Specialty Composites v. Cabot Corp.,*
    845 F.2d 981 (Fed. Cir. 1988) ......................................................................... 8

*St. Clair Intellectual Property Consultants, Inc. v. Matsushita Elec. Ind. Co., LTD,*
    2009 WL 3834541 (No. 04-1436) (D. Del. Nov. 13, 2009) ..................................... 34

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
    299 F.3d 1313 (Fed. Cir. 2002) ................................................................... 2, 4, 8

*TruePosition, Inc. v. Andrew Corp.,*
    507 F. Supp. 2d 447 (D. Del. Aug. 2007)............................................................. 37

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.,*
    473 F.3d 1173 (Fed. Cir. 2006) ................................................................... 3, 10

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) ................................................................... 12, 30

**Other Authorities**

COMPUTER DESKTOP ENCYCLOPEDIA........................................................................ 7

DICTIONARY OF COMPUTER AND INTERNET TERMS........................................................ 7

MICROSOFT COMPUTER DICTIONARY ................................................................... 6, 26

THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS TERMS ................................... 7

## I.      INTRODUCTION

Plaintiffs JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and JPMorgan Chase Electronic Financial Services, Inc. (collectively, "JPMorgan"), submit their Responsive Claim Construction Brief in support of their constructions of certain claim terms of U.S. Patent Nos. 7,317,823 ("the '823 Patent") and 5,917,965 ("the '965 Patent") (collectively, "the Patents-in-Suit" or "JPMorgan Patents").

ACS's arguments boil down to the erroneous proposition that this Court should limit the claims of the '823 and '965 Patents to a limited, litigation-inspired subset of the numerous embodiments disclosed in the patents' respective specifications.  In short, ACS wants the Court to hopscotch through the patents, picking only the narrowest embodiments to use to construe the claims, while ignoring numerous broader examples given in the specifications.  ACS repeatedly violates the fundamental canon of claim construction law that prohibits reading limitations from the embodiments into the claims.

As discussed in JPMorgan's Opening Claim Construction Brief, ACS improperly imports at least one limitation from the specification in its proposed constructions *for every disputed claim term*.  For the reasons stated below, ACS's claim construction positions are inconsistent with the plain language of the claims, the intrinsic evidence, and well-settled principles of law.  In contrast, JPMorgan seeks to construe the terms in accordance with their plain and ordinary means as supported by the intrinsic evidence. Accordingly, ACS's proposed constructions should be rejected, and JPMorgan asks the Court to adopt the constructions set forth by JPMorgan.

## II.     U.S. PAT. NO. 7,317,823

### A.     The '823 Patent Specification Includes No Clear Disavowal Limiting The Meaning of "Lockbox Processing System" to a Lockbox Processing System Where Checks "Need Not Be Separately Processed By a Conventional Financial Processing System"

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| lockbox processing system | a system that processes payments in the form of checks and documents associated with checks | a system that processes payments in the form of checks and documents associated with checks such that the check need not be separately processed by a conventional financial processing system |

JPMorgan proposes that "lockbox processing system" means "a system that processes payments in the form of checks and documents associated with checks." It is a straight-forward and intuitive construction consistent with the plain language of claim 1 and the specification. *See* JA00083, 7:40-43; JA00080, 1:26-30, 2:19-28, and 1:15-19. ACS, in contrast, seeks to add superfluous limitations to that construction by arguing that the inventors expressly disclaimed lockbox processing systems where checks "need to be separately processed by a conventional financial processing system." However, no such disavowal or disclaimer exists and ACS's attempt to create one from whole cloth fails.

The standard for proving a disavowal is high. To prevail, ACS must overcome the presumption that customary and ordinary meaning controls and establish that the inventors "demonstrate[d] an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). To do this, ACS relies on statements in the specification that simply do not rise to the level of a required "manifest exclusion" or "clear disavowal" of claim scope.

2

Specifically, ACS points to a brief reference in the "Background of the Invention" section to a description of conveyor belt type imaging arrangements:

> Some prior art systems have attempted to image the checks and the documents received in an envelope in a lockbox processing center. One such system placed the check and its associated documents on a conveyer belt type arrangement for imaging. Such a system is not suitable for a high volume lock box processing center since the checks must again be separately processed by the conventional financial processing systems. The redundancies therefore induced by this prior art system are not acceptable for any high volume processing center.

> Although financial service providers have been able to provide customers with the ability to search the databases containing the index and image files of the financial instruments (i.e., the checks), it is not possible heretofore to provide data and images with respect to the other documents associated with the checks such as the invoice submitted with the check.

JA00080, 1:60-2:9.

This lone reference is the basis for ACS's claim that the inventors disclaimed a system where checks are separately processed by a "conventional financial processing system."[1] However, this statement does not come close to the "expression of manifest exclusion or restriction, representing a clear disavowal of claim scope" required under the law. The Federal Circuit has consistently held that disparaging comments do not necessarily show a manifest or express disavowal of the criticized subject matter by themselves. *See, e.g., Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1180–81 (Fed. Cir. 2006) (finding that general comments distinguishing the prior art were not sufficient to limit the term "dispensing" to "direct dispensing"); *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1365–67 (Fed. Cir. 2004) (finding descriptions of the deficiencies of using mainframe computers did not exclude

---

[1] In its brief, ACS takes the illogical and unsupportable position that "separately processed by a conventional financial processing system" refers to a separate scanner. The reference to "separately processed by a conventional financial processing system" in the "Background of the Invention" section of the specification, however, does not provide any details conventional financial processing systems. Rather than referring to a separate scanner, it is more likely that the phrase "separately processed by a conventional financial processing system" refers to a check processed by a separate check presentment system, *i.e.*, a system that provides for the transfer of funds as ordered on a check.

3

mainframes from the term "user computer" because the specification as a whole did not express a clear disavowal of that subject matter).   Just a few months ago, the Federal Circuit reiterated that "*[a] patentee's discussion of the shortcomings of certain techniques is not a disavowal of the use of those techniques* in a manner consistent with the claimed invention." *Epistar Corp. v. ITC*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) (emphasis added).

Importantly, the inventors do not distinguish their invention from the conveyor belt imaging arrangement and certainly do not state that the claimed "lockbox processing system" means a "lockbox processing system where a check cannot be separately processed by a conventional financial processing system."   Instead, the specification merely recites what is shown in the prior art with respect to one particular conveyor belt type imaging arrangement.   In other words, these statements are characterizing the prior art; they are not "characterizing the invention," as required to show a "manifest exclusion" or "clear disavowal" of claim scope. *See Teleflex, Inc.*, 299 F.3d at 1324.

ACS attempts to strengthen its disavowal argument by relying on a boilerplate statement in completely different section of the '823 Patent  – the "Summary of the Invention" section – that the invention "overcome[s] the deficiencies of the prior art."   JA00080, 2:13.   This too falls short of the "clear disavowal" of claim scope required, and merely points out that the invention is advantageous.   In fact, the inventors describe multiple embodiments and features in the "Summary of the Invention" section of the '823 Patent that demonstrate that the inventors made no clear disavowal of claim scope in the patent specification. *See Golight v. Walmart Stores, Inc.*, 355 F.3d 1327, 1331 (Fed. Cir. 2004) (where the specification describes multiple embodiments or features of the claimed invention, a finding of disavowal of claim scope is inappropriate.)   As such, the plain and ordinary meaning of the term should control and "lockbox

processing system" should be construed to mean "a system that processes payments in the form of checks and documents associated with checks."

**B.    Neither the Specification of the '823 Patent Nor the Prosecution History of the Parent Patent Limits The Meaning of "Logically Associating" to the Alternatives Asserted By ACS**

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| logically associating | This claim term should be accorded its plain and ordinary meaning as understood by one skilled in the art, i.e., creating a logical, rather than physical, relation between | for a single document or single data record, automatically creating a logical connection by searching the document capture memory for documents that have a key corresponding to the check number, batch number or check amount reflected in the check data record, or for multiple documents with multiple data records, manually creating a logical connection through an operator at a workstation |

JPMorgan's construction of "logically associating" is consistent with the plain language of the claim as confirmed by intrinsic and extrinsic evidence. ACS, in contrast, proposes a shifting and complicated construction that changes depending on the context. ACS would have the Court assign three different meanings and requirements to the term "logically associating," namely: (1) "automatically creating a logical connection by searching the document capture memory for documents that have a key corresponding to the check number, batch number or check amount reflected in the check data record," for single documents or data records; (2) "manually creating a logical connection through an operator at a workstation," for multiple documents or data records; and (3) "associating a check number with…documents." This argument is one of the clearest examples of ACS abandoning principals of claim construction and scrambling to use any hint of a limitation in the intrinsic evidence in order to narrow the scope of the claims.

### 1.   "Logically Associating" Has A Customary Meaning In the Art

First, ACS incorrectly argues that "logically associating" has no meaning in the art. ACS's Brief at 22. JPMorgan, in contrast, submits that the ordinary and customary meaning of "logically associating" is evidenced by a variety of sources, including the words of the claims themselves, the remainder of the specification, and dictionary definitions.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005); *see e.g., Rexnord Corp. v. The Laitram Corp.*, 274 F.3d 1336, 1342, 60 USPQ2d 1851, 1854 (Fed. Cir. 2001) (explaining the court's analytical process for determining the meaning of disputed claim terms).  For example, the claim language describes "logically associating" as a process performed by a processor that results in a non-physical connection between four different items, *i.e.*, the check image, document image, check data record, and document data record.  *See* JA00083, 8:17-19.  Next, the specification, consistent with the claim, broadly teaches that:

> Once all of the data entry and scanning has been completed, an association process takes place in which the check data records, the check images, the document data records and the document images for each group are ***all associated and cross-referenced*** such that the system has now recreated an electronic version of the original group of physical papers.

JA00080, 2:50-58 (emphasis added); *see* JA00082, 5:65-67; JA00073, Abstract; JA00082, 6:7, 9-10, 19, 25.

Thus, JPMorgan's construction "creating a logical, rather than physical, relation between" is consistent with the broad disclosure of "logical association" both in the claims and its description in the specification.  The extrinsic evidence also confirms JPMorgan's proposed construction.  For example, the MICROSOFT COMPUTER DICTIONARY, Fifth Ed. (Blanton, et. al. Ed.) defines "logical device" as "a device named by the logic of a software system, regardless of its physical relationship to the system," and "logical file" as "a file as seen from a conceptual standpoint, without reference to and as distinct from its physical realization in memory or

storage."  Exh. A at 317.  Similarly, THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS

TERMS, Seventh Edition, defines "logical" as:

> pertaining to a view or description of data that does not depend on the
> characteristics of the computer system or the physical storage; pertaining to the
> form of data organization, hardware or system that is processed by an application
> program; it may be different from the real (physical) form.

Exh. B at 693.  Likewise, "logical database" is defined as "a database containing a collection of

related segments that may reside on one or more physical databases."  *Id.*; *see also* COMPUTER

DESKTOP ENCYCLOPEDIA, Ninth Ed. (Freedman, Ed.), Exh. C at 556 (defining "logical record" as

"a reference to a data record that is independent of its physical location"); DICTIONARY OF

COMPUTER AND INTERNET TERMS, Eighth Edition (Downing, et. al., Ed.), Exh. D at 294 (defining

an example of "logical" as "if a single disk drive is divided into two partitions which the

computer handles separately, it can be said to comprise two logical disk drives.").  These

extrinsic definitions are consistent with the use of the words in the intrinsic record and

JPMorgan's proposed construction.  Clearly, there is a customary definition of "logically

associating," and it is reflected in JPMorgan's construction.  Accordingly, ACS's proposed

construction should be rejected.

### 2.     ACS Does Not Overcome The Heavy Presumption That "Logically Associating" Be Given Its Customary Meaning

With such a convoluted construction, ACS is as far away from the customary meaning of

"logically associating" as possible.  In fact, ACS candidly concedes that its constructions do not

rely on the claim language, but rather, "on the explanation of how to perform the logical

association step provided in column 6 of the specification."  ACS's Brief at 23.  ACS attempts to

improperly import large swaths of the specification into the claim construction and move away

from the term's ordinary meaning.  In fact, ACS lifted language nearly verbatim from one of the

specification's examples of a "logical association" process, in particular, the process shown in

Fig. 3.  Notably, however, the specification refers to this association process as a mere "*example of the association process.*" JA00082, 6:1 (emphasis added).

Again, the standard for altering a claim term's customary meaning is high.  ACS cannot overcome the heavy presumption favoring a claim term's customary meaning by simply pointing to examples or other structures or steps disclosed in the specification or prosecution history. *Phillips*, 415 F.3d at 1323 ("[a]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988) ("Where a specification does not require a limitation, that limitation should not be read from the specification into the claims.").  The standard for restricting a claim with statements in the specification is met only if "the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex*, 299 F.3d at 1327.  There are no such words of restriction here.  Thus, the ordinary and customary meaning proposed by JPMorgan should be adopted.

### 3. Limiting "Logically Associating" To Manually Creating A Connection For Multiple Documents Reads Out Of The Claims An Embodiment That Describes An Automatic Process

ACS's construction requires that for multiple documents with multiple data records, "logically associating" means manually creating a logical connection through an operator at a workstation.  Yet, such a construction would be at odds with the specification, since other alternatives are disclosed. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1345 (Fed. Cir. 2003) (stating that a construction that reads a preferred embodiment out of the claims is rarely, if ever correct).  ACS ignores the specification's description of another embodiment

8

where the association process occurs without any manual intervention.  See JA00081, 4:34-35.
In particular, the specification describes a process where barcodes are imprinted on each
document, such that the barcode "would greatly speed the association process" and cause a
processor performing the association process to be "able to read and recognize each document."
JA00081, 4:25-35.   ACS's proposed constructions have the effect of reading a disclosed
embodiment out of the claims, and further, they improperly limit the scope of "logically
associating" when there is no evidence of any intent by the inventors to do so.   Thus,
JPMorgan's construction should be adopted.

### 4.    ACS May Not Limit "Logically Associating" By Importing Limitations From The Parent Patent's Prosecution History

ACS proposes a third requirement in its Brief not present in its stated clam construction,
namely, that the logical association operation use a "check number."   ACS argues that the
inventors unambiguously disclaimed the process of "logical associating" absent the use of a
check number in the prosecution history of U.S. Patent No. 7,068,832, the parent of the '823
Patent-in-Suit.  ACS's argument focuses solely on the prosecution history of the parent patent
and relies in no part on the prosecution history of the '823 Patent-in-Suit.  The fact that ACS
relies upon ***the parent patent's*** prosecution history rather than that of the patent-in-suit is critical
because the claim language at issue is not present in both patents.

In fact, all of the claims in the issued parent patent require "identifying information
containing…the check number" and "a check data record containing…the check number."   In
contrast, the '823 Patent specifically omits that language from all of the asserted claims.   The
alleged prosecution disclaimer identified by ACS focuses on single claim limitation -- the "check
data record containing…the check number" limitation found in each of the claims of the issued
parent patent.   JA02092 ("…it should be noted that the check data record [of independent claim

13 of the parent patent] includes the check number.  This feature is not disclosed in Kern as discussed above."). However, any isolated statement by the inventors regarding this limitation in the parent patent's prosecution history cannot be directed to the invention as a whole because no claim of the child application contains that limitation.[2]

Where, as here, purported disclaimers are directed to specific claim terms that are omitted in a continuation application (rather than to the invention itself), those disclaimers do not apply to the continuation application.  *Ventana*, 473 F.3d at 1182 ("[T]he doctrine of prosecution disclaimer generally does not apply when the claim term in the descendant patent uses different language."); *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1078 (Fed. Cir. 2005) ("[T]he prosecution of one claim term in a parent application will generally not limit different claim language in a continuation application."); *Advanced Cardiovascular Sys. v. Medtronic, Inc.*, 265 F.3d 1294, 1305-06 (Fed. Cir. 2001) (omitting the claim term to which the prosecution history disclaimer argument was directed precluded those statements from being applied to the child application).

Accordingly, any statements by the inventors in the prosecution history of the parent patent distinguishing prior art based on the presence or absence of a check number are simply

---

[2] In its Brief, ACS compares apples to oranges by representing that "[c]laim 13 as filed in the ***parent*** application is exactly the same as claim 1 in ***the issued*** '823 patent…As such, applicants' statements with respect to claim 13 in the parent application disclaiming systems that did not associate the documents with the check numbers apply to the same claim limitation in claim 1 of the '823 Patent." ACS's Brief at 21-22 (emphasis added).  Leaving aside ACS's misrepresentation that claim 1 of the '823 Patent is "exactly the same" as claim 13 of the parent patent application, ACS predictably fails to inform the Court that claim 13 of the parent patent was cancelled during prosecution; all of the claims of the issued parent include the "check data record containing…the check number" limitation; and none of the claims of the '823 Patent-in-Suit contain this limitation.  Accordingly, the state of claim 13 is wholly irrelevant to the Court's present claim construction analysis.

inapplicable to the '823 Patent where the "check data record containing…the check number" limitation is not found in any of the claims.[3]

### C.   The Specification Discloses Both Manual and Non-Manual Input of Information to Create the "Document Data Record" and the "Check Data Record"

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| check data record | identifying information from a check | a record that stores manually input identifying information from checks, including the check number |
| document data record | identifying information from a document | a record that stores manually input identifying information from a document associated with a check |

JPMorgan's proposed constructions of "document data record" and "check data record," are consistent with the plain language of claim 1 and the specification.  JA00083, 8:4-5 (reciting that the "document data record [] identifies the [] document."); JA00083, 8:12 (reciting that the "check data record [] identifies the check.").

### 1.   The "Document Data Record" Does Not Require "A Document Associated with a Check"

ACS argues that the "document data record" is "from a document associated with a check."  Yet again, ACS fails to point to anything in the claim language or the specification that would overcome the presumption that ordinary meaning controls.  Because the remainder of the claim sets forth language relating the document, check, and other elements of the claim limitation, it is not necessary to describe these relationships in connection with individual terms. Moreover, including this extraneous verbiage in the definition of the term "document data

---

[3] ACS's proposed construction is also contrary to the specification because the inventors made clear that the check number is but one example of a "key" that could be used to logically associate the images and the data records.  JA00082, 6:17-21.  Further, the inventors contemplated that association can be accomplished without using a check number – for example, the "barcode" embodiment (JA00081, 4:25-39) would encode the "key" used to logically associate the data records and images.  Thus, the specification clearly communicates that the association can be carried out in various manners and is in no way limited to a single approach such as using the check number.

record" is likely to cause jury confusion.  Accordingly, ACS's proposed construction should be rejected.

### 2. The "Check Data Record" Does Not Require "A Check Number"

As discussed above, none of the claims of the '823 Patent require that the "check data record" include a "check number."  Indeed, any construction requiring the check data record to contain the check number, as ACS has proposed, would be contrary to the specification, which unambiguously states that one *example* ("e.g.") of identifying information from a check is the "check number."  JA00080, 2:46-49 ("identifying information from each of the checks (e.g., the check number, the amount, etc.)...creat[es] a data record for each check."); *see also* JA00073, Abstract.  The "e.g." is a signal that identifying information could be any of the listed items, or any other identifying items from a check.  Thus, the claims and the specification, read together, indicate that a "check data record" is "identifying information from a check."  In sum, there is no basis in any of the intrinsic evidence for ACS's limitations.

### 3. Limiting "Check Data Record" and "Document Data Record" To Storing Manually Input Data Reads Out Of The Claims An Embodiment That Describes An Automatic Data Input Process

ACS again grafts a limitation from the specification onto the claim when it argues that the document data record and check data record must be created manually.  In fact, the specification states exactly the opposite by describing the invention as including both automatic and manual data input.  JA00081, 4:25-35.  Accordingly, to read automatic data input out of the scope of the claims as argued by ACS would require the Court to exclude from the claims several of the embodiments disclosed in the patent.  As discussed above, a claim should not be read to exclude a preferred embodiment disclosed in the specification.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (to construe a claim to exclude a preferred embodiment in the specification "is rarely, if ever, correct and would require highly

12

persuasive evidentiary support"). Viewed another way, to read manual data input into the claim as a requirement is impermissibly reading into the claim a limitation from the specification.

Indeed, the '823 Patent specification describes no less than five embodiments that do not require manual data entry to create the document data and check data records. First, the patent discloses that information may be automatically harvested from a document or check being processed in the claimed system:

> In an alternative embodiment of the present invention, the customer who utilizes the lockbox processing service of the present invention imprints a bar code on the each of the documents 110 that it sends to its customers (for eventual remittance back to the system of the present invention). The inclusion of the such a bar code on each of the documents 110 would greatly speed the association process as further described below. ***When such a bar code is imprinted on the documents 110, processor 180 is able to read and recognize each document 110, thereby obviating the need for any data entry with respect to the documents (as described below).***

JA00081, 4:25-35 (emphasis added). Second, the patent explains that Optical Character Recognition ("OCR") may be used to harvest data automatically from a document. JA00081, 4:22-24 (disclosing a "convention[al OCR] process"). Third, the specification teaches a Magnetic Ink Character Recognition (MICR) reader may be used to automatically read the MICR data from a check being processed in the system. JA00082, 5:25-27. Fourth, the specification teaches that a processor 180 may automatically process scanned documents 120 containing document information. JA00081, 4:14-20. Fifth, the specification describes semi-automation and full automation at length. JA000081, 6:1-29. Accordingly, these teachings, taken together, refute the limitation ACS seeks to superimpose on the claims, *i.e.*, that data must be manually input to create the document data record and check data record.

**D.    The Disclosure of the '823 Patent and the Prosecution History of the Parent Do Not Limit The Meaning of "Bulk File Interface" to "Transmitting All of the Data and Images for a Customer in a Single File"**

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| bulk file interface | a connection between at least two computer systems, e.g., the Internet, private network, LAN, WAN, VAN, or dial-up connection, allowing for the transmission of data, e.g., FTP | an Internet, private network, or dial up connection between the work station and the customer system for transmitting all of the data and images for a customer in a single file |

JPMorgan's construction of "bulk file interface" is the customary meaning in the field as supported by the intrinsic evidence. *See* JA00080-81, 2:59-3:6; JA00083, 7:16-32. ACS does not challenge it. Instead, ACS once again resorts to arguing that the inventors expressly disclaimed: (1) any "bulk file interface" outside of "Internet, private network, or dial up connection between the work station and a customer system;" and further (2) any interface that does not transmit "all of the data and images for a customer in a single file."

First, contrary to ACS's position, the specification discloses multiple embodiments where data is transferred to customers via a bulk file interface other than "...a connection between the work station and a customer system...":

> ***The present invention envisions several ways in which the lockbox customer may receive its information....The customer has the appropriate software to enable it to search, sort, view and print any of the information as it desires. In a second embodiment,*** all of the customer data is formatted into a bulk file and transmitted electronically to the customer over the Internet, by a private network, or through a dial-up connection. In a third embodiment, the customer information is stored on permanent storage on the system and the customer logs onto the system and selectively search, sort, retrieve, view and print the information electronically over the Internet.

> \*\*\*

> ***In a second alternative delivery method*** according to the present invention, workstation 215 is used to create a bulk electronic file of all of the data and images for a customer.   This bulk file is preferable encrypted for security purposes and transmitted to the customer over the public Internet 220.  ***In another alternative embodiment, this bulk file can be transmitted to the customer using***

> *a private network (e.g., Value Added network (VAN)) or other dial up connection between workstation 215 and the customer system 210.*

*Id.* (emphasis added).  Thus, the specification does not require that the "bulk file interface" be as limited as ACS proposes.

Second, ACS urges that data transmission via a bulk file interface occurs only through the transmission of a single file.  However, there is simply no support for ACS's additional "single file" requirement in the plain language of the claim or the specification.  JPMorgan's construction, in contrast, is proper because it does not import such extraneous limitations into the claims.  Accordingly, ACS's proposed construction should be rejected.

### E.   The Intrinsic Evidence Does Not Require That "Document Capture Memory" and "Check Capture Memory" Be Separate

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| document capture memory | This claim term should be accorded its plain and ordinary meaning as understood by one skilled in the art, i.e., a memory that stores images and data relating to documents | memory separate from the check capture memory that stores document images and data records |
| check capture memory | This claim term should be accorded its plain and ordinary meaning as understood by one skilled in the art, i.e., a memory that stores images and data relating to checks | memory separate from the document capture memory that stores check images and data records |

JPMorgan's proposed constructions of "document capture memory" and "check capture memory" reflect customary meanings in the field as supported by the intrinsic evidence.  ACS's proposed constructions, in contrast, impose the additional limitation that the "document capture memory" be "separate from the check capture memory[.]"  However, the claim language, specification, and prosecution history do not support this restriction.

First, it is undisputed that the claim language does not require that the document capture memory be physically separate from the check capture memory.  The mere fact that the "document capture memory" and "check capture memory" are separately recited in the claims is

insufficient to mandate that they be physically "separate and distinct" structures. *See Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1305 (Fed. Cir. 1999) ("[A] particular means may perform more than one function."); *Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1374 (Fed. Cir. 2000) (noting "[i]t is perfectly permissible for the front sides of the first interior sleeve to provide both support for the fluorescent tube [thus meeting "support means . . ." limitation] and electrical connections for the tube contacts [thus meeting "electrical means . . ." limitation].").

Since it cannot rely on the explicit claim language, ACS argues that two separate memory devices are implicitly required by the claims. Specifically, ACS suggests that two memory devices are implicitly required in order for the system to "retrieve" check images from the "check capture memory" and "store" check images in the "document capture memory." ACS's Brief at 14. The Federal Circuit, however, has decisively rejected this type of argument in the past. *See NTP v. Research in Motion, Ltd.*, 418 F.3d 1282, 1297 (Fed. Cir. 2005); *see also Avid Identification Sys. Inc. v. Phillips Electronics N. America Corp.*, 2006 U.S. Dist. LEXIS 35477, at *50-51 (E.D. Tex. Feb. 3, 2006) (rejecting proposed construction that a memory storing "alterable" data must be separate and distinct from a memory storing "unalterable data" where the claim does not require a first or second "type of memory," nor does it require that the alterable memory be physically distinct from the unalterable memory).

The *NTP* case is squarely on point. In *NTP*, the accused infringer argued that because the claim at issue required that information must be "transferred" between a receiver processor and a destination processor, *i.e.*, moved from one place to another, it implied that the receiver processor and the destination processor must be separately housed. In rebuttal, the patentee argued that the claims' requirement that information is "transferred" between two entities does

not necessarily require the physical separation of those entities.  For example, the patentee pointed out that a "transfer" of information can equally occur between two entities that are physically housed together.  The Federal Circuit agreed and "decline[d] to impose [the accused infringer's] additional restriction on the claims." *NTP* at 1311.

ACS's argument here is nearly identical to the accused infringer's failed argument in the *NTP* case.  Specifically, ACS argues that because the claims of the '823 Patent require a processor to "retrieve...from" a memory and "store...in" a memory, the claims also implicitly require that the memories must be separate.  However, as was the case in *NTP*, a processor "retriev[ing]...from" a memory and "stor[ing]...in" a memory is essentially just engaging in a "transfer" information from one place to another.  The fact that information is "retrieved" from a memory and "stored" in a memory does not necessarily require the physical separation of those memories.  The retrieval and storage of information can equally occur between two entities that are physically housed together.

For example, nearly every desktop PC has a physical hard drive or hard disk.  This one physical hard drive can be divided – or "partitioned" – into one or more "memories" that are each referred to by a separate name to organize data (*e.g.*, "C: Drive," "D: Drive," etc.).  (Of course, a partitioned hard drive is not physically divided, but rather, logically divided into discrete parts.)  Data can be "retrieved from" a C: Drive and "stored in" a D: Drive with a click of a mouse.  However, this retrieval and storage of information occurring between the C: and D: drives happens in "memories" that are physically housed together.

In another example, two folders located on the same "memory" (*e.g.*, the C: Drive) can be designated with different names (*e.g.*, "A" and "B").  Data can be "retrieved from" Folder

"A" and "stored in" Folder "B" by simply dragging and dropping icons in a Windows environment. This retrieval and storage of information occurs on the same physical device.

Similarly, relational databases separate information into numerous tables. The tables for a relational database are linked to each other through the use of keys. Data can be "retrieved from" Table "A" and "stored in" Table "B." Like in the earlier examples, this retrieval and storage of information does not require that the tables be physically separate. Accordingly, the fact that the claims require that information is retrieved from the document capture memory and stored in the check capture memory does not support a construction where the memories are separate as ACS suggests.

ACS's proposal that the Court limit the claims to systems having physically separate memories again violates the rule against importing limitations into the claims from the specification. *See Phillips*, 415 F.3d at 1320, 1323. In its Brief, ACS's wholly relies upon the depiction of two icons representing memories in Fig. 1 of the '823 Patent in support of its argument. However, the specification's "Summary of the Invention" section states that document data records are stored in "a database" and that check data records are stored in "a database," thus contradicting ACS's suggestion that there must be "separate" memories or databases. JA00080, 2:40-49. Because the specification states that document data records may be stored in the same database as check data records, ACS's proposed construction must be rejected. JA00082, 5:33-46; *see id.*, 5:59-61.

Finally, ACS inappropriately relies on statements made by the Examiner in stating his Reasons for Allowance as evidence that the present invention must include a document capture memory separate from the check capture memory. ACS's reliance on this item in the prosecution history is misplaced because the Federal Circuit has repeatedly held that "unilateral

statements of an examiner in stating reasons for allowance" cannot create a clear and unambiguous disavowal of claim scope and give rise to prosecution history estoppel, because "after all, *the applicant has disavowed nothing.*" *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1345 (Fed. Cir. 2005) (emphasis added). The Federal Circuit also recognizes that the inventors' silence regarding statements made by the Examiner during prosecution, without more, cannot amount to a "clear and unmistakable disavowal" of claim scope. *See 3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1373-4 (Fed. Cir. 2003) ("Prosecution history...cannot be used to limit the scope of a claim unless the applicant took a position before the PTO."). An applicant's silence in response to an examiner's characterization of a claim does not reflect the applicant's clear and unmistakable acquiescence to that characterization if the claim is eventually allowed on grounds unrelated to the examiner's unrebutted characterization.").

Here, ACS does not present any case law that stands for the proposition that an Examiner's unilateral statements in a Notice of Allowance constitute an inventor's clear and unambiguous disavowal of claim scope. This is not surprising, since the law "precludes drawing inferences from an applicant's decision to decline comment on an Examiner's Statement of Reasons for Allowance." *Salazar*, 414 F.3d at 1354. Moreover, to the extent they can be understood, the Examiner's statements reflect his view that in a general sense the invention has structural and functional differences as compared to the prior art. He is not articulating the particular distinction ACS argues as part of its claim construction. Accordingly, ACS's construction finds no support in the prosecution history.

In contrast, JPMorgan's straightforward constructions of "document capture memory" and "check capture memory" are consistent with the specification and other intrinsic evidence,

and should be adopted.  First, the claim language recites that the document capture memory "stor[es] the document image and the document data record,"  JA00083, 8:6-8, and the check capture memory "stor[es] the check image and the check data record."  JA00083, 8:13-15. Second, the specification supports JPMorgan's proposed construction because it describes that "a separate data record is generated for each document 110…and is included in database 170 [(or database 135)]." JA00082, 5:33-35; *see* 5:43-46; *see also* 5:59-61; JA00077, Figure 1 (computer 115 input into database 135).  Document images, according to the written description, are stored on an image file server "in the document capture memory 130."  JA00081, 4:13-14.  Thus, one of ordinary skill in the art would understand, after reading the patent, that the document capture memory includes a storage area for the document data records, and a storage area for the document images, which can be in the same, or different locations, and that these storage areas comprise the claimed "document capture memory."  Likewise, the specification is consistent in teaching that "a [check] data record is generated in database 170 for each check 105" and that "check images are [] stored on an image file server 175 and the check images are linked to their respective check data record in database 170." JA00082, 5:23-31.  Thus, the patent explains that the check capture memory, referenced in Fig. 1, includes a storage area for the check data records, and a storage area for the check images, and these storage areas comprise the claimed "check capture memory."  Accordingly, JPMorgan's proposed constructions should be adopted and ACS's proposed construction should be rejected.

**F.     The Intrinsic Evidence Does Not Limit the Meaning of "Document Capture Component" and "Check Capture Component" to Two Physically Separate Scanners**

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION[4] |
|---|---|---|
| document capture component | a scanner that captures document images and a processor programmed to generate a document data record | a scanner that images documents and a workstation to generate a document data record that are separate from the check capture component |
| check capture component | a scanner that captures check images and a processor programmed to generate a check data record | a scanner that images checks in parallel with the scanning of the documents by the document capture component and a workstation used to manually input data from each check to generate a check data record |

ACS's proposed constructions for "document capture component" and "check capture component" require that they are two, physically separate scanners.[5]   Like its proposed constructions for "document capture memory" and "check capture memory," ACS's proposed constructions here find no support in the plain claim language, the specification or the prosecution history.

First, it is undisputed that ACS's "separate scanners" requirement does not appear in the claim language.  In order to overcome the heavy presumption in favor of the ordinary meaning of claim language, the Federal Circuit has said that "a party wishing to use statements in the written description to confine or otherwise affect a patent's scope must, at the very least, point to a term or terms in the claim with which to draw in those statements."  *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1248 (Fed. Cir. 1998).  "That is, claim terms cannot be narrowed by reference to the written description or prosecution history unless the language of the

---

[5] ACS further argues in a footnote that the '823 Patent is invalid should JPMorgan successfully convince the Court to adopt its proposals for these terms.  However, the court's validity analysis cannot be used as basis for adopting a narrow construction of the claims.  Instead, any validity issues that ACS preserves and wishes to press can be addressed at trial.  *See Liebel-Flarsheim Co. v. Medrad, Inc.,* 481 F.3d 1371, 1375 (Fed. Cir. 2007).

claims invites reference to those sources." *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989-90 (Fed. Cir. 1999); *see, e.g., McCarty v. Lehigh Val. R.R.*, 160 U.S. 110, 116, 16 S.Ct. 240, 40 L.Ed. 358 (1895) ("[I]f we once begin to include elements not mentioned in the claim in order to limit such claim ..., we should never know where to stop."); *Renishaw*, 158 F.3d at 1249. In other words, ACS must point to a textual reference in the actual language of the claim with which to associate a proffered claim construction. ACS has proffered no such textual reference.

Instead, ACS points to the fact that the two limitations are referred to by different names. However, as discussed above, the fact that two claim limitations are called by different names does not require that the limitations be physically "separate and distinct." *See NTP*, 418 F.3d at 1309-11 (Fed. Cir. 2005) (finding that elements in a claim are not required to be "separate and distinct" without some "textual 'hook' in the claim language" requiring them to be so); *see also Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1150-51 (Fed. Cir. 2003); *Network Appliance, Inc. v. Bluearc Corp.*, No. 03-5665, 2004 WL 5651036, at *30 (N.D. Cal. Nov. 30, 2004) (refusing to read in phrase "distinct from mass storage device" where "no such limitation appears in the language of the claims"). Indeed, the Federal Circuit specifically recognizes that a single element can perform more than one recited function, and thus, are not required to be separate. *Rodime*, 174 F.3d at 1305; *Lampi Corp.*, 228 F.3d at 1374.

ACS next argues that the '823 Patent's specification implicitly requires that "document capture component" and "check capture component" be limited to physically "separate scanners."[6]    However, the specification does not describe "with reasonable clarity,

---

[6] Additionally, ACS references a "workstation" in its construction, but the claim language does not recite a "workstation." The specification mentions in one example that, in conjunction with a scanner, a workstation may be used by an operator to manually generate records of data harvested from the scanned documents. JA00082, 5:32-37. However, the specification also teaches that a processor 180 may process scanned documents 120 containing document information. JA00081, 4:47-50, 4:14-20. Thus, the specification describes document data records input at workstations as well as created by processors.

deliberateness, and precision" this requirement of "separate scanners" as proposed by ACS.  *See*

*In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).  In fact, ACS does not point to a single place

in the specification that describes a system requiring two physically separate scanners.  Instead,

ACS relies solely on the fact that Figure 1 of the '823 Patent separately illustrates icons

representing the "document capture component" and "check capture component."    ACS

transparently distorts Figure 1 to support its argument.   As shown below in a side-by-side

comparison of ACS's distorted "Figure 1" and the original Figure 1 from the '823 Patent, ACS

re-orients drawing elements to make it look like documents 110 are solely part of the ACS titled

"document" imaging path, instead of part of ***both*** the ACS titled "document" imaging path and

the ACS titled "check" imaging path, where no such distinction is described or implied by the

specification.   However, ACS's reliance on this manipulated version of "Figure 1"  with its

conveniently placed icons does not effectuate the disavowal that ACS seeks.    Instead, a plain

reading of original Figure 1 and the specification make clear that documents 110 are input into

both the check database 165 and the document database 130.

---

Also, the specification references such workstations as computers, so a person of ordinary skill in the art
would understand that workstations contain processors that allow them to generate the document data
records. *See* JA00077, Fig. 1 at 115, 145, and 160.



Moreover, contrary to ACS's arguments, *Gaus v. Conair, Corp.*, 363 F.3d 1284 (Fed. Cir. 2004), is inapposite.  There, the Court held that a narrow interpretation of a disputed term was compelled because of statements in the written description that made clear that the structural separation of a double conductor from voltage-carrying electrical operating unit was ***essential to the operation of the device in the prescribed manner.***  *Id.* at 1289 (emphasis added).  Here, there is no such unambiguous language in the specification; nothing suggests that "document capture component" is required to be physically separated from the "check capture component." *Cf. id.*  In fact, the person of ordinary skill in the art would readily recognize that there is overlap between the check capture component and the document capture component so that they need not be separate.  For example, the '823 Patent describes that the document data record is input by

workstation 160 directly into the check capture database. (JA00082, 5:32-37.)  The specification also describes an alternative embodiment where the document data record is input into the document capture database. (*Id.*, 5:43-46.)  Thus, "document capture component" is not required to be physically separated from the "check capture component."

ACS also argues that the Examiner understood that the terms "document capture component" and "check capture component" meant separate scanners during the prosecution of the '823 Patent's parent patent.  In particular, ACS urges that because the Examiner, in an Office Action, represented that "[i]t is understood by the examiner, the document data record is generated by the document capture component, rather than a check capture component," ACS's Brief at 11, citing JA02627, that "the examiner understood the document capture component and check capture component as two separate components."[7]  On the contrary, the Examiner's statement simply reflects his understanding that the document capture component creates the document data record – as recited in the claim.  Contrary to ACS's argument, the Examiner says nothing about two separate scanners.

Moreover, ACS overlooks the fact that the Examiner cited as prior art against the inventors' application certain references teaching only a single scanner.  *See* U.S. Patent Nos. 5,874,717 ("Kern"), 4,205,780 ("Burns"), and 5,602,936 ("Green").  For example, Kern describes a single scanner, and was cited by the Examiner as anticipatory art against the '823's parent patent.  *See* Kern, Fig. 1.  Neither the Examiner nor the inventors distinguished the invention from Kern on the basis that the claims require two separate scanners, while Kern

---

[7] Once again, ACS inappropriately relies on statements made by the Examiner as evidence that the present invention must include a particular feature.  As discussed above, ACS's reliance on this item in the prosecution history is misplaced because the Federal Circuit has repeatedly held that "unilateral statements of an examiner" cannot create a clear and unambiguous disavowal of claim scope and give rise to prosecution history estoppel.  *Salazar*, 414 F.3d at 1345.

describes only one.  Thus, it cannot be said that the Examiner "understood" the present invention to require two, separate scanners.

Further, ACS argues that because the check capture component must operate "in parallel" with the document capture component – they must be separate scanners.[8]  In particular, in its Brief ACS states that JPMorgan fails to "recognize that the 'document capture component' and the 'check capture component' are separate components *operating in parallel to reduce the inefficiency of imaging documents and checks using a single scanner.*"  ACS's Brief at 5 (emphasis added).  However, this parallelism requirement is blatantly and improperly adopted from an embodiment described in the specification.  *See* JA00082, 5:17-19.  Additionally, the purported reason ("to reduce the inefficiency of imaging documents and checks using a single scanner") is made up from whole cloth by ACS.  Nowhere does the specification make that statement.

Moreover, the specification's statement that the "document capture component" and "check capture component" can work in parallel does not compel a construction that these components are physically separate scanners.  *See, e.g.,* JA00073, Abstract ("[i]n parallel to the scanning of the documents, the checks are scanned and images are created for each of the checks.").  Computers are often used to do several tasks in parallel, while using the same machine.  Performing multiple tasks at the same time using the same resources is the essence of multitasking.  For example, in data handling, "parallel" is defined as "of or relating to handling more than one event at a time, with each event having its own portion of the system's resources."  MICROSOFT COMPUTER DICTIONARY, Fifth Ed. (Blanton, Ed.), Exh. A at 389.   Thus, the

---

[8] ACS also attempts to limit the generation of the check data record to only manual data entry.  Not only is this concept found nowhere in the claim's plain language, it is also directly contrary to the automatic generation of a check data record disclosed by the specification with the MICR reader discussed above. JA00082, 5:25-27.

specification here is referring to the allocation of the system's resources for performing the check capture and document capture functions. Therefore, contrary to ACS's argument, this reference to "parallelism" does not require two physically separate scanners. Moreover, the specification teaches away from such a restriction by repeatedly emphasizing that the operations of the invention can take place in various sequences. *See, e.g.*, JA00080, 2:40 ("Either before or after the documents are scanned . . ."); JA00082: 5:2-4 ("After the scanning process is complete . . . (or alternatively during real time during the scanning process"); *id.*, 5:40 ("[t]here is no preferred order"). In short, ACS's attempt to graft a requirement that the document capture component and check capture component limitations be separate has no basis in the law, the specification or the asserted claims.

JPMorgan's proposed construction, in contrast to ACS's, is informed by and entirely consistent with the claims, specification, and prosecution history of the parent patent. Specifically, the specification supports JPMorgan's interpretation by teaching that a "scanner" scans the documents received into the lockbox processing system, and that the scanner outputs image files that represent the scanned documents. JA00081, 4:6-13. The specification also teaches that a "scanner" scans the checks received into the lockbox processing system, and that the scanner outputs images files that represent the scanned checks. JA00082, 5:27-31. Thus, a scanner scans the documents in order to capture check images. A person of ordinary skill would understand, then, that a scanner is the part of the system that scans the document and generates an image of the document. Thus, the specification supports JPMorgan's construction of the term to include a scanner and processor. In sum, JPMorgan's proposed construction is consistent with the claim language, the specification, and the file history and should be adopted. Accordingly, ACS's proposed construction should be rejected.

### III.    U.S. PAT. NO. 5,917,965

#### A.    ACS's Proposed Construction of "Decoded Magnetic Ink Coded Data" Is Copied Verbatim From an Uncorroborated Website Advertisement for Toner Products and Is Inconsistent with the Claims and the Specification

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| decoded magnetic ink coded data | This claim term should be accorded its plain and ordinary meaning as understood by one skilled in the art, e.g., decrypted magnetic ink coded data. | machine recognized data based on the magnetic signal created by each magnetic ink character's unique shape |

JPMorgan and ACS agree that the proper construction for the term "magnetic ink code line" is "a series of alpha numeric digits encoded in magnetic ink." Given that agreement, JPMorgan urges that the proper construction for "decoded magnetic ink code data" is straightforward – *e.g.*, data converted from encoded magnetic ink back to its original form. Rather than adopt this logical construction, however, ACS, in an effort to impermissibly add limitations to this claim term, improperly relies upon extrinsic evidence copied from a website advertisement for toner products. These additional limitations are not found in the specification or claims.

In particular, ACS urges that the term "decoded magnetic ink code data" requires: (1) that "each magnetic ink character" have "a unique shape" and (2) that data is read using a "magnetic signal." In its Brief, ACS represents to the Court that:

> *the explanation provided in the specification is consistent with "the understanding of one of skill in the art"* that MICR data is magnetically encoded and decoded: "magnetically charged printing allows *each character to be recognized based on the magnetic signal created by each character's unique shape.* These shapes create a unique magnetic 'fingerprint' which allows the reader-sorter machines to recognize each character."

ACS's Brief at 33-34 (emphasis added). However, ACS's construction is not found in the claims, nor is it "consistent with the specification" and "the understanding of one of skill in the art" as ACS urges. Rather, ACS's proposed construction it is copied from an uncorroborated

website selling toner products dated years after the '823 Patent was filed, as shown below in yellow:

numbers and symbols specifically designed for readability on check sorting machines which read at extremely high rates of speed.  The symbols provide a beginning and ending point for each group of numbers allowing the machine to quickly determine what each series of number signifies.  Line placement, character placement, skew and quality are several critical components of printing MICR; the line must be precisely positioned in the MICR Clear Band area.  To create consistency in the check clearing process it is critical that each character is readable and that the printing methods are reliable.

Some key phrases that you need to know in order to understand "What is MICR" include:

MICR (Magnetic Ink Character Recognition)

MICR Printing

MICR Toner



Information Provided by:

MICR is a technology which uses magnetically charged ink or toner to print the numbers and special characters on the bottom of checks or other financial documents. TROY produces MICR toner with the tightest tolerances allowing them to consistently meet or exceed the yield of your OEM cartridges. To learn more about the history of MICR and TROY click here.

**MICR, Magnetic Ink Character Recognition:**

MICR is the technology which allows the characters printed on the bottom of the check to be read by reader-sorter machines.  A special formulation of ink or toner, MICR can be printed with impact machines, on a printing press, or a laser printer.

The magnetically charged printing allows each character to be recognized based on the magnetic signal created by each character's unique shape.  These shapes create a unique magnetic "fingerprint" which allows the reader-sorter machines to recognize each character.  Since MICR is a machine readable process, it is imperative that each character is accurately placed and is free of irregular marks or voids. The uniformity of print is another key component to readability.

*See* ACS's Brief at Exh. 3; http://www.whatismicr.com/.   Contrary to this advertisement, however, neither the claims nor the specification require that each magnetic character have a "unique shape."

According to the '823 Patent's specification, a particular magnetic ink character corresponds to an alpha-numeric digit.  In a MICR line, the same digit may be represented numerous times, *e.g.*, the digit "0" is repeated five times in the line "000001234."  The magnetic characters in a MICR line representing the digit "0" would have the same – not a unique – shape. Put another way, the MICR line highlighted below contains forty-seven magnetic ink characters. However, those magnetic ink characters only have nine "unique shapes."

ACS's construction excludes from the claim scope the MICR line shown above since not every

magnetic ink character on that check has a "unique shape."  *See Vitronics*, 90 F.3d at 1583

(finding a construction that reads out the preferred embodiment is "rarely, if ever, correct.")

In contrast to ACS's proposal, JPMorgan's construction is consistent with the claim

language, which refers to "decoding" the MICR data to form the "decoded magnetic ink coded

data."  The specification also supports this construction by using the term "decoded" to identify

the data decoded from the magnetic ink code line.  *See* JA00047, 9:7-9 ("[T]he invention further

comprises electronically reading and decoding the magnetic ink code line to form decoded

magnetic ink coded data …"); JA00049, 14:65-67.  JPMorgan's construction is proper because it

does not import extraneous limitations into the claims.   Accordingly, ACS's proposed

construction should be rejected.

    **B.**    **The Claims, Specification, and Prosecution History Expressly Contradict ACS's Positions That "Tagged image File Format (TIFF) File" Must Be a "Standard" File Format and "Tag Field in the TIFF File" Requires "Merging" and "Storing" of Tag Fields**

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| tagged image file format (TIFF) file | a file format for storing images and data in tag fields | a standard file format for storing images and data in tag fields currently under the control of Adobe Systems |
| tag field in the TIFF file | a data field in a TIFF file | a data field defined by the TIFF standard that is merged into the same TIFF file and stored in the same |

30

| | | physical electronic storage device as the image data |
|---|---|---|

ACS's proposed construction of "tagged image file format file" requires the additional limitations that such a file format be a "standard" format "currently under the control of Adobe Systems." The intrinsic evidence does not support these extraneous limitations.

First, the claims do not mention "standard" files or "Adobe Systems." Instead, the term "tagged image file format" is used without any requirement that a TIFF is a "standard" TIFF. *See* JA00069, Claim 1, ("tagged image file format (TIFF) file"). Second, the specification contradicts ACS's proposal. For example, when describing a preferred embodiment, JA00051, 17:58-62, the specification indicates that an image from a scanner ***can be converted into*** a "standard Tagged Image File Format." *Id.*, 18:40-46; JA00050, 15:1-4 ("In accordance with the preferred embodiment of the invention, the digital images of the front and back of the check 1 are merged, by the control computer 201, into a single TIFF (Tagged Image File Format) file 22"). Thus, the inventors contemplated that not all images are "standardized." Third, as ACS acknowledged in its Brief, the prosecution history indicates that "new fields" were developed for use with the present invention that "were not available in standard file formats." ACS's Brief at 31; *see* JA00591. In particular, the inventors stated:

> ***The Examiner may not be aware that the assignee of the present invention registered the new fields that were created specifically for the purposes of this invention*** with the Aldus Corporation which developed the TIFF standard. See the disclosure at page 20, line 17 (as amended) for the reference to Aldus. ***These fields were not available in the standard file formats, contrary to the assertion in the Office Action.***

JA00591 (emphasis added). Moreover, the prosecution history makes plain that "at the time of the development of the instant inventions, ***TIFF was an emerging standard and it was not at all obvious that these fields should be added [to TIFF files] in the manner in which the inventors herein have done.***" JA00591-593 (emphasis added). Accordingly, the intrinsic evidence leaves

31

little doubt that the claims are not limited to a "standard" TIFF under the control of Adobe Systems and ACS's attempt to import this limitation must be rejected.

Similarly, ACS's proposed construction of "tag field in the TIFF file" improperly requires that the tag field is "merged into the same TIFF file and stored in the same physical electronic storage device as the image data." ACS's attempt to add these functional requirements into the meaning of the term "tag field in the TIFF file" is inconsistent with the claim language. For instance, the claims contain no mention of storage "in the same physical electronic storage device as the image data." Moreover, the claims contain separate limitations concerning the "merging" and "storing" of the "TIFF file." *See, e.g.,* claim 1:

> 1. A method for storing electronic images of documents having printed or written indicia thereon and further having a magnetic ink code line, the method comprising:
> ...
> ***merging said electronic image*** and said decoded magnetic ink coded data into a tagged image file format (TIFF) file, with the decoded magnetic ink coded data ***stored in a tag field in the TIFF file***, each document being associated with a TIFF file; and
>
> ***storing the TIFF file in an electronic storage device.***

JA00069 (emphasis added). Adopting ACS's proposal to add similar but different limitations into the meaning of "tag field in the TIFF file" will render the additional claim language redundant at best, irreconcilable at worst.[9] Accordingly, ACS's construction should be rejected.

---

[9] Substituting ACS's proposed definition for "tag field in the TIFF file" would result in claim 1 reading as follows: "merging said electronic image and said magnetic ink coded data into a tagged image file format (TIFF) file, with the decoded magnetic ink coded data merged into the same TIFF file and stored in the same physical electronic storage device as the image data, each document being associated with a TIFF file; and storing the TIFF file in an electronic storage device."

**C.    The Specification and Prosecution History Expressly State That the Meaning of "Binary Large Object (BLOB)" Is "As Commonly Used in the Field"**

| CLAIM TERM | JPMORGAN'S CONSTRUCTION | ACS'S CONSTRUCTION |
|---|---|---|
| binary large object (BLOB) | a collection of binary data stored as an entity in a database | a collection of TIFF images stored as a single entity in a database |

JPMorgan's construction of "binary large object (BLOB)" is supported by the specification and the prosecution history.  For example, the prosecution history states that: "[t]he instant inventors *define BLOB* on page 36, line 18, *as a Binary Large Object, as is commonly used in the field*."  JA00593 (emphasis added).  ACS's Brief acknowledges the inventors' statements.  ACS's Brief at 35.  Despite that acknowledgement, ACS urges improperly limiting the meaning of "BLOB" to a collection of "TIFF images" stored as a "single" entity in a database.

In addition to contradicting the prosecution history, ACS's construction also contradicts the plain language of the claims.  Specifically, with respect to claim 3, "a plurality of ... TIFF *files*" are grouped as a binary large object or BLOB.  JA00069, 54:46-51.  ACS's construction of binary large object recasts the language of the claims, inserting TIFF *images* for TIFF *files*, and adding a separate requirement that the TIFF *images* "be stored as single entity."  Substituting ACS's proposed definition for "binary large object (BLOB)" would result in claim 3 reading essentially as follows: "grouping a collection of said TIFF files into a collection of TIFF images."  Furthermore, in addition to being internally inconsistent, ACS's proposed construction thus ignores the specification's teaching that a BLOB contains other data, *e.g.*, financial information.  Accordingly, ACS's construction should be rejected.

**D.     ACS's Constructions for the Eight Disputed Means-Plus-Function Limitations Improperly Include Extraneous Steps Not Necessary to Perform the Recited Functions**

ACS proposes that the Court read large portions of the specification into the claims without regard for whether such portions actually describe the steps necessary to perform the recited functions of the eight disputed means-plus-function limitations.

In particular, ACS proposes that the structure corresponding to any of the eight recited functions is a computer programmed to perform either the "Requester Process" or the "Retrieval Process." ACS's broad-brush approach should be rejected because it neglects to describe the discrete steps and sub-steps recited in the specification that are truly "necessary to perform the recited function of the claim." *See St. Clair Intellectual Property Consultants, Inc. v. Matsushita Elec. Ind. Co., LTD*, No. 04-1436, 2009 WL 3834541, at *19 (D. Del. Nov. 13, 2009) (determining "in light of the *Aristocrat* line of cases" to reject a claim construction that included "structures. . . [not] necessary to perform the described function.").

For example, with respect to the "means for searching said BLOB index by using the account number and check number of the requested check" claim term, ACS broadly defines the structure for performing the recited function as a computer that performs the *entire* "Requester Process" described in the specification. However, the structure corresponding to a recited function should be limited to the algorithmic steps *necessary* to perform the function stated in the claim. *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1254 (Fed. Cir. 2005); *St. Clair*, 2009 WL 3834541 at *19. The Federal Circuit has consistently held that a corresponding structure that includes extraneous features is overly broad and impermissible. *See, e.g., Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). Here, the "Requester Process" includes many additional steps that are not necessary to perform the stated function. *See, e.g.*, JA00055, 25:47-50 (steps for reading check requests); *id.*, 26:4-15 (steps for processing a search

34

wherein more than one TIFF file is located and wherein no TIFF files are located).  By way of example, ACS admits in its Brief that the Requester Process performs the step of: "comparing the account number in the request to the list to determine if the requester is authorized to make requests from the account specified by the account number." *See* ACS's Brief at 37-38 (citing JA00055, at 25:39, 58-64).  This step is unrelated to and unnecessary for the performance of the recited function of this claim term.

In contrast, the specification enables and makes clear to one of ordinary skill in the art the necessary steps to perform the claimed function, namely, that the "check to confirm that the user is authorized is done by verifying that the account with which the request check is associated in on the user's valid accounts file." *See* JA00055, 26:35-45.  Accordingly, ACS's proposal that the entire "Requester Process" is the appropriate algorithm for performing the recited function is overbroad.  In contrast, the corresponding structure is appropriately identified by JPMorgan as limited to a special purpose computer that is specifically programmed to "search an index database for a check request using an account number and a check."

Likewise, with respect to the claim term "means for determining the platter associated with each request and forming a listing of the requests for each platter," ACS also defines the structure corresponding to the recited function to be a computer that performs the entire "Requester Process."   However, as discussed above, the Requester Process includes many additional steps not required to perform this function.

Unlike ACS's broad construction, JPMorgan's construction is correctly tailored to reflect the specification's algorithm in support of this function.  For example, the specification discloses an algorithm that converts the account number, check number, and/or the amount of the requested check into a path and file name and then locates the corresponding path and file name,

if it exists.  *See* JA00055, 25:50 - 56.  The specification further discloses interrogating the meta-data to determine the platter upon which the requested TIFF file is present.  *See id.*, 25: 56 - 60.  The algorithm then sorts all of the requests by platter and platter side.  *See id.*, 26:25-27.

Alternatively, the specification discloses an algorithm that performs a search of the index database 30 for each check image request in the request queue to determine whether or not an index record exists corresponding to that request, and thus, the check image is present on the image storage device.  *See* JA00057, 29:20-25.

Finally, the specification discloses obtaining the location of the check image from the index record and interrogating the stored meta-data to determine the platter and side upon which the corresponding TIFF file is located.  *See id.*, 29:36-41.  In each of the disclosed embodiments, the algorithm may be generally described as "interrogating the storage space to determine the platter associated with the request."  *See Harris,* 417 F.3d at 1254 (generally describing and construing disclosed algorithm in light of detailed disclosure in numerous paragraphs of specification and figures).  Thus, ACS's proposal is overbroad and should be rejected.

Similarly, ACS broadly defines the structure corresponding to the recited function for all of the remaining six claim terms to be a computer that performs the ***entire*** "Retrieval Process" described in the specification.  However, like the "Requester Process," the "Retrieval Process" includes many additional steps that are not necessary to perform the six particular stated functions.  *See* JPMorgan's Opening Brief at 33.  By way of example, in its Brief ACS submits that the Retrieval Process includes the additional step of "comparing the account number in the request to the list to determine if the requester is authorized to make requests from the account specified by the account number."  *See* ACS's Brief at 37.  On its face, this additional step in the "Retrieval Process" is not necessary to perform the function of a number of claim limitations

including "means for verifying each request for a check to insure that the user placing the request is authorized." Thus, ACS's claim construction is impermissibly broad. In contrast, the '965 Patent plainly discloses that the algorithm for this function is to "check to confirm that the user is authorized [] by verifying that the account with which the request check is associated in on the user's valid accounts file." *See* JA00055, 26:35-45. This description enables and makes clear to one of ordinary skill in the art the necessary steps to perform the claimed function. *See TruePosition, Inc. v. Andrew Corp.*, 507 F. Supp. 2d 447, 459 (D. Del. 2007). Therefore, the corresponding structure is appropriately identified by JPMorgan as limited to a special purpose computer that is specifically programmed to "verify the request against a valid perform the Retrieval Process accounts file, and its equivalents."

Thus, contrary to the proper process for construing computer implemented means-plus-function limitations, ACS incorporates multiple extraneous paragraphs of the specification and figures as the required algorithm for performing each of the eight recited functions, but ACS fails to identify the particular algorithm that performs each function at issue. Accordingly, ACS's proposed construction should be rejected.

## IV.   CONCLUSION

For the foregoing reasons, JPMorgan respectfully requests that the Court adopt its proposed constructions.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Scott L. Robertson
Thomas J. Scott, Jr.
Stephen T. Schreiner
Eleanor M. Hynes
GOODWIN PROCTER LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 346-4000

Michael S. DeVincenzo
Andrew N. Stein
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(202) 346-4000

Dated:   December 8, 2009
945462

By: /s/ Philip A. Rovner
     Philip A. Rovner (#3215)
     Hercules Plaza
     P.O. Box 951
     Wilmington, Delaware  19899
     (302) 984-6000
     provner@potteranderson.com

*Attorneys for Plaintiffs*
*JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A., and*
*JPMorgan Chase Electronic*
*Financial Services, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on December 8, 2009, the within

document was filed with the Clerk of the Court using CM/ECF which will send notification of

such filing(s) to the following; that the document was served on the following counsel as

indicated; and that the document is available for viewing and downloading from CM/ECF.

### BY CM-ECF AND E-MAIL

Collins J. Seitz, Jr., Esq.
Kevin F. Brady, Esq.
Connolly Bove Lodge & Hutz LLP
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE  19899
cseitz@cblh.com
kbrady@cblh.com

I hereby certify that on December 8, 2009 I have sent by E-mail the foregoing

document to the following non-registered participants:

Lewis T. LeClair, Esq.
Mike McKool, Esq.
Phillip M. Aurentz, Esq.
David Sochia, Esq.
McKool Smith
300 Crescent Court, Suite 1500
Dallas, TX  75201
lleclair@mckoolsmith.com
mmckool@mckoolsmith.com
paurentz@mckoolsmith.com
dsochia@mckoolsmith.com

Brett E. Cooper, Esq.
McKool Smith
399 Park Avenue
New York, NY  10022
bcooper@mckoolsmith.com

/s/ Philip A. Rovner
Philip A. Rovner  (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com